# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

GAIL, JOHN D. AND JOHN F. CORVELLO, et al.

v. C.A. NO.: 05-0221T

NEW ENGLAND GAS COMPANY, INC.

DEPOSITION OF MATTHEW DIFABIO

in the above-entitled cause, taken on behalf of the Defendant, pursuant to notice, before Jane F. Cormier, CSR, at the offices of Adler Pollock & Sheehan P.C., One Citizens Plaza, Providence, Rhode Island, on Thursday, December 21, 2006, convening at 10:00 a.m.

PRESENT:

FOR THE DEFENDANT.... DAVID E. ROSS, ESQ.
KASOWITZ, BENSON,
TORRES & FRIEDMAN

FOR D.E.M............ DAVID SCHULTZ, ESQ.
R.I. DEPARTMENT OF
ENVIRONMENTAL MANAGEMENT

FOR THE WITNESS...... STEVEN M. RICHARD, ESQ.
NIXON PEABODY LLP

project would be completed by Monday.

MR. ROSS: I'm going to show you what's been previously marked as Exhibit Warroom Exhibit 2.

(DEFENDANT'S EXHIBIT 2 MARKED FOR IDENTIFICATION)

Q. I've placed before you what's been marked as Warroom Exhibit 2. It's a copy of an e-mail from Kevin Worsham to Brian Wagner dated Wednesday, October 18th, at 3:32 p.m. Is that the e-mail that you were just referring to?

A. It is.

Q. Other than that communication, were there any other communications between the time that RIDEM first made contact with Warroom and the time that Warroom was told that it had the job?

A. None.

Q. After this e-mail on October 18th, this Warroom Exhibit 2, what was the next contact with a representative of RIDEM?

A. The next contact would be Brian Wagner calling our general main number to have the project picked up and completed. My sales rep, Kevin Worsham, who authored this e-mail, went out, picked up the project, received instructions, came back to the main office, at which time I got involved, because I looked at the instructions and questioned them.

projects, but there are always times where we're doing something different, and all we do is we follow our instructions as a service provider.

Q. Fine. So now, could you tell me what you said to Brian and what he said to you?

A. Well, my question to Brian was that the documents that we were going to be imaging had privileged documents within the boxes that were either flagged by a post-it or by a colored slip sheet. My understanding was that originally we were going to need to produce two different CDs of all the images, and that they were going to be Bates-labeled with the same prefix, however, on the second CD, on the privileged CD, they were going to be Bates-labeled on the top, privileged. My question at that point was, are the Bates numbers on the privileged CD going to match the Bates numbers on the original CD.

Q. In other words, is it going to be numbered from one to whatever the end document was continuously?

A. I didn't have any question about that. My question was, when we, amongst the six boxes of documents that were produced to us to image, when I get to document number 270, is that first Bates number and whatever is relevant to that document, is that going to have the same Bates numbers on the

second privileged CD as the Bates number in the first CD. And he said yes. So there is no question in my mind that they wanted one CD that was going to have all the documents, including privileged, and one CD that was only going to have the privileged, and that the two of them had to have the same Bates number on both of them; the only difference was the privileged CD was going to have a Bates label at the top that said privileged. The only difference.

Q. So, for example, let's assume for the moment that the first document, number 00001 --

A. Yes.

Q. -- was a privileged document.

A. Right.

Q. Let's just assume that for this hypothetical. Your understanding of the instructions were that that document would be on the master CD, and it would also be the first document of the privileged CD, but in addition to the Bates number at the bottom, it would also have a privileged legend up at the top.

A. Yes.

Q. And is that, in fact, how the job was done?

A. Yes.

Q. Did you review with Mr. Wagner that your understanding was that he wanted two CDs, one with a

master set that would have all the documents, and a second that would have the subset that would only have the privileged documents?

A. Yes.

Q. Did you discuss with him how those two CDs should be labeled; in other words, what should be written on the outside of the actual hard disk CD?

A. No.

Q. Did you discuss anything else with Mr. Wagner in that phone call that you had with him, other than reviewing how the documents were to be Bates-labeled and the fact that there were going to be a total of two CDs that you were producing, one with all the documents, including privileged, and a separate one that was only the privileged documents?

A. My main focus when I spoke to Brian on the phone was to, A, clarify the Bates labeling process, and B, insure what the contents were going to be on each CD. I reiterated several times with him to make sure that we were doing it the way he was looking for it.

He asked for one CD with all the documents, meaning everything, to be contained on one CD, Bates-numbered with the Bates number that he asked for, and the second CD to be only the privileged

documents with the matching Bates numbers, including a privileged stamp on the top of it.

MR. ROSS: Can we now look at what's been marked as Warroom Exhibit 3, which is entitled Special Instructions. What is that document?

A. It's a document to detail and add any clarification for my production staff to follow in addition to our standard document -- excuse me -- production document instruction sheet.

Q. So by special instructions, this is used to clarify or emphasize special handling or directions for your staff in addition to what are your basic policies and procedures?

A. Yes.

Q. Could you take us now through what's actually on the special instructions sheet. Let's start with job number OCT-190. What is that?

A. It's October 190. It would be chronologically ordered each month by job number coming into our facility.

Q. So this job for RIDEM was assigned the OCT-190 unique description, and all the work that you did for RIDEM was under OCT-190?

A. Correct.

Q. And the billing would follow OCT-190, and any person