# EXHIBIT B

Volume I
Pages 1-100

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
ADMINISTRATIVE ADJUDICATION DIVISION

-------------------------------
IN RE: SOUTHERN UNION COMPANY
AAD NO. 06-001/SRE
-------------------------------

VIDEOTAPE DEPOSITION OF JOSEPH "JOSE" SOUZA

Date: February 15, 2007
Time: 10:31 a.m. - 1:25 p.m.
Place: 145 Judson Street
Tiverton, Rhode Island

-----Reporter: Christine Silva-Adermann, RPR-----
All New England Reporting Service
50 Fitzpatrick Road
Grafton, Massachusetts 01519
508-839-1142 Fax 508-839-1768



APPEARANCES:

Representing Petitioner, the Department of Environmental Management:

Sutherland Asbill & Brennan LLP
By: Lewis S. Wiener, Esq.
1275 Pennsylvania Avenue, NW
Washington, DC 20004-2415
202.383.0140 Fax 202.637.3593
lewis.wiener@sablaw.com

State of Rhode Island, Department of Environmental Management, Office of Legal Services
By: Patty Allison Fairweather, Esq.
Susan B. Wilson, Esq.
235 Promenade Street
Providence, Rhode Island 02908-5767
401.222.6607 Fax 222.3378
patty.fairweather@dem.ri.gov

In attendance: Stephen Dahl, Videographer



APPEARANCES:

Representing Respondent, Southern Union Company:
Hinckley Allen Snyder LLP
By: Gerald J. Petros, Esq.
Alexandra K. Callam, Esq.

1500 Fleet Center
Providence, Rhode Island 02903-2393
401.457.5160 Fax 401.457.5161
gpetros@haslaw.com
acallam@haslaw.com

APPEARANCES VIA TELEPHONE:

Representing Petitioner, the Department of Environmental Management:

Sutherland Asbill & Brennan LLP
By: Gerald J. Pels, Esq.
2 Houston Center
909 Fannin, Suite 2200
Houston, Texas 77010
713.470.6100 Fax 713.654.1301



APPEARANCES VIA TELEPHONE:

Representing Respondent, Southern Union Company:

Kasowitz Benson Torres & Friedman LLP
By: David E. Ross, Esq.
Seth B. Davis, Esq.
Eric Herschmann, Esq.
1633 Broadway
New York, New York 10019
212.506.1700 Fax 212.506.1800

Bishop London Brophy & Dodds
By: Christina Carlson Dodds, Esq.
3701 Bee Caves Road
Suite 200
Austin, Texas 78746
512.481.3755 Fax 512.479.5934



I N D E X

| | DIRECT | CROSS | RE-DIRECT | RE-CROSS |
|---|---|---|---|---|
| Mr. Wiener | 14 | | | |
| Mr. Petros | | 59 | | |

E X H I B I T S

EXHIBIT PAGE
Exhibit 1, Mr. Souza's Declaration.........6
Exhibit 2, Map of Tiverton.................6

(Marked, Exhibit 1, Mr. Souza's Declaration)

(Marked, Exhibit 2, Map of Tiverton)

THE VIDEOGRAPHER: We're now recording and on the record. My name is Stephen Dahl. I am a certified legal video specialist for National Video Reporters Incorporated. Our business address is 11 South Angel Street, Providence, Rhode Island, 02906. Today is February 15, 2007, and the time is 10:32 a.m.

This is the deposition of Joseph Souza in the matter of In re: Southern Union Company d/b/a New England Gas Company, notice of violation OC&I/SR 06-01 in the State of Rhode Island and Providence Plantations, Department of Environmental Management, Administrative Adjudication Division, AAD No. 06-001/SRI.

This deposition is being taken at 145 Judson Street, Tiverton, Rhode Island, 02878, on behalf of the petitioner, the Department of Environmental

Management, State of Rhode Island. The court reporter is Christine Silva-Adermann of All New England Reporting Services. Counsel will state their appearance, and the court reporter will



administer the oath.

MR. WIENER: Lewis Wiener for petitioner, Rhode Island Department of Environmental Management.

MS. WILSON: Susan Wilson for petitioner, Department of Environmental Management.

MS. FAIRWEATHER: Patty Allison Fairweather for the Department of Environmental Management, the petitioner.

MR. PETROS: Gerry Petros for the respondent.

MS. CALLAM: Alexandra Callam also for the respondent.

MR. WIENER: Counsel on the phone, please identify yourselves and your affiliation.

MR. PELS: Gerald Pels for petitioner, Rhode Island Department of Environmental Management.

MR. WIENER: Anyone else on the line?

MR. PETROS: David, Seth, you on the line?

MR. ROSS: Yes, we are on the line. David Ross, Kasowitz, Benson, Torres, and Friedman in New York City for Southern Union Company.

THE COURT REPORTER: One more time.

MR. ROSS: David Ross, R-o, double S like Sam; and Seth Davis, D-a-v-i-s, of Kasowitz, K-a-s-o-w-i-t-z, Benson, Torres, T-o-r-r-e-s, and Friedman, F-r-i-e-d-m-a-n, LLP. We're at 1633 Broadway, New York, New York, 10019. And we're counsel for Southern Union Company along with counsel already identified.

MR. WIENER: Before we get started, I would like to confirm with the individuals who are joining us by phone two things; one is that no one else is present with you at this time; and second, that no recordation of this proceeding is being made by anyone on the phone.

MR. PELS: Gerald Pels, that is correct.

MR. ROSS: What is the basis for your request, and why is it improper to record this matter? Why can't anyone else listen to this matter based on the rules?

MR. WIENER: Because we had a hearing with the hearing officer Kathleen Lanphear immediately before coming here, and my understanding is that it was represented that only the individuals who are on the phone would be on the phone and that no recordation would be made of these proceedings



other than by video and by the court reporter who is here present with us today.

MR. PETROS: Just to be --

MR. ROSS: Gerry Petros, can you enlighten us as to what was said about that?

MR. PETROS: Yeah, just to be clear, the hearing officer did say that she did not want anybody on the phone recording the deposition, so I certainly agree with that. I had told the hearing officer that I expected that my colleagues from New York would be on the phone. She did not make an order, that I recall, Lew, limiting it to specific people. But I don't know if that's an issue anyway.

MR. WIENER: Can you tell us whether there is anyone else present with you?

MR. ROSS: Right now, one of my colleagues is with us. I expect Eric Herschmann will be calling in to listen to this call. I expect that Chris Dodds will be calling in to listen in on this call at various points in time. These are all people who worked for the -- for Southern Union Company in this matter.

MR. WIENER: Are those individuals employed with your law firm?

10

MR. ROSS: Yes. Chris Dodds is a partner in Watson Bishop London Brophy and Dodds of Austin, Texas.

MR. WIENER: Who does he represent?

MR. ROSS: She represents Southern Union Company.

MR. WIENER: Is she an employee of Southern Union Company?

MR. ROSS: Are you taking her deposition?

MR. PETROS: No, Lew, she's --

MR. ROSS: She's counsel for the company. If you want to take it up with the hearing officer now, we can have a new hearing on that.

MR. WIENER: Thank you. Again, she is counsel for the company. And the other gentleman that you identified who is he affiliated with?

MR. PETROS: He's with the same firm, Lew. There's a pro hoc vice motion pending for Eric along with Dave.

MR. WIENER: Okay. And do you anticipate anybody else joining you?

MR. ROSS: I don't know. Anyone who works for me may walk into the room, and they're



entitled to listen to this phone call since they work with me.

MR. WIENER: Certainly. Have you invited anyone else to participate with you?

MR. ROSS: You know, you want --

MR. PETROS: David --

MR. ROSS: -- to take my deposition? We can start a whole new process if you'd like that.

MR. WIENER: We certainly could, but the fact is that --

MR. PETROS: Lew, Lew, let me --

MR. WIENER: -- the motion was made by --

MR. PELS: I can't remember the last deposition I attended where the parties that were present at the deposition were not identified to the other parties and that was not made of record, and that's all we're asking for. This should not be difficult. It's reasonable to know who is present, and it's always the case.

MR. PETROS: David, let's --

MR. PELS: We've all been doing this for a long time. Depositions are not flea markets where people come and go.



MR. PETROS: If --

MR. PELS: I don't think there's anything wrong with telling us who's going to be present.

MR. ROSS: I've tried to identify for you so far who I think may be present because this is being done in a law office and because of the conditions under which this matter is being handled on this notice. It's being done in my office. People come and go from my office. I don't intend to exclude them from walking in to my office. Would you like to debate that?

MR. PETROS: David, let's agree that if anybody else is going to enter your office for purposes of substantively listening in to the

deposition, we will identify that person.

MR. ROSS: Okay. I'm also going to include Noelle Kowalczyk of my firm who also may come and go and may listen and participate substantively in terms of listening.

MR. PETROS: She's an associate with your firm?

MR. ROSS: A partner of mine.

MR. PETROS: Fine. Okay.



MR. WIENER: As Mr. Petros confirmed one question that the hearing officer had, or I would say instruction, is that there should be no recording of this proceeding other than by the court reporter and by the videographer. Are all the parties on the phone in agreement with that?

MR. PELS: Yes.

MR. PETROS: Yeah, we will follow the hearing officer's order.

MR. WIENER: Thanks.

MR. ROSS: We will of course follow the hearing officer's order.

THE COURT REPORTER: They have got to identify themselves for the record.

MR. PETROS: If anybody on the phone feels the need to speak during this deposition, can they identify themselves first, please.

MR. PELS: Yes, that's very reasonable.

MR. WIENER: Counsel, are you ready to go forward?

MR. PETROS: Yeah. Before we begin, Lew, for the record, I just want to say -- we're on the record, I assume -- I just want to say that Southern Union objects to this deposition going



forward in terms of its timing, its place, and its manner. We did file a motion for a protective order. The hearing officer denied our motion this morning. So we're going forward pursuant to her ruling.

But I want to make it clear the respondent, Southern Union Company, does object for all the reasons stated in its earlier papers.

MR. WIENER: Your objection is noted. Good morning, sir.

THE COURT REPORTER: I need to swear him in.

MR. WIENER: Yes.

THE COURT REPORTER: Mr. Souza, could you raise your right hand. Do you solemnly swear the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I guess so. I don't lie.

MR. PETROS: I'm sorry, your response was "I guess so"?

THE WITNESS: Yeah, well, yes. Is that what you want me to say? Yes.

JOSEPH SOUZA,

having been duly sworn by the Commissioner of Deeds,

was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WIENER:

Q. Good morning, sir. Could you please -- what's your name?

A. Jose Souza.

Q. Mr. Souza, my name is Lewis Wiener. I'm an attorney with the law firm of Sutherland Asbill & Brennan in Washington, DC. I represent the petitioner in this case, that being the Rhode Island Department of Environmental Management.

You are here today for a deposition. I'm going to be asking you a series of questions, and I'm going to be asking you for your answers to those questions. If you don't understand something that I am asking you, I'd ask that you say I don't understand what you just said and I'll be glad to repeat it or rephrase it so we have a clear record of my questions and your answers. Do you understand my instruction?

A. Yes.

Q. We will take regular breaks. We will break at a minimum of once an hour to give you an opportunity to stretch your legs. If at any other



time you need a break, I'd ask that you please tell me and we will then take a break in these

proceedings and then resume when you're ready to start back up.

Again, there are a number of people in the room with us today, among them a court reporter. The court reporter's job is to take down and record on paper everything that's said here today. So my questions will be recorded, your answers will be recorded, as will anything anyone else in this room says.

Your deposition is also being taped by video. The camera is recording us as we're here today. The camera is focused on you and is a video of your testimony. So, again, there are two opportunities for people to record everything that's said in the room today. Do you understand that?

A. Yes.

Q. Sir, you are here voluntarily?

MR. PETROS: Lew, before we begin, two things; first of all, the hearing officer indicated today that Mr. Souza's son should not being participating in this. Is he at the bottom of the stairs, do you know where he is? Mr. Souza, are you

17

in earshot of us now?

MR. WIENER: You're free to check if you'd like. We told him that he could not be physically present here, and he left. I don't know where he went but I have no reason to believe and we have not told him that he could be anywhere within

earshot.

MR. PETROS: No, I'm sure you haven't. I just wanted to confirm. I thought he was downstairs. That's fine. And, second, we would ask --

MR. WIENER: You have confirmed that he is not within earshot?

MR. PETROS: Downstairs, yes. And, second, we would request the opportunity to voir dire Mr. Souza before the deposition begins concerning his competence, his health, and his abilities, mental abilities.

MR. WIENER: Well, you had the opportunity to make that, bring that matter before the hearing officer, and you did not.

MR. PETROS: I'm asking for it now.

MR. WIENER: Well, I respectfully give you the opportunity to pursue that on



cross-examination.

Q. Mr. Souza, when were you born?

A. Uh?

Q. When were you born? When's your birthday?

A. 19, let's see, 4/19, 4/25/19. That's what it is; right?

Q. You say 1925?

A. 1925.

Q. What day, what month and day?

A. That was in -- oh, boy, fourth month? Be April; right?

Q. I don't know.
A. All I know 4/25/19.
Q. You say 4/25/19?
A. Yes, four the month.
Q. So April 25, 1919?
A. That's right. Yeah, 1919.
Q. Okay. Are you currently taking any medication?
A. For what?
Q. Anything.
A. Of course I take medication at my age, why not? I take it for pain. And I got a blocked artery, so I take it for that.



Q. Is the pain medication or any other pain medication that you take --
A. No, it's not.
Q. Sorry. Let me finish my question. Any reason you wouldn't be able to testify truthfully because of the medicine you're taking?
A. Oh, no, no. What I say is going to be the truth. I don't lie for anybody. I don't even lie for my son.
Q. Okay. Where did you grow up?
A. Tiverton. Right top over the hill.
Q. Do you remember the street address where you grew up?
A. Uh?
Q. Do you remember the street address -- the

street you grew up on?
A. Yes.
Q. What street did you grow up on?
A. Connell Street.
Q. That's C-o-n-n-e-l-l?
A. Right.
Q. And where do you live now?
A. Church Street, right at the corner.
Q. You've lived in Tiverton your whole life?



A. Yep. Only when I went in the service.
Q. And when were you in the service?
A. World War II.
Q. Where did you -- did you fight in World War II?
A. I was there for four years.
Q. Over in Europe?
A. No. No. I stood in the States. I had a lot of pull.
Q. Where were you stationed?
A. I stationed in Louisville, New Jersey, and Utah.
Q. And what branch of service did you --
A. Air Force.
Q. And what rank did you have?
A. Sergeant.
Q. Did you leave -- when did you leave the service, do you know?
A. Oh, boy, I don't know.
Q. Sometime in the 1940s?

A. After the war was over, I was there for one more year then I got out.
Q. When you got out, did you come back to Tiverton?



A. Yes.
Q. Before you went into the service, did you go to school?
A. Of course.
Q. What school did you --
A. Tiverton school.
Q. Was that a high school?
A. No. Grammar school. Was down below the hill.
Q. So you went to grammar school. Did you go to junior high school?
A. Yes.
Q. Did you graduate from junior high school?
A. No.
Q. Did you go to high school?
A. Yes.
Q. Did you graduate from high school?
A. Yeah.
Q. Hold it. You said you didn't graduate from junior high school. What grade did you complete in school?
A. I went as far as the eighth grade.
Q. Then what?
A. Then I got out. I had to go to work.

Q. Where did you go to work?
A. With Simpson.
Q. Simpson being who?
A. John Simpson.
Q. What did you do for John Simpson?
A. Worked. We worked delivering coal to the neighbors, welfare people, all that baloney.
Q. What business was Mr. Simpson in?
A. Uh?
Q. What business was Mr. Simpson? Did he have a company?
A. He was a contractor.
Q. Again, what business was he in as a contractor?
A. We did everything. We did all kinds of work. Not just one thing. We did a lot of work.
Q. Like what?
A. Like building, knocking down buildings, putting up buildings.
Q. Hauling coal?
A. Haul coal.
MR. PETROS: Objection. Let's not lead this witness. That would be highly inappropriate.
A. We haul the coal for the welfare people.



Q. Anything else you can think of?
A. Well --

Q. How long did you work for Mr. Simpson?
A. Almost four years, I guess.
Q. And --
A. I went in the service.
Q. You worked for Mr. Simpson for about four years then you went to the service?
A. I joined the service.
Q. Do you know approximately how old you were when you joined the service?
A. Had to be 18.
Q. So did you work for Mr. Simpson from roughly when you were 14 to about when you were 18?
A. Yeah.
Q. And then when you got out of the service, you said you came back to Tiverton; do I got that right?
A. Yep.
Q. And what did you do after you got back?
A. I went to work in a baker shop.
Q. A bakery?
A. Yeah.
Q. What did you do there?

24

A. I worked in a bakery and baked bred.
Q. Did you -- how long did you work at the bakery shop?
A. Four years.
Q. And then what?
A. And when I got out.

Q. Oh, you say you worked in the bakery while you were in the service?

A. Oh, no, no. When I came out, I got out of the service and I went and worked for a baker shop. My father knew the man so I went there.

Q. Okay. And what did you do after the bakery shop?

A. What's that?

Q. Where did you go work after the bakery shop?

A. Let's see, I think I went to New Jersey right after the baker shop.

Q. What did you do in New Jersey?

A. I worked construction.

Q. Do you know where in New Jersey?

A. I can remember the boardwalk. That's where I worked on a boardwalk. Had old buildings there where we fixed them all up for people to move in.



Q. Do you remember who you worked for?

A. Oh, don't ask me that because I don't know the guy already it's been so long. I worked for some contractor up there.

Q. How long did you work in New Jersey?

A. Almost four years.

Q. And then what did you do?

A. Came home.

Q. What did you do when you came home?

A. What did I do when I came home? I think I -- I don't know. I don't even remember now. I

think I went to the baker shop. Oh, I went in business for myself.

Q. What did you do?

A. Roofing.

MR. PETROS: I'm sorry?

A. Roofing.

MR. PETROS: Thank you.

Q. How long were you in the roofing business?

A. Four years.

Q. What did you do after you were in the roofing --

A. I retired.

Q. When did you retire, do you know?



A. Well, I was 65.

Q. About 20 years ago?

A. Oh, yeah, all of that.

Q. I'd like to show you a piece of paper that the court reporter's put a little sticker on. It says Exhibit Souza 1.

MR. PETROS: Lew, before you hand that to the witness, I want to note I object to what you are about to show the witness. You were kind enough to give me a copy of it. It's Mr. Souza's affidavit. I object to the witness being shown that at this time. I object to him being led in those areas.

This is your witness on direct examination. You have an obligation to question him without

leading him through other documents and giving him a script to repeat. So I object strenuously to your showing him that affidavit at this point in time, unless you're going to impeach him with it, and obviously you're not going to do that.

This is your witness on direct examination. If you want any of these questions to be admissible, seems to me you got to follow the rules of procedure. And the rules are with your witness you



cannot give him a script to repeat back to you.

MR. WIENER: Your objection is noted.

Q. Mr. Souza --

MR. PETROS: I don't need you to tell me the objection is noted. It's noted as of record.

Q. Let me show you the document that's been marked as Souza Deposition Exhibit 1.

MR. ROSS: I also, I just want to note for the record we will also object to the admission of any testimony after this point since you have, you asked the witness what else he remembered from that time frame. He could not recall anything else. And you are now attempting to lead him through a document which is not admissible. And, therefore, all the testimony that comes hereafter will be the subject of objection.

MR. WIENER: Duly noted.

Q. Mr. Souza, have you ever seen this document before?

A. I don't remember looking at it. I don't

remember.

Q. Why don't you turn to the second page.

MR. PETROS: I object. He just said he doesn't remember looking at it.



Q. You see the second page?

A. I signed that paper.

Q. Again, having looked at this, having looked at the two pages of the two-page document, do you remember ever seeing this before?

A. Well, if I signed it, I signed it; right? I must have seen it.

Q. Let's look at the first page.

MR. PETROS: I object. I would like to take a break now and call the hearing officer. I think this is totally improper to be leading the witness through this affidavit procured under circumstances we're not familiar with yet. Mr. Souza, could you put that document back on the table for a moment, please, sir. Thank you.

I would like to adjourn the deposition and call the hearing officer and address this objection with her. I think it's an absolutely improper way to proceed with this testimony particularly under the circumstances in this case. She said --

MR. WIENER: You're making a speaking objection, sir, which is improper under the rules. Your objection is noted.

MR. PETROS: Let's call.

MR. WIENER: Why don't we stop here. We'll excuse the witness. He can step out of the room, and we'll call the hearing officer.

MR. PETROS: That's fine. Mr. Souza, we're going to take a break for about five minutes. Okay? Thank you, sir.

THE VIDEOGRAPHER: We are going off the record. The time is 10:55 a.m.

(Break taken)

THE VIDEOGRAPHER: We are back on the record. The time is 11:20 a.m.

MR. PETROS: Just to note, we did take a break. We talked with Kathleen Lanphear, the hearing officer. I raised the objection I had raised before the break that is that it was inappropriate to show this witness his affidavit at this juncture in the deposition particularly before his memory had been exhausted. The hearing officer overruled me and instructed us to go forward and gave Mr. Wiener permission to use the affidavit with the witness.

MR. ROSS: For the record, I just note as I said off the record that Christina Dodds also representing Southern Union Company has also now joined the call, joined the deposition on the phone.



Q. Mr. Souza, let me hand you back what the

court reporter has marked as your Deposition Exhibit No. 1, sir.

A. Beg your pardon?

Q. I just want to hand that back to you. Again, on the second page that is your signature, sir?

A. Yeah.

Q. Okay.

A. That's mine. Nobody can write as rotten as me.

THE COURT REPORTER: I'm sorry?

A. Nobody can write as rotten as me.

Q. Mr. Souza, did you ever work at the Fall River Gas plant?

A. Did I work there?

Q. Yes.

A. No. I worked cleaning the place out.

Q. When you say cleaning the place, you're talking about --

A. Well, I was working for Simpson then.

Q. Do you know whether Mr. Simpson had any involvement with the Fall River Gas plant?

31

A. Not that I know of.

Q. So I understand --

A. He had a contract just to clean the place up.

Q. Your testimony is that Mr. Simpson had an agreement with the Fall River Gas plant to clean the

plant?
A. Yeah.
MR. PETROS: Objection.
Q. And you worked for Mr. Simpson?
A. Yeah.
Q. And as -- when working for Mr. Simpson, did you, were you involved in cleaning up the Fall River Gas plant?
MR. PETROS: Objection.
A. Yeah.
Q. Can you tell me what you did?
A. We took all the cinders out.
Q. The cinders?
A. Yeah. You know, after they burned, you get the gas out of the soft coal, they got the coke, and we cleaned that all out and all the cinders. We cleaned, we used to clean out the vats and everything.



MR. PETROS: Just for the record, Lew, did you say coke, was that the word you were saying?
A. Yeah.
MR. PETROS: Thank you. Okay.
A. That's what they used to burn in the houses, coke. Not the stuff to drink. It's coke to burn.
Q. Do you remember where the Fall River Gas plant was?
A. On Charles Street.
Q. Okay. I'm going to show you what the court

reporter has marked as Deposition Exhibit No. 2. It purports to be a map of the Tiverton area. Do you see this, sir?

A. Yeah.

Q. Just for purposes of identification, you said the -- did I understand correctly, you said the Fall River Gas plant was on Charles street?

A. Yeah.

Q. And do you see Charles Street on this map?

MR. PETROS: Well, you're pointing to it.

MR. WIENER: I'm pointing out to him does he see Charles Street here.

33

MR. PETROS: Okay. That's fine.

MR. WIENER: And I'm helping him see where on the map it is.

Q. Do you see that?

A. I can't make it out. Anyway, Charles Street was off Bay Street.

Q. Charles Street was off of Bay Street?

A. Yeah.

Q. Let the record -- now, Bay Street runs parallel to the water?

A. Down below. All the way down into Fall River.

Q. So it runs through Tiverton up until Fall River?

A. Yeah.

Q. And then Charles Street was off of that?
A. Charles Street was one street going off.
Q. Down off, meaning towards the water from Bay Street?
A. Yeah.
Q. Okay. And how far approximately was that from where you lived at the time?
A. At the time?
Q. Yeah.



A. I lived in Fall River then. Then I came to Tiverton. I was up in Davis Street in Fall River.
MR. PETROS: I object to the question in terms of time. It's okay.
A. I went in the service, got out of the service, came back to Tiverton.
Q. Do you remember how far the Fall River Gas plants was from where you were living when you worked for Mr. Simpson?
A. I would say about a half a mile or so.
Q. About a half mile?
A. Yeah. Say a mile anyway.
Q. Again, in terms of the timing, you worked for Mr. Simpson like in the forties sometime?
A. Oh, yeah.
MR. PETROS: Objection.
A. Before the service.
Q. Yeah. Right. And I believe you testified --
A. Before the war.

Q. Right. I believe you said you got out of the service about a year after the war ended?
A. Yeah.
Q. And before you were in the service for



about four years?
A. Yeah.
Q. And before you went into the service, you worked for Mr. Simpson for about four years?
A. Yeah, and I worked in a baker shop too.
Q. Right. But while you were working for Mr. Simpson, one of the things that you did, if I understand correctly, is you were, you worked in cleaning out the Fall River Gas plant?
A. Right.
Q. Okay. And how did you get back and forth to the plant when you were cleaning it out?
MR. PETROS: I object to that last question and the answer. I'm sorry, go ahead, Lew.
A. I used to walk.
Q. Okay. Like you said, it was about a half mile from where you lived?
A. I don't know, a mile or so anyway.
MR. ROSS: Objection. Leading.
A. I used to walk there every day. I didn't have no car.
MR. WIENER: Let's go -- one second, we need to get clear who is representing Southern Union on this deposition, Mr. Petros.

MR. PETROS: I agree. David, I need to make the objections.

MR. ROSS: Gerry, I will defer to you.

MR. PETROS: Thank you.

Q. Do you know who owned the Fall River Gas plant?

A. Who owned it?

Q. Yeah.

A. How the heck do I know? I don't know. I wasn't that big shot.

Q. Do you know what they did at the plant?

A. Yeah, made gas.

Q. Do you know how?

MR. PETROS: Objection.

A. They'd burn the coal. They used to get this coke from the mines, right, we called it soft coal. And they burn it, get the gas out of it, made the coke, made the cinders and all that jazz.

Q. Were there, I think there were things in the plant called beehives?

MR. PETROS: Objection.

A. Yeah.

Q. What are beehives?

MR. PETROS: Objection.



A. Well, that's where they used to store all the chips that filter the gas.

Q. And what kind of chips?
A. Wood chips.
Q. And did you ever see these wood chips?
A. Uh?
Q. Did you ever see these things, personally see?
A. Of course, used to clean out the vats.
Q. What kind of vats?
A. Well, that's where they keep the chips. They were beehives like, made out of brick, and they had all these wood chips in there and filter the gas.
MR. PETROS: Objection. Move to strike. Go ahead, Mr. Souza, you can continue.
Q. So it's your understanding they filtered the gas through these wood chips?
MR. PETROS: Objection.
A. They filter the gas so it could go to the city.
Q. Did you ever see this process work? I mean, did you ever see this stuff happen when they were actually filtering the gas through the wood



chips?
A. I was working there. I saw it. Wasn't I?
Q. What did you see?
A. I see -- I don't know. We used to all work there. That's all I know. I see what they want to let us see. They never reject us from doing

anything. Our job was to work, clean the yard up, clean the vats out, and then put the cinders all over the place. This whole town is covered with cinders.

Q. How did you clean the vats out?

A. With a shovel.

Q. And where did you put what you took out of the vats?

A. In Simpson's trucks.

Q. Okay. And how many -- did you clean -- how often did you clean out the vats?

MR. PETROS: Objection.

A. I don't know. At least twice a year, I think.

Q. Did anyone else do it with you?

A. Uh?

Q. Anyone do it with you?

A. Of course, I couldn't do that alone.

39

Q. Who did it with you?

A. My brother did, my older brother.

Q. What was his name?

A. John. But he's dead. You can't get him.

Q. Anyone else?

A. Well, my brother Pete worked there. He lives in Connecticut right now.

Q. Older brother or younger brother?

A. Younger. And Joe Ferries and Arthur Ferries.

Q. Again, who told you what to do?

A. I worked for Simpson. I used to go with guys. I went with Jack Bravo or my brother, whoever was driving the trucks.
Q. And you said you used shovels. And what did you do?
A. Shovel into the trucks.
Q. The wood chips?
MR. PETROS: Objection.
A. No, no, the cinders.
Q. The cinders?
A. The wood chips that was cleaned out by someone else.
Q. What did these cinders look like?



A. Well, it was burned off coke.
Q. They have a color?
A. I don't know. I would say black or gray. I don't know. Call them what you want. Coke, what does coke look like when it's burned?
Q. What does coke look like when it's burned?
A. Coke.
Q. What did it smell like?
A. Oh, coke, you can smell after you burned it. Before you burned it, it was all gas. They used to burn the gas out of the soft coal, and the soft coal turned to coke.
Q. Yes.
A. So we used to clean that out, and people would burn it in their houses.

Q. And you put it on, you said, I believe you testified you put it on Mr. Simpson's trucks?
A. (Nods)
Q. Do you remember how big the trucks were?
A. Yeah. Two-ton, two- to five-ton trucks.
Q. How much stuff did they hold?
A. Well, had big sideboards on them. I would say five tons.
Q. What did you do with the stuff after you



cleaned out the beehives and put it on the truck?
MR. PETROS: Objection. He's testified to it. Go ahead.
Q. What did you do with it?
A. We delivered it anyplace you want it. People put it in their yards and on the roads, all over. People wanted it so we used to bring it to them.
Q. Anyone tell you where to put it?
A. Yeah, told me dump the load, let them spread it.
Q. Again, did you put it in people's yards?
A. Yeah.
Q. Did you put it on any roads?
MR. PETROS: Objection. Move to strike the last two questions.
A. Put it where?
Q. Where did you put it?
A. In the yards.
Q. People's yards?

A. Yeah.
Q. Did you put it on any roads?
MR. PETROS: Objection.
Q. You can answer.



A. I don't know what you're talking about.
Q. Did you put the stuff that you put in Mr. Simpson's trucks, did you put it on any roads?
MR. PETROS: Objection.
A. Any where?
Q. Any roads.
MR. PETROS: Objection.
Q. Like any of the roads around town.
A. Oh. No. Our jobs was bring it to Simpson, and he took it from there. Jack Bravo did all that.
Q. So when you say you brought it to Simpson, where did you bring it?
A. On Chase Avenue. Chase Avenue and Connell Street, between the two streets. Had a big pile in the yard.
Q. You just dumped it there?
A. Yes.
MR. PETROS: Objection.
Q. Did you dump it anyplace else?
A. No. Some people take some to Fish Road. I don't know. Up by Fish Road. I never went up there.
Q. Was it --
MR. PETROS: Objection. Move to strike.

Go ahead, Lew.

Q. When you dumped it, how did you leave it, outside?

A. Yeah. People used it to fix their roads and everything else. You know, years ago, there was no roads here. We didn't have asphalt roads. We only had dirt roads. So be all muddy. Filled the holes up.

MR. PETROS: Objection. Move to strike. Mr. Souza, just so you know, I'm objecting for the record. I don't mean to interfere with your answers. You should always complete your answers. I'm objecting just for the record; okay?

THE WITNESS: Objecting to what?

MR. WIENER: He's just --

MR. PETROS: When I object, I'm doing it just for the record.

THE WITNESS: Oh, all right.

MR. PETROS: Okay. You should always complete your answers. I don't want to interfere with your answers; okay? Thank you.

Q. This stuff was just left outside when you dumped it?

A. Yeah, of course.



Q. Did it rain on it?

A. Uh?

Q. Did it ever rain on this stuff?
A. Of course.
Q. Snow on this stuff?
MR. PETROS: Objection.
A. It was outside all the time. You couldn't put that inside of a house.
Q. Did you ever -- once you dumped it on Mr. Simpson's property, did you ever then take it anyplace else?
MR. PETROS: Objection. It's been answered.
Q. You can answer.
A. I'll tell you, like I said, we just put it on a road if people wanted it. People wanted it so they could fix their roads. We had no roads here in them days. All dirt roads.
Q. Did you ever take it from Mr. Simpson's property and bring it anyplace else?
MR. PETROS: Objection. He's answered that two or three times.
A. Directly from the gas company.
Q. Right. To where?

45

A. To wherever people wanted it. Say you want some in your yard, ask Simpson, Simpson say go take it, take it up and go dump in your yard.
Q. Do you know any of the streets where the yards were where you brought the stuff?
A. Yeah. This street over here.

Q. Which is Judson Street?
A. Judson Street, yeah
Q. Where else?
A. Down below. Connell Street. Chase Avenue. State Avenue. All the roads in Tiverton. Took some to, back to Fish Road.
Q. And you personally did that?
A. No, not personally, no.
MR. PETROS: Objection. Move to strike his previous testimony.
A. Because I was working for the company. I was working for Simpson.
Q. Right.
A. And that's where I go.
Q. Who brought the stuff to all those streets you mentioned?
A. We did.
Q. You and the other people you worked with?



A. My brother, my older brother. I had to work with him. He was the truck driver.
Q. Other than the beehives, did you clean out stuff from any other place on the Fall River Gas plant property?
MR. PETROS: Objection.
A. No.
Q. Did you ever clean filters out, something called the retour house?
MR. PETROS: Objection.
A. Yeah.

Q. What's the retour house?
A. Retour house was where they made the gas and all the cinders come out and we pick it up and take a load out.
Q. And the beehives connected to the retour house?
A. No. No.
Q. So what was in the retour house?
A. All was inside there was wood chips that filtered the gas. But the retour house was where they made the gas.
Q. Did you ever clean out the retour house?
A. No. There wasn't nothing to clean.

47

Q. Was there any ash in the retour house?
A. Yeah. That's where all the cinders came from.
Q. Did you clean that out?
MR. PETROS: Objection.
A. We took it from piles and brought it to all over town and everybody wanted it.
Q. Okay. And did you ever clean out filters?
MR. PETROS: Objection.
A. The retour house?
Q. The filters in the beehives?
A. Yeah, of course, I cleaned them out.
Q. And, again, what was in that stuff?
A. All wood chips. That's all that was in there.

Q. All right. Did the -- again, the chips what did they look like?
A. You don't know what wood chips look like?
Q. I'm just asking you if you could tell me what they looked like?
A. Piece of wood.
Q. That's before they were used at the gas plant; right?
A. They put them there so they could filter



the gas.
Q. What did they look like after they filtered the gas?
A. All blue.
Q. Did you ever remember taking these blue things out, cleaning them out?
MR. PETROS: Objection.
A. Of course, I did. That was my job.
MR. PETROS: Objection.
Q. Okay. And where did you put them?
MR. PETROS: Objection.
A. All over town.
Q. You put them on Mr. Simpson's trucks?
A. Right.
Q. And then you hauled them into town?
A. Right.
Q. And you put them where people wanted them?
MR. PETROS: Objection. The witness already testified he didn't do that. Now he's saying he did do it.

MR. WIENER: You'll have an opportunity to cross-examine him, sir. You're making a speaking objection.

Q. So you said there was ash that you and



cinders that you hauled around?

A. Yeah.

Q. You also hauled around these blue chips?

MR. PETROS: Objection.

Q. Is that correct? Do I understand that correctly?

MR. PETROS: That's not what he said.

Q. Do I understand what you said correctly?

A. That's what I said, didn't I?

Q. Okay. And you put these blue chips, where did you put them?

A. Come on. What do I know where they went? They was on the road. We put everything on the road.

Q. In the same places? You said Judson?

A. All over the road.

Q. Judson Street?

A. Yeah.

Q. Cooper Street?

A. Connell Street. All over. Down Bay Street, all over. We even took some to Fish Road.

Q. Who paid you?

A. Uh?

Q. Who paid you when you were doing this?

A. I was working for Simpson, so Simpson paid me.

Q. Did any of the homeowners pay you when you brought the stuff to their place?

A. No. No. That was -- we were trying to get rid of it so they take it. It was a gift to them. Not for us.

MR. WIENER: Why don't we take a short break consistent with the magistrate -- the hearing officer's instructions. We're going to take a real short break for a couple of minutes. Is that okay with you?

THE WITNESS: Okay with me. I ain't got no place to go.

MR. ROSS: I want to make sure no one confers with the witness during any breaks.

MR. WIENER: We are aware of our ethical obligations.

MR. PETROS: Are you agreeing that you won't confer with him?

MR. WIENER: I'm not going to dignify that with an answer.

MR. PETROS: Dave, the hearing officer already instructed that so we're okay.



MR. ROSS: Thank you.

THE VIDEOGRAPHER: We are going off the

record. The time is 11:38 a.m.

(Break taken)

THE VIDEOGRAPHER: We are back on the record. The time is 11:48 a.m.

Q. Mr. Souza, have you ever given testimony before like this, a deposition?

A. Me?

Q. Yeah.

A. I'm not a crook.

Q. So first time you've ever been deposed?

A. Yeah. No, I've been here before for this reason.

Q. But in any other case?

A. Uh-uh.

Q. Did you ever testify in court?

A. No.

Q. Looking at that map I gave you, do you see the town of Tiverton in there?

A. Town of Tiverton. This is all Tiverton, ain't it?

Q. Yeah. You see Bay Street down there near the water?

52

A. Yeah. Down by where the railroad tracks are. Right here.

Q. Yeah.

MR. PETROS: Where were you pointing to, Mr. Souza?

A. Right across the, right around the railroad

tracks.

MR. PETROS: Thank you.

Q. Do you see any of the streets there, the areas where you said you put the stuff that you took out of the Fall River Gas plant?

MR. PETROS: Objection.

A. Am I not supposed to answer?

Q. No, no, no, you can answer.

A. Oh, I can. Well, like I say, we put it on Bay Street I know for sure. Judson Street, Connell Street, State Avenue, Chase Avenue, and Hilton Street. I think every street in town had it.

Q. Now, you said you put this stuff on Mr. Simpson's trucks?

MR. PETROS: Objection.

A. Yeah.

Q. Were you driving the truck?

A. No. No. I was the helper.



Q. Where were you? Were you on the truck?

A. Of course. I worked with my brother, my oldest brother.

Q. Who drove? Did he drive?

A. My older brother drove the trucks.

Q. Were you sitting next to him?

A. Uh?

Q. Were you sitting next to him in the truck?

A. Yeah, of course. Think I was gonna sit out on the back? That would be the day. That's where the cinders were in the back of the truck. I wasn't

going to sit there.
Q. Again, do you remember anyone else who worked with you cleaning out the Fall River Gas plant?
A. Like I said before --
MR. PETROS: Objection.
A. -- Joe Ferries.
Q. Is he still alive?
A. Uh?
Q. Is he still alive?
A. No, he's dead.
Q. Anyone else?
A. Skippy. He's dead.



Q. Who else?
A. Joe Ferries, Skippy, oh, boy, I can't remember the names.
Q. This was in the forties; right? Forties this all happened?
A. Oh, yeah, this is before the war.
Q. World War II?
A. Yeah. Is there any other war? I didn't know they had another war.
Q. You say your younger brother also did this?
A. My younger brother worked, yeah.
Q. He lives in Connecticut?
A. He lives in Connecticut, yeah.
Q. Do you know where in Connecticut?
A. Danbury.

Q. Is he in as good shape as you are?

A. Uh?

Q. Is he in as good shape as you are?

A. Well, I think he's in better shape than I am, I'll tell you.

Q. Did the gas -- did you ever know that the gas company itself ever clean out the waste or the stuff that was on the property there?

MR. PETROS: Objection.



Q. You can answer.

MR. PETROS: You can answer.

A. We were cleaning the place out. We had to see it; right?

Q. But did the company itself ever clean the stuff out and bring stuff in to Tiverton?

A. No. Jack Bravo was a contractor to clean out the place. And we worked for the gas company and worked for Simpson and Simpson had a job cleaning out the place and Jack Bravo. So that's where we worked. Well, I worked for Simpson.

Q. Do you know if anyone else ever cleaned out the cinders or the chips?

A. Oh, Christ All Mighty, do you want names?

Q. If you know.

A. I said Joe Ferries, right. Skippy worked for a little while. Oh, I don't know.

Q. But do you know other than the guys you just mentioned, did the company itself ever haul stuff out of there?

MR. PETROS: Objection.

A. The company, the company never did nothing. They were too big. You work in a white collar, you don't want to move coal, do you?



MR. PETROS: Objection. Move to strike.

Q. Were there ever any employees at the company that cleaned out the beehives or the other places?

A. No. Simpson had the contract to clean out these places so that's what his job was to clean them out.

Q. Again, how often did you do that?

MR. PETROS: Objection.

A. Like I said, I think it was every six months. I'm not sure now.

Q. How long did it take to clean out?

A. Oh, somedays sometimes two, three days because there was a lot of hives.

MR. PETROS: A lot of what?

A. Beehives.

MR. PETROS: Thank you.

Q. How many, you know, on average how many truckloads of stuff did you take out of there to clean up the place when you did it?

A. Oh, I never kept track of that.

Q. Just approximately?

MR. PETROS: Objection.

Q. Was it more than one?

A. Oh, sure, of course. You can never clean that with one truck.

Q. But how many truckloads do you think it took?

A. Sometimes it took a couple of days.

Q. So how many trucks would you think you'd fill up over the course of those days?

MR. PETROS: Objection. You don't have to guess, Mr. Souza.

A. Uh?

MR. PETROS: You don't have to guess.

MR. WIENER: Your objection is noted.

Q. Do you know approximately how many trucks you filled up?

MR. PETROS: Objection.

A. Like I say, all I can tell you is what I did. I don't know what somebody else done because I wasn't there.

Q. But when you would go clean out, on average how many trucks would you fill up with the stuff?

MR. PETROS: Objection.

Q. The cinders, the wood chips, how many trucks would you haul out of there?

A. Clean the place out.



Q. Yeah.

A. Well, I don't know. We never kept track of

that.

Q. But it was more than one?

A. Oh, sure.

Q. Was it more than ten?

MR. PETROS: Objection.

A. More than ten truckloads?

Q. Yeah.

A. I don't think so. Maybe so. I don't know. I can't remember that far back.

Q. Okay.

A. We were just working. We didn't go around keeping track of trucks. It wasn't our job to keep track of trucks.

Q. How much did you get paid for doing this, do you remember?

A. $18 a week.

Q. Again, everything you said here is the truth?

A. Well --

Q. As you remember it?

A. Yeah.

MR. PETROS: Objection.

59

MR. WIENER: I tender the witness for cross-examination.

MR. PETROS: Okay. Let's take a short brake, again, please.

THE VIDEOGRAPHER: We are going off the record. The time is 11:57 a.m.

(Break taken)

THE VIDEOGRAPHER: We are back on the record. The time is 12:12 p.m.

CROSS-EXAMINATION

BY MR. PETROS:

Q. Mr. Souza, good afternoon. My name is Gerry Petros. I'm an attorney for a company called Southern Union Company, that is a company that has succeeded to Fall River Gas Company. Okay? So I'm the gas company, all right, do you understand that, sir?

A. Yeah.

Q. Just as Mr. Wiener did this morning, I'm going to ask you a series of questions this afternoon. If at any time you don't understand one of my questions, will you let me know?

A. Yeah.

Q. We just had a chance to take a break, and

60

we spoke with your son. You're okay to continue now?

A. Yes.

Q. Okay. You'll let us know if you get too tired; okay?

A. I'll drop dead first.

Q. Don't do that. Okay. Let's talk about your medical condition if we can, Mr. Souza. You mentioned earlier that you are taking some medication?

A. Yes.

Q. Including some pain medication?
A. Yeah.
Q. What pain medication are you taking?
A. Oh, I don't know. I got them home. I don't know what they are. I take them. The doctor gives them to me.
Q. How many different medications are you taking?
A. Two.
Q. Two, okay. And how often do you take the pain medication?
A. Once a day. Just to be safe.
Q. Did you take any today?



A. Yeah, this morning.
Q. Okay. And how many pills do you take for pain?
A. One.
Q. One, okay. And you're not sure what it's called?
A. No.
Q. And the second pill you take, is that for a heart condition?
A. Heart condition?
MR. WIENER: Objection. No foundation.
Q. I'm sorry. What's the second pill for?
A. High blood pressure, ain't it? No, for my artery.
Q. Your arteries?

A. I got a blocked artery, and I take that for pain.

Q. Okay. So are both the pills you take are they both for pain?

A. One's white, they're both white, and he gives me half a pill. I don't know what it's for. I don't know what the pills are for. I just take them.

Q. How is your health right now, sir?



A. I think I'm in good health. I think I am, let's put it that way.

Q. Okay. You were hospitalized for a while this past fall?

A. Oh, yeah.

Q. Was that gallbladder?

A. Gallbladder and the artery.

Q. Okay. And did you fully recover from that?

A. Well, don't bother me that much.

Q. Okay. Are you in any discomfort right now?

A. No.

Q. Okay. How long have you been taking the pain medication? How many years?

A. How many years?

Q. Yeah.

A. I don't know. I think it's just a year, I think. I don't know.

Q. Is it fairly recent?

A. Yeah, recent.

Q. Okay. Were you taking any medication

before you went into the hospital this fall?
A. No.
Q. So it started after you went into the hospital?



A. Yeah. That's why I went to the hospital because I had pain.
Q. Are you in pain now?
A. No.
Q. Mr. Souza, you testified you worked for Mr. Simpson; correct?
A. Yes, that's right.
Q. How close was Mr. Simpson -- did Mr. Simpson have a yard he worked out of?
A. A yard?
Q. Yeah, a location?
A. Yeah.
Q. Okay. And was that close to your home?
A. Yeah.
Q. How close?
A. In my backyard. I mean, I was in his backyard, I should say.
Q. Now, you recall going to school through the eighth grade; is that right?
A. Right.
Q. Okay. Did you go to any years in high school?
A. No.
Q. Did you even start attending the high

school?
A. No. I had to work on a farm. I had no choice to go to work. I had a big family. Somebody has to support them.
Q. So when you finished school, you went to work at a farm?
A. My father owned the farm.
Q. Where was the farm located?
A. Right below the hill.
Q. Okay. Right near your house?
A. Right down here.
Q. Okay. And was it next to the house you lived in?
A. No. I lived on Connell Street.
Q. Okay. At the time you worked on the farm, did your, was your family home on the farm or someplace else?
A. No. No. My family lived on Connell Street, and that's where I worked. We had the farm here because we used to rent all this land.
Q. Okay. Your family owned that land?
A. No. No.
Q. You rented it from somebody else?
A. Somebody else, yeah.



Q. Okay. Your father rented it from somebody else?

A. Yep.
Q. And you worked on the farm?
A. Yes.
Q. What did you do on the farm?
A. What do you do on a farm? Plant, take care of the garden, that's it.
Q. Is that what you did when you left the eighth grade?
A. I was taking care of the cows and everything else. We had cows and horses and everything else.
Q. I just want to be clear. Did you go to work on the farm when you left or finished the eighth grade?
A. I was working already, working on the farm when I left school.
Q. Okay. Did you continue to work on the farm after you left school?
A. No. I worked in the baker shop.
Q. Okay. When did you start to work in the baker shop for the first time?
A. I don't know. I think it was '45, '46. I



don't even know to tell you the truth.
Q. Okay. You worked at the baker shop when you came back from the service; correct?
A. Yeah.
Q. Okay. Didn't you also work in the baker shop for a year before you went into the service?

MR. WIENER: Objection.

A. I worked in the baker shop two years before I went into the service.

Q. Two years, okay. Do you remember the name of that baker shop?

A. Russo.

Q. Where was it located?

A. On South Main Street, East Main Street.

Q. Okay.

A. Right on the corner of South Main and East Main.

Q. Do you remember who owned the bakery?

A. Mr. Russo.

Q. And you baked bread there?

A. Yeah.

Q. And you baked bread for two years before you went into the service?

A. Right.



Q. Okay. And you were 18 when you went into the service?

A. I guess so.

Q. Okay. And you are sure that World War II had already started before you went into the service; correct?

A. No. I don't think so. They had to draft -- I went in by joined to go in -- I joined when I was in the draft. I was caught in the draft; right? So I joined before they come and got me because I could get a better shot at it.

Q. Let me try it this way: Do you know whether you were in the service before or after the invasion of Pearl Harbor?

MR. WIENER: Objection to the form of the question.

A. Before, yeah. I went in before Pearl Harbor.

Q. You were in the service before Pearl Harbor?

A. Yeah.

Q. Okay. Do you know how long before Pearl Harbor it was?

A. I think it was less than a year.



Q. All right. So after you finished your eighth grade of school, you were working on the family farm; is that right?

A. (Nods)

Q. You have to say yes or no.

A. Yes.

Q. Okay. You also remember working two years at the Russo's Bakery before you went into the service?

A. Right.

Q. Okay. And when you came back from the service, you went back to Russo's Bakery?

A. No. No. I went -- where did I go from there? I went construction for Simpson.

Q. Okay. You worked construction for Simpson

after you finished the service?
A. Yeah. Just -- you got me confused now.
Q. I want you to be clear in your testimony. Take your time.
A. What did I do? I went in the service. I came out of the service. I went in the baker shop. Got out of the baker shop. No. I went in the service. I went in the service when I was working for Simpson. And it was four years in the service.



Stood in New Jersey for a while. I worked in New Jersey. Then I came home. You know, I went in business for myself, went roofing.
Q. Okay. Let me back up again. And let's try this another time. You recall going to school through the eighth grade; is that right?
A. Yes.
Q. Okay. You recall working at the family farm after you finished the eighth grade; is that right?
A. No. I didn't go to the farm. I went to work for Russo's Bakery. I went to Russo's Bakery.
Q. I'm sorry. Okay. You went to work for Russo's Bakery for a couple of years you think?
A. Yeah.
Q. And what did you do when you left Russo's Bakery?
A. I went to New Jersey. I worked in New Jersey. I worked on the boardwalk in New Jersey.
Q. Okay. Did you go to New Jersey after the

service or before the service?
A. After the service.
Q. Okay. Let's try to go chronologically. When you finished the eighth grade, you've indicated



at different times you either went to work at the farm or you may have gone to work at the Russo's Bakery. Do you recall which it was?
MR. WIENER: Objection to the form of the question.
A. I went to Russo's Bakery when I got out of school.
Q. Okay. When you got out of school, it was Russo's Bakery?
A. Right.
Q. And you are only 14, 15, 16 years old?
A. No. I was 18 or better.
Q. What did you do when you finished working at Russo's Bakery, where did you go next?
A. I went to New Jersey.
Q. Okay.
A. I quit Russo's Bakery and went to New Jersey. Because the guy, the owner owned it, right? He wouldn't give us any promotions. He was giving it to his sons and his cousins and everybody else so we are just dogs there working. I quit. I went and worked in New Jersey.
Q. Mr. Souza, I'm just trying to follow your testimony, and I know you're trying to give it as

clearly as you can of where you went after you finished the eighth grade. So you told me a moment ago that when you finished the eighth grade, you went to work at Russo's Bakery; is that correct?
A. Right.
Q. And you were baking bread there?
A. Right.
Q. And you hadn't gone in the service yet. You went from school to Russo's Bakery?
A. Yep.
Q. At some point after Russo's Bakery, did you go into the service?
A. I went in the service when I was in Russo's Bakery.
Q. So you were working at Russo's Bakery, and you left there to go to the service?
A. Right. That's when the war broke out.
Q. And you were about 18 at that time?
A. No, I was older than that.
Q. Okay. Apart from working at Russo's Bakery before going into the service, did you work anywhere else between the eighth grade and the time you went into the service?
A. I worked for Simpson.



Q. Okay. So between the eighth grade and the time you went into the service, you spent two years

working at Russo's Bakery and some time working for Simpson?

A. Right.

Q. Okay. How long did you work for Simpson before you went into the service?

A. I think I didn't work for him too long. A couple of years, I guess. I'm not sure.

Q. Okay. So is it accurate to say and fair to say that your best recollection is that you worked for two years at Russo's Bakery and a couple of years --

A. I worked for, I worked over three years in Russo's Bakery.

Q. Okay. Is it fair to say that you worked almost three years at Russo's Bakery and a couple of years with Simpson before you went into the service?

A. Right.

MR. WIENER: Objection to the form of the question.

Q. Okay. Did you work at Simpson's before you worked at Russo's Bakery, or did you work at Russo's Bakery before you worked at Simpson's?

73

MR. WIENER: Objection to the form of the question.

A. I was at Russo's Bakery. See, I quit Simpson because he was giving all the best jobs to the other guys. So I'm taking all the crumbs, so I didn't go for that. So I went to the baker shop.

My father knew the owner of the baker shop, so he got me a job in the baker shop.

Q. All right. So you went from Simpson to the baker shop?

A. Right.

Q. And you went from the baker shop to the service?

A. Right.

Q. And when you left the service and came back to Rhode Island --

A. I stood in New Jersey for two years.

Q. When you left the service and came back to Rhode Island, well, let me ask this way: When you left the service, did you first come back to Rhode Island?

A. Yeah.

Q. Did you go back to the baker shop when you returned to Rhode Island?



A. No, I didn't go back to the baker shop, no. I went in business for myself.

Q. I want to talk about Mr. Simpson. What was his first name?

A. John.

Q. By the way, Mr. Souza, how well are you able to read now?

A. How well?

Q. Yeah.

A. I don't know.

Q. How is your vision? Are you able to -- if

I may just show you one of the exhibits you referred to.

MR. PETROS: Where is the affidavit?

MR. WIENER: The affidavit you didn't want to use?

MR. PETROS: The one you showed the witness, yeah.

Q. Mr. Souza, are you able to read the first two lines of Exhibit 1?

MR. WIENER: Let the record reflect that Mr. Petros has handed the witness the document that has been marked for identification as Souza Exhibit No. 1.



MR. PETROS: I think I said Exhibit 1.

Q. Mr. Souza, can you read the first two lines?

A. Put my glasses on.

Q. Okay. That was the first question I wanted to ask you. Are you able to read without your glasses on?

A. Some things I can, yes.

Q. Can you read the first two lines on that document without your glasses on? Just tell us if you can.

A. I currently reside at Four Church Street, Tiverton, Rhode Island.

Q. Okay. Do you see the first line right here with the bigger print? Can you read that? Why

don't you try -- see if you can read it with the
glasses on?
    A. This is, says something about me.
    Q. Are you able to read it, sir?
    A. Yeah.
    Q. Why don't you just read that first line for
us.
    A. Oh, boy, I can't pronounce that first word.
Then it says Jose Souza.



    Q. Can you read the second line?
    A. Joseph Souza hereby declares the following.
You want me to go down further? I currently live
on, reside on Four Church Street.
    Q. No, I think you've answered my question.
Thank you, Mr. Souza. So you're able to read better
with your glasses on?
    A. Oh, yeah, of course, I can see better with
my glasses.
    Q. Okay. Now, Mr. Simpson, you worked for him
for a little while. His first name was John?
    A. Yeah.
    Q. How much older than you was Mr. Simpson?
        MR. WIENER: Objection. No foundation.
    A. The father?
    Q. Let's back up. You worked for John
Simpson?
    A. Yeah.
    Q. Okay. Did you work for more than one
Simpson, or was it just John Simpson?

A. No, he owned the company, John Simpson. His sons worked there too.
Q. Okay. Let's talk about the father. How much older than you was the father?



MR. WIENER: Objection. No foundation.
A. He was older than my father. I don't know. I don't keep track of the ages.
Q. Okay. And he ran -- did he run the company, John Simpson?
A. He owned it.
Q. Okay. And did he run the company?
A. Yeah, of course, he owned it. His son John used to run it.
Q. He had a son that was also named John?
A. Yep.
Q. Who gave you -- who told you what to do? Was it John Junior or John Senior?
MR. WIENER: Objection to the form.
A. Alvin Simpson.
Q. Okay. Which one?
A. Alvin.
Q. Alvin?
A. I worked with him.
Q. Now, tell me about Simpson's business. What did he do?
A. He did everything. He was a contractor.
Q. But you told us earlier he built houses and demolished houses?

A. He moved houses around.
Q. He moved houses?
A. Yep.
Q. That were already built?
A. Yep.
Q. What else did he do?
A. Like I say, he did everything. Regular construction, you know, you do a job.
Q. He had a lot of trucks?
A. Oh, I would say yes.
Q. How many?
A. At least ten. At least ten.
Q. Now, you've talked about some work that Simpson did for Fall River Gas Company. Did Simpson haul materials for other companies?
A. Like I say, he was a general contractor, he did everything.
Q. Okay. Did he do any work for the town of Tiverton?
A. Oh, I don't know.
Q. Okay. Did he do any work for any other companies?
A. Not that I know of.
Q. Who were his clients? Who were his



customers?
MR. WIENER: Objection to form.

A. Whoever he gets.
Q. Okay. Do you remember any of them?
A. No. All I know he did all the work in the Fall River Gas Company.
Q. Okay. Can you remember any other customer that he had?
A. No.
Q. Can you remember any other business that he did apart from moving houses?
A. He was a general contractor. He did everything.
Q. Can you tell me some of those things?
A. Uh?
Q. Are you able to tell us some of those things that he did?
MR. WIENER: Objection. Asked and answered.
A. Oh, boy. I don't know. Like I say, we worked on the gas company cleaning out the vats, and we delivered coke to the houses.
Q. Was most of the material that you removed from the Fall River Gas Company cinders and coke?



A. Yeah.
Q. Okay. And you would go to the gas company I believe you testified every six months to do this cleaning?
A. Well, whenever it was necessary.
Q. Okay. And you estimated it was about every

six months?

A. Yeah.

Q. Okay. Mr. Souza, I want to ask you some questions about what you saw at Fall River Gas Company, okay? I'm going to ask you about what you saw there. Now, the first question is in a very general way when you pulled into the facility, how many buildings were there on this facility?

A. Oh, God, it was a plant.

Q. Okay. I want you to describe for me what you remember on the Fall River Gas Company facility, what physical structures?

A. Like I say, they had the vats where all the chips went in. Had the house where they made the gas and the retour house and the water gas. That's about it.

Q. Was there a driveway you would go in?

A. Well, of course, you had a big yard.



Q. Okay. What was in the yard?

A. What was in the yard?

Q. Yeah.

A. Filter houses, retour house, and inside was the water gas house. All I know I worked.

Q. Okay.

MR. WIENER: Gerry, Mr. Souza, are you okay? Do you need to take a break?

THE WITNESS: Uh?

MR. WIENER: Do you need to take a break?

THE WITNESS: No.

MR. WIENER: Are you okay?

THE WITNESS: Yeah, I guess I won't get any better, I'll tell you.

MR. WIENER: Why don't we take a short break.

THE WITNESS: I can't remember all these things you're asking me.

MR. PETROS: I think the witness is struggling a little bit.

THE WITNESS: You're asking me too many questions.

MR. WIENER: Why don't we take a couple



minute break?

MR. PETROS: Let me just ask a few questions and then we'll take a break and it may be time to break for the day. But I would like to ask him a few questions before we do that.

MR. WIENER: Are you okay, sir?

THE WITNESS: Yeah.

MR. PETROS: Can you answer questions for another five or ten minutes, Mr. Souza? If you are not able to, I'll stop right now.

THE WITNESS: No, go ahead. I don't care.

MR. PETROS: If you get tired or confused, you tell all of us and we'll stop; okay?

THE WITNESS: How can you get tired?

Get confused, yes.

MR. PETROS: We all get tired, Mr. Souza. We all get confused even though we're not quite 87 yet, so.

Q. All right. Let me ask you when you pulled into the Fall River Gas Company, you would drive in in a truck; right?

A. Yeah.

Q. Okay. And there was a long driveway?



MR. WIENER: Objection.

A. You come down Charles Street and drove right in the yard.

Q. Okay. What was -- there was a road you would drive on in the yard; right?

A. Yeah.

Q. Okay. What was to the right of you as you pulled into the facility?

A. That's where the water gas house was.

Q. Okay. What was the water gas house?

A. That's where they made gas.

Q. Okay. Is that where they burned coal?

A. No. Coal was across the street.

Q. Ah, okay.

A. I mean, it's the same yard, but it's over on the -- down toward the railroad tracks.

Q. So when you look to the right, you said that was the water gas. What did you see?

A. What did I see?

Q. Yeah, what did it look like?

A. A building.
Q. Okay. Did you ever go in that building?
A. Of course I did.
Q. The water gas building?



A. Yeah.
Q. What did you do in that building?
A. Clean it out.
Q. Okay. What did they use to make gas in that building?
A. They use coal already burned.
Q. Already burned?
A. Yes.
Q. As you looked to your left, on the right you said it was water gas; right?
A. Yeah.
Q. Let me start again. As you pulled into the facility, on the right-hand side was the water gas building?
A. Yeah.
Q. Was it a brick building?
A. Yes.
Q. Okay. And that's where they made gas?
A. Yeah. Water gas.
Q. Water gas. They burned coke or coal in there, do you know?
MR. WIENER: Objection to the form.
A. Mostly oil.
Q. They burned oil in there. Okay.

A. Yeah.
Q. Was there any coke in that facility?
A. Yeah. They burned coke too.
Q. In the water gas?
A. Yeah. I don't know why, but they burned coke too.
Q. Okay. And when you -- what do you remember seeing when you were inside that building, the water gas building?
A. Big building, that's what I see.
Q. Okay. Most of your work was outside the buildings, Mr. Souza, wasn't it?
A. Yeah.
Q. Okay. Do you remember you spoke to -- you spoke a couple of times with some lawyers from the gas company over the last four or five months?
A. I know I talked to somebody. I don't know who they were, but I talked to somebody.
Q. Okay. Do you remember talking a few times to one or two of the lawyers representing the gas company?
A. Yeah.
Q. Do you remember telling those lawyers that almost all the work you did at the Fall River Gas



Company site was on the outside not on the inside of the buildings?

A. Yeah. I don't work inside. I worked
outside.
Q. Okay. Now, as you pulled into the facility
and you looked to your left, what did you see to
your left?
A. Which road we going down? Charles Street
--
Q. Yes.
A. Or Slade Street.
Q. Same way, Charles Street?
A. Charles Street. On my left --
Q. That would be your right, Mr. Souza, the
hand you had up; right?
A. If I go like that, on my right would be the
building.
Q. On your right was the water gas?
A. Yeah.
Q. Okay. And what was on your left?
A. That was the big retour house where they
made the gas out of coke, coal.
Q. Okay. What did that house look like, the
retour house?

87

A. Oh, big building.
Q. Was it brick?
A. Yeah.
Q. Okay. Red brick?
A. Yeah.
Q. Was it a square building? What did it look

like?

A. I don't know. It was four stories high. That's all I can tell you.

Q. Okay. And as you went further into the Charles Street facility, what other physical buildings or structures do you remember seeing?

A. They had all kinds of buildings there. They had the filter houses. They had the water gas house.

Q. Okay. Now, one of the things you remember doing is taking coke from the facility, from the Fall River Gas Company facility --

A. Right.

Q. -- and bringing it to people; right?

A. Yeah. We delivered it to the houses.

Q. Right. And a lot of those homes were what we now would call welfare homes or homes on relief?

A. They were welfare homes then.

88

Q. And you would bring the coke and they would take it and do what with it?

A. Burn it.

Q. In your house in this time frame in the 1930s, did you burn coal in your house?

A. Yeah, of course we did.

Q. Did everybody do that?

A. I don't know. I know what we did.

Q. Okay. Did most of the people you knew whose homes you went into did they also burn coal or coke?

A. Yeah.
Q. And what did they burn it for?
A. To heat the house.
Q. Okay. And was that common in that time frame, that people would burn coal or coke to heat their home?
A. Yeah, of course.
Q. Okay.
A. Some people had wood stoves in the middle of the floor, put coke in there to warm it up. Potbelly stoves we call them.
Q. So you and one of your -- and somebody else would put the coke in the back of a truck?

89

A. Yeah.
Q. Was this like a dump truck? What did the truck --
A. Yeah, it was a dump truck.
Q. Could it actually go up and dump?
A. Yeah.
Q. Okay. And you would deliver this coke to different people in Tiverton or elsewhere?
A. All over.
MR. WIENER: Objection to the form.
A. City of Fall River.
Q. City of Fall River?
A. Yeah.
Q. Okay. When you delivered the coke to these people, did they pay you for it?

A. No. We just delivered. They used to pay Simpson.

Q. Ah, okay. Did these people pay Simpson for the coke?

A. Of course. They wasn't going to get it for nothing. They use it for heat.

Q. But you never took any of the money? You weren't involved in that?

A. No. I never handled any money, no. I was



lucky to get a bar of candy.

Q. And where did this -- where did you get the coke that you would deliver to these people?

A. Came out of the retour house.

Q. Okay. Now, you also mentioned a few times a term called "beehives"?

A. Yeah.

Q. Do you remember that?

A. Yeah, that's filter houses.

Q. That's the what?

A. Filter houses.

MR. WIENER: Did you say filter houses?

A. Yeah. Where you filter the gas.

Q. That's right. They used to filter the gas in the beehives; right?

A. Yep.

Q. Okay. And did you ever go inside the beehives?

A. Have to clean them out.

Q. Did you ever go inside the beehives?

A. Of course.
Q. Okay. Now, you remember a moment ago, Mr. Souza, I asked you about conversations you had with the gas company lawyers?



A. Yeah.
Q. Okay. I want to ask you another question. And if you don't understand it, let me know. But I'll try to be very clear. Do you remember telling the gas company lawyers that you didn't know what a beehive was, you never heard that term before?
MR. WIENER: Objection.
A. Well, we never called it that. We just called them filter houses.
Q. Okay. So when you were talking to the gas company lawyers just a few months ago, you hadn't heard of the term "beehive" before?
MR. WIENER: Objection to the form of the question.
Q. You called them filter houses?
A. We called them filter houses. That's what they were.
Q. Okay. Who told you the term, who told you the term "beehive"? Where did that come from?
MR. WIENER: Objection. No foundation.
A. I don't know.
Q. Had you ever heard of the term "beehive" before you were shown the affidavit that's marked as Exhibit 1?

MR. WIENER: Objection.
A. I can't remember that.
Q. Okay. But that term, that's not your word; that's a word that came from somebody else, Mr. Souza; right?
A. People that worked there. The people that worked there, right?
Q. Right.
A. So I worked for Simpson; right? You going to go clean the beehives.
Q. Mr. Souza --
A. So we go out there and clean them.
Q. Let me go back to the question I asked you a moment ago. Do you remember telling the gas company lawyers that you had never used or heard of the term "beehive"?
MR. WIENER: Objection. Asked and answered.
A. No. We never had -- never said that with me. We didn't know what they were. We only called them filter houses.
Q. Okay.
A. Never called them beehives. They called them beehives. We didn't call them beehives. We



called them filter houses.
Q. But even five or six months ago you didn't

know what a beehive was, Mr. Souza, did you?

MR. WIENER: Objection. It's a mischaracterization of his testimony.

A. You're talking to me like I'm a dumbbell. I'm not a dumbbell.

Q. No. I know you're not, Mr. Souza, you're not at all.

A. I worked there. We cleaned out these filter houses so they could put new chips in there to filter gas. So we used to take all those wood chips out and put new ones in.

MR. PETROS: Okay. I move to strike.

Q. Mr. Souza, my question is very simple, okay? The term "beehive" is that a term that you used when you were working for Mr. Simpson?

A. Well, that's what they used to call them.

Q. Who used to call them that?

A. Everybody.

Q. Okay.

A. You're going to work in the beehives today and we're going to clean them out. That's what they used to say. So we go in there and clean them out.

94

Q. Do you remember telling the attorneys for the gas company --

A. Beg pardon?

Q. Do you remember telling the attorneys for the gas company a few months ago that you didn't know what the term "beehive" referred to?

MR. WIENER: Objection. You're badgering the witness at this point. That's the third time you've asked him the same question.

A. We never called them beehives. We called them filter houses.

Q. Okay. And that was on the left-hand side as you came into the facility, what you call the filter houses?

MR. WIENER: Asked and answered.

A. Let's see, as we came in the gate, I think they were on the left side. I'm not sure now.

Q. Okay. And if you kept driving further into the facility, what else would you, what other buildings would you see or encounter?

A. Well, that's where the main plant was.

Q. Okay. Did you always work with the same person when you were working at the Fall River Gas Company to pick something up?

95

A. I worked with my brother I told you.

Q. Okay. And I'm sorry, which was one that?

A. My older brother.

Q. And Pete is your younger brother?

A. Pete, yeah.

MR. PETROS: Okay. That's the topic I wanted to finish. Why don't we break now. And, Mr. Souza, we're going to bring your son over. We'll talk with your son again; okay?

THE WITNESS: What's that?

MR. PETROS: We'll ask your son to come

over now and we'll talk with him and see if we're going to resume the deposition or continue it some other time; okay?

THE WITNESS: Okay.

MR. WIENER: For the record, we would object to continuing the deposition, but let's talk to Mr. Souza's son.

MR. PETROS: Okay.

THE VIDEOGRAPHER: We are going off the record. The time is 12:49 p.m.

(Break taken)

THE VIDEOGRAPHER: We are back on the record. The time is 1:22 p.m.



MR. PETROS: Okay. We're back on the record. We've been talking about trying to agree to a date in which to continue Mr. Souza's deposition. We have agreed that we're going to try to continue this deposition on Thursday, the 19th -- is that the 19th, Lew?

MR. WIENER: No. No. The 22nd.

MR. PETROS: I'm sorry, the 22nd?

MR. WIENER: Yes.

MR. PETROS: Thursday, the 22nd of February, a week from today. I'm going to propose, Lew, you and I can talk about this, I'm going to propose we get another room right nearby where there's a table and some more comfortable accommodations to take a -- a neutral location for

the deposition.

MR. WIENER: We don't object.

MR. PETROS: We'll rent a room or something. I advised counsel for the state that I am starting a trial on Tuesday before Judge Rubine, the Superior Court, the case is Hagerty versus Narragansett Electric Company. We hope and expect that will only be a two-day trial and will be over shortly.



We also have pro hoc vice motions pending for, I believe, Mr. Ross and Mr. Herschmann on Wednesday, the 21st of this month. And so the date of the 22nd to continue Mr. Souza's deposition is subject obviously to one of us being available to resume the cross-examination. We have also agreed that in the event that neither of us are available because of trial and a ruling on the pro hoc vice motions that March 8th will be the date we will move the deposition to and continue the deposition on that date, again, only as a substitute date in case something happens on the 22nd. Did I summarize that accurately?

MR. WIENER: Correct. We are in agreement with those dates and with your characterization of our discussions.

MR. PETROS: Okay. And, Lew, again, I don't know what the practice is in other states, but our practice here is that given that Mr. Souza is on cross-examination, it wouldn't be appropriate for

the parties to be talking to him in the meantime. I would ask the state to honor that as we will.

MR. WIENER: We understand our ethical obligations.



MR. PETROS: Okay.

MR. ROSS: So you agree to honor it, Lew? Or you're saying --

MR. WIENER: I'm not going to dignify your question with an answer.

MR. ROSS: Or do we need the hearing officer to make a ruling on that?

MR. WIENER: I'm not going to dignify that with an answer.

MR. ROSS: All right. We'll ask her to make a ruling on it. Will you also agree that no party representing the plaintiffs should contact the witness and coach him during this period of time in any way?

MR. WIENER: I'm not going to dignify your question with an answer.

MR. ROSS: All right. We'll contact the hearing officer and ask her to rule on that as well.

MR. WIENER: Go for it.

MR. PETROS: Okay. Mr. Souza, thank you very much for your time, and we will meet with you again shortly. Okay. That concludes -- we'll adjourn today's deposition.

THE VIDEOGRAPHER: The time is 1:25

p.m., and the deposition is concluded for today. This is the end of cassette number one, and we're off the record.

(Deposition adjourned at 1:25 p.m.)



CERTIFICATE OF COURT REPORTER

I, Christine Silva-Adermann, Registered

Professional Reporter, and Commissioner of Deeds in and for the State of Rhode Island, do certify that the deposition of JOSEPH "JOSE" SOUZA, in the matter of SOUTHERN UNION COMPANY, on FEBRUARY 15, 2007, was stenographically recorded by me; that the transcript produced by me is a true and accurate record of the proceedings to the best of my ability; that I am neither counsel for, related to, nor employed by any of the parties to the above action; and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

FEBRUARY 15, 2007 ______________________________

Christine Silva-Adermann, RPR