# EXHIBIT C

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
ADMINISTRATIVE ADJUDICATION DIVISION

IN RE: AAD NO. 06-011/SRE
SOUTHERN UNION COMPANY
d/b/a NEW ENGLAND GAS COMPANY
NOTICE OF VIOLATION OC&I/SR 06-01

VOLUME II

Videotaped deposition of JOSEPH SOUZA, a Witness herein, taken on behalf of the Respondent, on THURSDAY, MARCH 8, 2007, 10:09 A.M., at the offices of THOMAS BRADY, ESQUIRE, 167 MAIN STREET, TIVERTON, RHODE ISLAND, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.

Vivian S. Dafoulas, RMR-CRR
50 Fieldstone Drive
East Greenwich, RI 02818-2064
(401) 885-0992

APPEARANCES:

FOR THE PETITIONER:

SUTHERLAND, ASBILL & BRENNAN LLP
BY: LEWIS S. WIENER, ESQUIRE
1275 PENNSYLVANIA AVENUE, NW
WASHINGTON, DC 20004-3593

SUSAN B. WILSON, ESQUIRE
235 PROMENADE STREET
PROVIDENCE, RI 02908-5767

FOR THE RESPONDENT:

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
BY: ERIC D. HERSCHMANN, ESQUIRE
DAVID E. ROSS, ESQUIRE
SETH DAVIS, ESQUIRE
1633 BROADWAY
NEW YORK, NY 10019-6799

HINCKLEY, ALLEN & SNYDER LLP
BY: GERALD J. PETROS, ESQUIRE
50 KENNEDY PLAZA, SUITE 1500
PROVIDENCE, RI 02903

# I N D E X


| WITNESS | PAGE |
|---|---|
| JOSEPH SOUZA | |
| EXAMINATION BY MR. HERSCHMANN | 4 |

| EXHIBITS | PAGE |
|---|---|
| 3 Letter from Roofers & Waterproofers Local Union No. 33 dated 1/3/07 | |
| 4 E-mails between Joe R. Souza and Robert McConnell | |

VIDEOGRAPHER: We are now recording and on the record.

My name is Brett St. Gelais. I'm a legal video specialist for National Video Reporters. Our business address is 11 South Angell Street, Providence, Rhode Island, 02906.

Today is March 8, 2007 and the time is 10:09 a.m. This is the continuation of the deposition of Joseph Souza in the matter of Southern Union Co. doing business as New England Gas Co. in the State of Rhode Island and Providence Plantations, Department of Environmental Management, Administration Adjudication Division.

This deposition is being taken at 167 Main Road, Tiverton, Rhode Island. The court reporter is Vivian Dafoulas. Will counsel please state your appearances and will the court reporter please administer the oath.

MR. WIENER: Lewis Weiner for the Petitioner, Rhode Island Department of Environmental Management.

MS. WILSON: Susan Wilson for the Rhode Island Department of Environmental Management.

MR. PETROS: Jerry Petros for Southern Union Company.

MR. DAVIS: Seth Davis for Southern Union Company.

MR. HERSCHMANN: Eric Herschmann for Southern Union Company.

MR. ROSS: David Ross for Southern Union Company.

THE WITNESS: What am I supposed to say?

MR. HERSCHMANN: Good morning.

THE WITNESS: Good morning. All right. I don't know -- the way you've been talking, I don't know what's going on here, so if I got to say something, I want to say it; get it over with.

MR. HERSCHMANN: Can we swear the witness? He hasn't been sworn, right?

MR. WIENER: He's ben sworn, yes.

MR. HERSCHMANN: All right.

JOSEPH SOUZA - RESUMED

EXAMINATION

BY MR. HERSCHMANN:

Q. Mr. Souza, you understand that you are still under oath?

A. Oh, yeah. Yeah. I'm not going to lie.

Q. And, Mr. Souza, what I'd like to do is -- we've never met before, right?

A. I don't remember you, no.

Q. My name is Eric Herschmann. I'm an attorney representing Southern Union Company. Have you ever heard of Southern Union Company?

A. No.

Q. And, sir, I'm going to ask you a series of questions today. If you don't understand the question, will you tell me so I can try to rephrase it; okay?

A. Okay.

Q. It's important that you answer everything verbally. You have to say yes or no or answer the question. You can't just nod your head; okay?

A. Yeah. I understand that.

Q. The stenographer here takes down everything that you say; okay?

A. All the lies too?

Q. All the lies too, everything. Mr. Souza, you said, I think, the last time that you gave testimony in this matter was the first time you ever testified, right?

A. Yeah.

Q. Other than going into the Air Force during World War II, had you ever had to take an oath where someone says I need you to raise your right hand and tell the truth?

A. I don't recall.
Q. And yesterday we met a gentleman named Mr. Moran who said he was your lawyer.
THE WITNESS: He's my lawyer?
MR. WIENER: Yes.
A. Moran? Moran. Only Moran I know is my boss's son.
Q. You've never met someone named Moran and he's not your lawyer, right?
A. Not that I know of.
Q. Well, obviously you would know, right?
A. Oh, yeah. Yes, I would.
Q. And going out and hiring a lawyer is a big deal, right?
A. Oh, I wouldn't hire a lawyer.
Q. And you don't have any lawyer in relationship to this, right?
A. No.
Q. Do you have any idea why some people in the neighborhood would have gone about getting somebody and have that person say he was your lawyer?
MR. WIENER: Objection to the form of the question.
A. I don't know.

Q. That's not truthful, right?
A. No.
Q. Now, your son gave testimony, like you're doing today, yesterday; do you know that?
A. No, I didn't know that.
Q. Did he tell it?
A. Huh?
Q. Did he tell you that he testified yesterday?
A. I think he did. I'm not sure.
Q. Well, did you see him last night?
A. No. I seen him this morning. He brought me up here.
Q. But you don't remember whether he told you that he testified or not?
A. Yes. I know -- now I remember, yeah. He told me that he was here with you guys.
Q. Well, do you remember now that -- because I asked you it or are you remembering it because he had told you it himself?
MR. WIENER: Objection to the form of the question.
A. He told me himself.
Q. And did your son tell you what he testified about?

A. No. No.

Q. Did he tell you that some of the lawyers before him that had come to your house to see you tried to confuse you about things?

MR. WIENER: Objection to the form of the question.

MR. HERSCHMANN: What's the basis?

MR. WIENER: You want me to make a speaking objection?

MR. HERSCHMANN: If -- I'm asking for a basis. If you have a basis, I can correct the form, if I understand it.

MR. WIENER: I think it's an improper question. I think it suggests facts not in evidence. There's no foundation for the question.

MR. HERSCHMANN: You should have read yesterday's testimony. Okay.

Sir, you -- you can answer the question. Can you read it back, please?

(The question was read by the court reporter, as requested.)

A. No.

Q. You told us a moment ago that the only time you remember taking an oath was when you testified here, right?

A. Right.
Q. Do you remember at some point having to go to your son's house and a bunch of people were trying to ask you questions?
A. Yeah.
Q. And your son told us yesterday that nobody had you take an oath in his living room, right?
A. I don't remember taking any oaths.
Q. Well, if you -- if you went into your son's house and someone said, "I want you to raise your right hand," you'd remember that, right?
A. Oh, yeah.
Q. So that definitely didn't happen; and he said it didn't happen --
A. Yeah.
Q. -- right? Is that correct? You have to answer.
MR. WIENER: Objection to the form.
A. Yes or no?
Q. Yes. That didn't happen, right?
A. Yes.
Q. All right. Now, your son said that they gave you a document and no one read it to you and you didn't have your reading glasses so you didn't

read it. They said, just sign on the page. Do you remember doing that?

MR. WIENER: Objection.

A. Hey, I don't remember.

Q. Sir, do you remember a few weeks ago someone putting some papers in front of you and saying, "Sign this"?

A. A few weeks ago?

Q. Yes. In the latter part of January.

A. I don't know. I don't remember that.

Q. Sir, do you know what today's date is?

THE WITNESS: Today's date?

MR. HERSCHMANN: Yes.

A. I think it's the sixth, isn't it?

Q. Sixth of what month?

A. February.

Q. Okay. And -- so do you remember just like last week then it would have been, if today is the sixth day of February, that you would have had -- they had you sign something? Do you remember that?

A. You got me confused there.

Q. Sir --

A. I know somebody came and talked to me. Just told me I had to come for a meeting. That's

all they told me.

Q. And your son said it was confusing to you. Do you remember being somewhat confused when you were there?

MR. WIENER: Objection to the form.

A. I don't know.

Q. You need your reading glasses to read, right?

A. Oh, yes. Yes, I forgot to bring them.

Q. Your son said that's what happened when they met with you, you forgot to bring your reading glasses also, right?

A. Yeah.

MR. WIENER: Objection to the question.

A. Yeah, because I only use them when I read paper in the house, so...

Q. Can you read without your reading glasses?

A. Oh, yeah, sure. If the letters are big enough, yes.

MR. HERSCHMANN: Just one second, sir.

( P A U S E )

BY MR. HERSCHMANN:

Q. Mr. Souza, let me ask you just a couple of questions before I show you a document. Do you

recall why your son said you had to go to his house a little while ago?

MR. WIENER: Objection.

A. To whose house?

Q. To your son's house.

A. No.

Q. Do you remember that there were some people in the house talking amongst themselves and just asking you some questions?

A. Not in this house, no.

Q. And do you remember at some point these people created -- made up a piece of paper and they gave it to your son and they said, you know, you have to sign the document, Mr. Souza?

MR. WIENER: Objection.

A. Oh, God, you have to ask my son that because he didn't give me no papers.

Q. Do you recall at some point the Simpson girl coming to see you? Do you know who the Simpson girl is?

A. Oh, yeah, I know who she is but I don't remember -- I mean if she walked across here now, I wouldn't know who she is. She looks something like this.

(Witness indicating the court reporter.)

Q. And you're saying the Simpson girl has blond hair?
A. Yeah.
Q. And do you recall the Simpson girl coming to see you in the last several months, telling you that she wants you to help out the community?
MR. WIENER: Objection.
A. No. No.
Q. Do you recall talking to your son at some point and telling your son, "I don't want to be bothered with all this stuff and you go talk to people"?
A. Yeah, I told him that, yes.
Q. Who was -- who was bothering you?
A. Huh?
Q. Who was coming to bother you?
MR. WIENER: Objection.
A. Oh, I don't know. I didn't want people coming into my house and asking me all stupid questions. That happened 40 years ago.
Q. And you're saying you know this year is 2007, right?
A. Yeah.
Q. So the stuff you're talking about happened 40 years ago from today?

A. I'm talking about before the war.
Q. Before which war?
A. World War II.
Q. And do you know how long ago World War II was?
A. '41.
Q. And, sir, the person that was coming by and was bothering you about this stuff, was that a man or a woman?
A. Oh...
MR. WIENER: Objection to the form.
A. I never had no woman come to my house. I had no woman come to my house. So it had to be a man.
Q. So if the Simpson girl had said that she had come to your house, that's not the truth, right?
MR. WIENER: Objection.
A. Well, she's been to my house, yes, but not for this.
Q. What did she come to your house for?
A. I don't know.
Q. But she never spoke to you about any of this?
A. No.

Q. Who came to your house? Which man came to your house to talk to you about it?
A. I don't know who they are.
Q. Was it this gentleman sitting next to you?
A. Him? I don't know. I don't remember.
Q. And memory is a hard thing, right?
A. Yes. Yes. Yes.
Q. And your son told us yesterday that sometimes you get confused, is that right?
MR. WIENER: Objection to the form.
A. Yes, of course I do.
Q. And what makes you confused?
A. Old age.
Q. It's harder to remember things when you get older, right?
A. Yeah. Yeah.
Q. And sometimes people can try to help you remember something by continuously telling you it until they get you to try to remember, right?
MR. WIENER: Objection.
A. No. No.
Q. Well, sir, do you know that your son spoke to you and then told some other lawyers what you had told him?

MR. WIENER: Objection. Requires speculation.

A. I couldn't tell you that.

Q. Well, did your son tell you that people want to know some information so I'm going to ask you and then I'm going to tell them?

MR. WIENER: Objection.

MR. HERSCHMANN: What's the basis?

MR. WIENER: It requires speculation. I think it's an improperly leading question. There is no foundation for the question.

MR. HERSCHMANN: Okay. You can answer that question.

THE WITNESS: I can answer that? What was it?

MR. HERSCHMANN: Can you read it back, please?

(The question was read by the court reporter, as requested.)

A. I know people wanted to know a lot of things but I don't -- I don't know why. So you want a yes or a no?

Q. Well, sir, what I'm trying to understand is do you know -- you know what a computer is, right?

A. Yeah.
Q. And you know that you can type now messages and send it to somebody --
A. Yeah.
Q. -- right? So you've heard -- have you heard the term "e-mail" before?
A. Yes, of course.
Q. Your son sent out e-mails to some of the lawyers on the other side saying that he spoke to you and you said something. Does that help you remember having conversations with your son?
A. I don't talk to my son that much.
Q. Well, if your son told somebody in writing that he spoke to you and you said something, do you think he's telling the truth?
A. My son never lies.
Q. Sir, yesterday he told us under oath that he lies all the time.
A. Oh, yeah?
MR. WIENER: Objection to the form.
A. Well, that's his business; that ain't mine.
Q. But your -- your view is that if he said something in writing and he said he had a conversation with you, then he was telling the

truth, right?

A. Of course.

Q. And you remember at least sometimes your son coming to talk to you because some gentlemen were coming and bothering you, right?

MR. WIENER: Objection. It's a mischaracterization of his testimony.

MR. HERSCHMANN: Is that a speaking objection? If you do that -- if I want a basis, I'll ask you.

MR. WIENER: I don't take my instructions from you, Mr. Herschmann.

MR. HERSCHMANN: I'm not asking for instructions. Just comply with the rules. That's all.

MR. WIENER: Objection. It mischaracterizes his former testimony.

MR. HERSCHMANN: The record will speak for itself. Do you want to have an argument with me all day long or do you want to take the guy's testimony? Say objection. If I want a basis, I'm going to ask you to preserve it for the record.

MR. WIENER: I'm not taking instructions from you, sir.

MR. HERSCHMANN: I'm not asking for

instructions. I don't want to get down to this now. Let's ask the witness questions.

BY MR. HERSCHMANN:

Q. This is the type of lawyering stuff that you don't need to be involved in, okay, Mr. Souza? So what I want to do is I want to ask you questions.

He is objecting because later on there's going to be a judge or administrator that's going to make certain decisions whether or not the questions were right or wrong. So that's just for later on, but for you, you need to answer the questions, okay? Is that all right?

A. All right.

Q. Now, did there come a time that you remember talking to your son about helping out the community?

A. Yes.

Q. And you expected that your son would go tell some people what you were saying, right?

A. Oh, I don't think he goes around talking about it.

Q. Sir, let me hand you Exhibit 3 for a moment. Sir, can you read Exhibit 3? Not the top, the big print, but the regular print.

A. I can't see it. There's too much glare.

MR. HERSCHMANN: Just so the record is clear, the shades are drawn and there is a fluorescent light on the ceiling.

MR. WIENER: There is a glass top on the table which has a reflection on it.

A. I don't know.

Q. Sir, why don't you hold it up carefully because Mr. Wiener is concerned that the glass on the table may be reflecting to such a degree that you can't see. So why don't you hold it up and see if you can still try to read any of it?

A. (Reading) The special order of business will be the vote on the wage increase of $1.45? Oh, boy.

Q. Can you read the first line for us? Can you see that?

THE WITNESS: The first line?

MR. HERSCHMANN: Yes.

A. (Reading) Please be advised that the next scheduled union meeting will be held on Tuesday --

Q. Okay.

A. -- January the ninth, 2007. That's today, huh?

Q. And, sir, you understand that this is for -- when it says January 9th, 2007, that's today's date, right?

A. Yeah.

MR. WIENER: Objection.

Q. Okay. And, sir, what date were you born?

A. 1919.

Q. Do you remember the month?

A. April.

Q. April?

A. Fourth month, 25th day, 1919.

Q. Sir, do you remember last time you were here you said that you were born in 1925?

THE WITNESS: Me?

MR. HERSCHMANN: Yes.

A. I never said that.

Q. Sir, and this is Page 18 of your last testimony. They asked you, "You say 1925?" And your answer was, "1925."

MR. WIENER: You want to show him the testimony?

A. I born in 1925? I born in 1919.

Q. Okay. So if you said 1925 before, you may have just been confused, right?

A. Yeah. I don't know.

MR. WIENER: Let the record reflect the witness doesn't have his testimony before him.

BY MR. HERSCHMANN:

Q. Now, do you recall the first job you had was working at the farm?

THE WITNESS: Working at a farm?

MR. WIENER: Objection. Asked and answered.

A. I worked in a farm all my life.

Q. And when did you first start working at the farm?

MR. WIENER: Objection. Asked and answered.

A. What farm?

Q. Well, you just said you worked at the farm all your --

A. My father had a farm.

Q. I'm sorry?

A. My father had a farm.

Q. Okay. So how old were you when you first started to work at the farm with your father?

MR. WIENER: Objection. Mr. Herschmann --

MR. HERSCHMANN: Counsel, you can make an objection.

MR. WIENER: Mr. Herschmann, the hearing officer was very specific in her ruling in this case, that we cannot --

MR. HERSCHMANN: Is this called a speaking objection?

MR. WIENER: We cannot go over --

MR. HERSCHMANN: If you want to take a recess --

MR. WIENER: -- that we cannot -- will you please let me finish?

MR. HERSCHMANN: No, excuse me.

MR. WIENER: That we cannot retread areas that we've gone over in the first deposition.

MR. HERSCHMANN: You want to have an objection? Listen, do me a favor --

MR. WIENER: You are improperly going over --

MR. HERSCHMANN: Mr. Souza, he is trying to make sure you don't testify truthfully.

MR. WIENER: No, that is not correct, sir. I am not --

COURT REPORTER: Excuse me.

(Court reporter attempts to interrupt counsel who are speaking at the same time.)

MR. WIENER: That is not correct.

MR. HERSCHMANN: Mr. Wiener, I am not listening to speeches.

MR. WIENER: You are speaking over me intentionally because you are trying to keep this from getting down.

MR. HERSCHMANN: Because you should not be making a speaking objection. You are making a speaking objection. It's inappropriate and you know it.

(Court reporter attempts to interrupt counsel who are speaking at the same time.)

MR. HERSCHMANN: You want to take a break? During the recess, call the hearing officer, get a special master, do whatever you want. Right now I'm going to ask the questions. You want to show me a point where the exact same question was asked before? Go ahead.

Now, we've gotten testimony that you know was conflicting to previously. I'm going to ask the questions; all right?

I heard enough testimony yesterday about the shenanigans that went on. We're going to cover it today. That's it. You want to take a break? Let's get a special master in here, we'll have him sit here with a special master. We'll see what the

special master says.

MR. WIENER: Now that you have made --

MR. HERSCHMANN: That's it.

MR. WIENER: -- your speech, sir, the hearing officer was very, very clear --

MR. HERSCHMANN: You're wasting time.

MR. WIENER: -- the hearing officer was --

MR. HERSCHMANN: You are wasting a lot of time.

MR. WIENER: No, you are wasting time, sir. The hearing officer was very clear --

MR. HERSCHMANN: Put your finger down.

MR. WIENER: The hearing officer was very clear that we --

MR. HERSCHMANN: Mr. Wiener, I'm not listening to you.

MR. WIENER: -- we are not -- it's very clear that you are not.

MR. HERSCHMANN: Because --

MR. WIENER: You're also preventing the -- you are also preventing the court reporter from getting any of it down.

MR. HERSCHMANN: You have a video. You can play it. Stop it. What are you doing?

MR. WIENER: The hearing officer was --

MR. HERSCHMANN: Stop it.

MR. WIENER: -- very, very clear that we are not going to go over --

MR. HERSCHMANN: Stop it. I'm got wasting our time.

MR. WIENER: -- that we are not going over areas that he's already --

(Court reporter attempts to interrupt counsel who are speaking at the same time.)

MR. HERSCHMANN: Are you done?

MR. WIENER: You're trying -- all you're trying to do is prolong this deposition and harass this witness.

MR. HERSCHMANN: Oh, please stop it. Oh, please stop it.

MR. WIENER: That's all this is about.

MR. HERSCHMANN: Please stop it.

MR. WIENER: You're asking misleading questions --

MR. HERSCHMANN: I don't want to hear it.

MR. WIENER: -- and you're trying to harass this witness.

MR. HERSCHMANN: Please stop it. Grow up. Will you stop it? Are you serious? Let's go.

MR. WIENER: Let's call the hearing officer.

MR. HERSCHMANN: You want to take a break? You can go --

MR. WIENER: Let's go off the record.

MR. HERSCHMANN: We're not going off record.

MR. WIENER: Let's call the hearing officer. We're going off the record --

MR. HERSCHMANN: No, we're not.

MR. WIENER: -- and calling the hearing officer.

MR. HERSCHMANN: Mr. Souza, I'm asking questions.

MR. WIENER: We are going to call the hearing officer.

MR. HERSCHMANN: You can do whatever you want. You got an attorney. Go do whatever you want. I'm continuing the deposition.

MR. WIENER: I'm going to call the hearing officer.

MR. HERSCHMANN: Have a good time.

MR. WIENER: Mr. Souza, would you please leave the room?

MR. HERSCHMANN: Mr. Souza, don't get up.

Mr. Souza, listen to me.

MR. WIENER: Mr. Souza --

THE WITNESS: What am I supposed to --

MR. HERSCHMANN: You are here -- you are here to answer the questions.

(Court reporter attempts to interrupt counsel who are speaking at the same time.)

MR. HERSCHMANN: Stop it. You want to take a break?

MR. WIENER: We're calling the hearing officer.

MR. HERSCHMANN: You can raise it any way you want.

MR. WIENER: We are calling the hearing officer.

MR. HERSCHMANN: Enough. Enough.

MR. WIENER: We are calling the hearing officer.

MR. HERSCHMANN: You do whatever you want. You have another attorney sitting next to you --

MR. WIENER: We are going off the record.

MR. HERSCHMANN: -- you go make whatever calls. We are continuing.

MR. WIENER: We are going off the record.

MR. HERSCHMANN: Mr. Souza, let me continue.

MR. WIENER: Please stop the video.

MR. HERSCHMANN: Do not stop the video. We are continuing.

MR. WIENER: We are going off the record.

MR. HERSCHMANN: Mr. Souza --

MR. WIENER: This is improper, Mr. Herschmann.

MR. HERSCHMANN: There is a question pending. You can state an objection.

MR. WIENER: Mr. Herschmann, this is improper.

MR. HERSCHMANN: You can state the word objection.

MR. WIENER: Mr. Herschmann, this is improper.

MR. HERSCHMANN: Are you done? You're not convincing me by saying it over and over again.

MR. WIENER: I'm objecting to this.

MR. HERSCHMANN: You can object.

MR. WIENER: I want to call the hearing officer --

MR. HERSCHMANN: Object.

MR. WIENER: -- because this whole line

of questioning is improper.

MR. HERSCHMANN: Object.

MR. WIENER: And it's contrary to --

MR. HERSCHMANN: Mr. Souza --

MR. WIENER: -- the hearing officer's specific instructions --

MR. HERSCHMANN: Mr. Souza --

MR. WIENER: -- on how this deposition is supposed to go forward.

MR. HERSCHMANN: Do you realize how time type you're wasting with this witness now?

MR. WIENER: Mr. Herschmann --

MR. HERSCHMANN: Do you realize that?

MR. WIENER: -- you are the one who is wasting time by revisiting things that this witness has already been through which is specifically contrary to the hearing officer's specific instructions in this case.

MR. HERSCHMANN: Are you done?

BY MR. HERSCHMANN:

Q. Mr. Souza --

MR. WIENER: We're going off the record to contact the hearing officer.

Q. Mr. Souza, you told us -- you told us beforehand that you --

MR. WIENER: Mr. Herschmann, are you refusing to go off the record so that we can contact the hearing officer?

MR. HERSCHMANN: I'm continuing with the inquiry now.

MR. WIENER: Are you refusing --

MR. HERSCHMANN: You can take a recess.

MR. WIENER: Are you refusing my request --

MR. HERSCHMANN: I'm not answering your questions.

MR. WIENER: -- to contact the hearing officer?

MR. HERSCHMANN: We're done with this.

MR. WIENER: Are you refusing my request to contact the hearing officer?

MR. HERSCHMANN: Mr. Souza, let me continue to ask questions of you because Mr. Wiener obviously doesn't want to act professionally.

MR. WIENER: Are you refusing my request to contact the hearing officer?

THE WITNESS: Hope you guys didn't bring any guns.

MR. HERSCHMANN: Exactly. Good point.

Q. Mr. Wiener (sic), let me ask you a

question. You told us a moment ago --

MR. WIENER: Mr. Herschmann, are you refusing my request to contact the hearing officer? (Court reporter attempted to interrupt counsel who are speaking at the same time.)

MR. HERSCHMANN: Are you trying to ruin the record? Is that what you are trying to do?

MR. WIENER: No, you've already done that.

MR. HERSCHMANN: That's very interesting. Are you done?

MR. WIENER: Are you refusing --

MR. HERSCHMANN: I am continuing --

MR. WIENER: -- my request to contact the hearing officer?

MR. HERSCHMANN: You can contact anybody you want. I'm not taking a recess when a question is pending after you made your long speaking objection.

MR. WIENER: So -- so after he answers the question --

MR. HERSCHMANN: No, I will --

MR. WIENER: -- will you agree to contact the hearing officer?

MR. HERSCHMANN: -- I am going to finish

a series of questions whether you like the answers or not. You want to object? Preserve it.

MR. WIENER: It has nothing to do with the answers, sir, it has to do with the improper --

MR. HERSCHMANN: Oh, please, please stop it.

MR. WIENER: -- nature of your questions.

MR. HERSCHMANN: Can you read back the last question, please?

MR. WIENER: If you want to be incivil, sir, fine. The hearing officer gave us specific instructions. If we reach an impasse in the deposition, we are to contact her.

MR. HERSCHMANN: We're not at an impasse. We're not at an impasse.

MR. WIENER: You can't declare that unilaterally. You are asking the witness improper questions and --

MR. HERSCHMANN: Excuse me. Excuse me.

MR. WIENER: -- and revisiting issues that have already been discussed with this witness.

MR. HERSCHMANN: You -- you started off by "asked and answered." You show me in the transcript where that question was asked and answered. I'm going to give you a moment to do it

since you just wasted five minutes of our time.

MR. WIENER: I'll deal with this with the hearing officer on the phone.

MR. HERSCHMANN: No, no, we're not --

MR. WIENER: I don't have to prove anything to you, sir.

MR. HERSCHMANN: We're not recessing in the middle of a question. You've made an objection.

MR. WIENER: So he'll answer the question and then we can contact the hearing officer.

MR. HERSCHMANN: No, let's see what the basis -- let's see what the question is. You've made an objection, asked and answered. I'm giving you the opportunity to identify the question and answer that's --

MR. WIENER: The whole topic of his prior work history was dealt with exhaustively in his first deposition.

MR. HERSCHMANN: That's your determination? You make the determination so we don't get to ask the questions? That's your position?

MR. WIENER: His whole work history was --

MR. HERSCHMANN: Was that answer -- was that question and answer given?

MR. WIENER: -- that was the whole entire point of the first hour of his cross-examination.

MR. HERSCHMANN: Mr. Wiener, I appreciate you don't like the answers so far.

MR. WIENER: It has nothing to do with the answers, sir.

MR. HERSCHMANN: Was that question and answer -- I'm asking you a question. Was that question and answer given previously?

MR. WIENER: Yes. My position is it is.

MR. HERSCHMANN: Tell me where, okay? Tell me where --

MR. WIENER: You go back and if you look through --

MR. HERSCHMANN: No, no, excuse me.

MR. WIENER: -- your cross-examination, you will see where the whole history of his work is.

MR. HERSCHMANN: Excuse me. Excuse me. That's not the rule. The rule for asked and answered is not a basis to end the deposition. It's not a basis --

MR. WIENER: I'm not ending the

deposition.

MR. HERSCHMANN: That's fine.

MR. WIENER: I want to get the hearing officer on the phone so she can clarify that the scope of this deposition is for things that have not already been discussed with this witness.

MR. HERSCHMANN: We haven't asked this. I don't know what you're talking about. I'm asking -- I'm giving you the opportunity to take out the transcript and show me. You show it to me and I'll rephrase the question and not cover the same thing over again.

MR. WIENER: Are you saying that his work history is not --

MR. HERSCHMANN: No, I'm not saying -- I'm not saying work history.

MR. WIENER: -- has not been covered in the -- in the cross-examination?

MR. HERSCHMANN: I don't understand what you're saying. Do you think we don't get to follow up and pursue answers that may be inconsistent? We just got a different answer than previously, right?

MR. WIENER: What was that?

MR. HERSCHMANN: Can you read back the last question and answer, please? I know we just

wasted a lot of your time and I apologize.

And if you show me this answer in the transcript, okay, then we'll see whether we go to the hearing officer.

MR. WIENER: It has to do with the answer. It has to do with the questioning, the whole line of questioning.

MR. HERSCHMANN: You're being ridiculous. You really are. I don't understand what we're doing. Can you please read back the last question and answer?

(The question was read by the court reporter, as follows: So how old were you when you first started to work at the farm with your father?)

MR. HERSCHMANN: Sir, you can answer that question.

A. How old I was? I don't know, seven, eight years old.

Q. And you said you worked at the farm your entire life, right? Your whole life you did the farming, right?

A. That's right.

Q. And do you recall at some point you became a roofer?

A. Oh, yes.
Q. And that's the next thing that you did after farming, right?
A. No, I went in the service.
Q. Right. I'm sorry. You went to the service. So you were at the farm and then you went to the service?
A. Right.
Q. And then afterwards you went to New Jersey, right?
A. Yeah.
Q. And you worked on the boardwalk in New Jersey, right?
A. Right.
Q. And then you came back and became a roofer, right?
A. I was a roofer already.
Q. And you continued in the roofing business until you retired, right?
A. Right.
Q. And those are all the jobs you had, right?
A. Yeah.
Q. Now, what did you do on the farm?
A. Farm? What do you on a farm?

MR. WIENER: Objection. Asked and answered.

A. Everything on a farm.

Q. Sir, I've never worked on a farm so I don't know what that is.

A. Oh, your plants, take care of your plants.

MR. WIENER: Let the record reflect on Page 65 of the earlier transcript, the question was asked, "What did you do on the farm?"

MR. HERSCHMANN: And what's the answer?

MR. WIENER: You can see it for yourself, Counsel.

MR. HERSCHMANN: It's 65?

MR. WIENER: The questions are the same. The question has been asked and answered.

MR. HERSCHMANN: The objection is -- the question is, the objection is asked and answered.

Q. So, sir, what type of cows did you have on the farm?

A. What type of what?

Q. Cows.

A. Cows? We had Jersey cows and old steens. Well, that's what they were. ***

Q. Now, did you have your own roofing

business?

A. Yes.

Q. What was the name of that business?

MR. WIENER: Objection. Asked and answered.

A. Souza.

Q. Sorry?

A. Souza.

Q. Souza Roofing?

A. Yeah.

Q. And was that a corporation? Did you --

A. No, no. Just me. Just me.

Q. Did you ever work for a company called National Roofing?

A. Oh, that was me.

Q. National is Souza Roofing?

A. No. National, I worked for National Roofing.

Q. Okay.

A. I was a foreman for them, and I went in business for myself because they went out of business so I took over the company.

Q. Do you remember working for a little bit of time at Russo's Bakery?

A. Yes. A little bit of time. I worked

four years there.

Q. And you did that before you went into the Air Force, correct?

A. Oh, yes.

Q. Sir, do you know that when you go into the military, they ask you questions about what you did beforehand?

A. Yeah.

Q. And you told them you worked at a bakery, right?

A. Right.

Q. And that was truthful back then, right?

A. Of course it was.

Q. And where did you live back when World War II was going on?

A. Cornell Street in Tiverton.

Q. When did you live on Davis Street?

A. After I got married. After I came back from the service. Let me see, I think it was '45 or '46. I'm not sure.

Q. How long were you in the service?

A. Four years.

Q. And do you remember when you started?

MR. WIENER: Objection. This is retreading issues that have already been discussed

during the first part of his cross-examination.
A. When I started? I don't know. I can't remember that far back.
Q. Do you know someone named Gail Corvello?
A. Gail? Yeah. Of course.
Q. How do you know her?
A. My neighbor.
Q. And has she ever come to talk to you about things?
A. No.
Q. When you were on the farm, how many other farms were around your neighborhood?
A. That's the only one around.
Q. You were --
A. We had a -- excuse me -- we had all the land, my father had all the land and we were the only ones farming.
Q. He owned all the land?
A. Well, he rented or owned. I don't know.
Q. But he had -- when you say all the land around, what do you mean?
A. Well, where we were farming.
Q. Where was the farm?
A. Off Bay Street down the bottom, Bay and -- what is that street down there now? I think

its Hooper or Judson, one of the two. Hooper is what I think it is. I'm not sure now. It's a little dirt road. That's all I can tell you.

Q. You don't remember the street that it was on?

A. It was on a side street. It had -- I don't think it had a name.

Q. And how big was the farm?

A. Oh, I don't know. I couldn't tell you. I don't know.

Q. You don't remember it because it was too long ago?

A. Yeah. Of course. We didn't measure the farm, we worked on it. I didn't measure the farm, we worked on the farm. That's all.

Q. Your son has said that your memory isn't so good from long time ago and that you -- that we're not going to find you reliable about the old stuff; do you agree with that?

MR. WIENER: Objection.

THE WITNESS: Yes or no?

MR. HERSCHMANN: You can answer that.

MR. WIENER: Go ahead and answer.

A. Agree to what, not lying?

Q. No, no, not lying. You just said that

stuff was a long time ago so you're having trouble remembering it, right?

A. Oh, yeah. That's true.

Q. And your son said that, in talking to you, that we would find out that your memory from a long time ago is not reliable.

A. Oh, I don't know.

Q. Well, do you agree with that, that it's a long time ago so it's hard to remember?

A. Well, of course it is. Do you remember everything that happened in your whole life?

Q. Absolutely not.

A. I'm no different than anybody else.

Q. So that's why remembering things from 60, 70 years ago is really hard, right?

A. Yeah. I don't even know why I'm here.

Q. Well, your son said you never had anything to do with any of this stuff; is that true?

MR. WIENER: Objection. It's a mischaracterization of the testimony.

Q. Your son -- you can answer that question. I'll show you something that your son wrote to people.

A. I had nothing to do with what?

Q. Well, you just said you don't even know why you're here. Candidly, I'm not certain why you're here either. Do you know why you're even here?

A. Yeah. They want to know what happened in my neighborhood. That's what they want to know.

Q. Because they want you to help out the neighborhood, right?

MR. WIENER: Objection.

A. I live in that neighborhood.

Q. And you want to help them, right?

A. Yes. I wouldn't lie for them.

Q. But you want to help them out as much as you can, right?

A. Yes.

MR. HERSCHMANN: Let me mark this as Exhibit 4.

(Whereupon, Souza Exhibit No. 4 was marked.)

THE WITNESS: You expect me to read all that? Holy Christ. I can't even see it.

BY MR. HERSCHMANN:

Q. Do you remember ever getting a document that was a couple of pages long and taking the time to read through the whole thing recently? I mean

very recently.

A. In my house? I was with my son when all this happened.

Q. I'm sorry?

A. I was with was my son. My son was with me when this all happened.

Q. When all this stuff happened?

A. When they brought all these papers to my house. I went to see him because I didn't want to get involved.

Q. And he said that he never read the papers that they wanted you to sign?

A. I don't know.

Q. But you didn't read them, right?

A. I told you I didn't read them, no, because I -- I can't even see that. Are you kidding?

Q. Now, sir, here your son -- this is an e-mail that your son sent to another lawyer. Okay? And your son wrote -- and let me read it to you, okay, because I understand you can't see it. It's the last sentence of the first paragraph; okay?

Before I read it, let me ask you this: You told us you think your son is going to be truthful when he talks to people, right?

A. Yes.

Q. And if he put something in writing you think he'd be pretty careful, right?

A. That's right.

Q. And you know at times he spoke with you about the stuff in -- about the neighborhood, right?

A. Yeah.

Q. He says here, "I spoke to my father and he told me he was never involved with or in a truck that was involved in any of this so I will be concerned if he testifies to anything contrary." So that's what your son wrote?

MR. WIENER: Objection to the form of the question. It's only part of what his son wrote.

MR. HERSCHMANN: You can object.

Q. Sir, is that truthful, what your son is saying here?

A. I don't know what my son says here.

Q. Well, he says he spoke to you, so let me read it to you again so you listen to the words, okay? It says, "I spoke to my father and he told me he was never involved with or in a truck that was involved in any of this so I will be concerned if he testifies to anything contrary."

MR. WIENER: Objection.

A. I wouldn't know. I wasn't in the truck.

MR. WIENER: It's only part of what his son said.

Q. I'm sorry?

A. I don't know. I wasn't in that truck.

Q. You weren't in a truck, right?

A. No.

Q. Okay.

A. My brother was. My oldest brother was. He was the driver.

Q. But you weren't in the truck yourself, correct?

A. I was in the truck part of the time, yeah.

Q. Well, you have a brother named Pete?

A. Yes.

Q. Pete says that only one day was he in the truck.

THE WITNESS: Pete?

MR. HERSCHMANN: Right.

A. I don't remember him -- I don't remember him being in the truck.

Q. Now, do you remember you were talking about a minute ago about your son's house; do you

remember that?
A. My what?
Q. Going to your son's house about this?
A. Yeah.
Q. Do you remember that?
A. Yeah.
Q. Now, do you have a computer at your house?
A. No.
Q. Did your son ever show you -- withdrawn.
Did anyone ever tell you, from the other side, people in the town, any of the lawyers or anybody, ever tell you that they were going to tell a judge what you were going to say? Did they ever tell you that?
A. No.
Q. Okay. Your son told us that he got a document from the other side and that he went over the document with you. Do you remember that at any time?
A. No, I don't remember that, no.
Q. And what he said was that almost the opposite of what they had written down was the truth; do you remember any of that?
MR. WIENER: Objection.

A. I don't know what they was talking about. What are you talking about anyway? Let's get this thing straight now. What are you talking about?

Q. Sir, I'm trying to understand what was going on on the other side because we never met before, right?

A. On the other side? What do you mean by the other side?

Q. Well, some lawyers came to see you and we weren't there, right? Do you remember that?

A. Yes.

Q. So we weren't around, so I wasn't there to find out what's going on. The only way we can find out now is to talk to you and talk to your son and see what you remember, okay?

A. Ask my son those questions. Don't ask me.

Q. Well, sir, we asked your son yesterday.

A. Yes. What did he tell you?

Q. He said that you signed a piece of paper that you never read.

MR. WIENER: Objection. Is there a question there?

Q. Is that right?

A. I don't know. Here we go.

MR. HERSCHMANN: Sorry.
THE WITNESS: Oh, God almighty.
Q. I'm going to show you what I'm going to mark as Exhibit 5 for a minute, okay?
MR. HERSCHMANN: Is that his declaration?
THE WITNESS: Boy, you expect me to read this?
MR. WIENER: That's already marked as Exhibit 1.
MR. HERSCHMANN: I'm sorry. I'm sorry. Do we have it here?
MR. WIENER: Yes.
MR. HERSCHMANN: Okay. Let me have that back from you. We're going to give you a different one. It may be the easiest thing.
MR. WIENER: Why don't you make sure this is the same one that you got. That's the one that I had that was marked. It has the Bates numbers at the bottom.
MR. HERSCHMANN: Okay. Let me give you this. What I want you --
MR. WIENER: You have my -- that's my copy.
MR. HERSCHMANN: We'll give you an extra copy. Here's an extra copy.

BY MR. HERSCHMANN:

Q. Sir, can you look at the last page?

A. Last page?

Q. You see that second page? You see there is a place for a name?

A. It got my name on it here.

Q. Right. Now, do you remember signing this?

MR. WIENER: Objection. Asked and answered.

A. If I signed it, I should remember, right?

Q. But do you remember?

A. Yeah.

Q. Well, sir, this is a document that your son says you signed but no one ever read to you and you didn't read it.

MR. WIENER: Objection.

MR. HERSCHMANN: Let me break it down.

Q. Sir, this is the document your son says you never read before you signed.

MR. WIENER: Objection.

Q. Is that truthful? Is that correct?

A. I can't see it so how can I read it?

Q. That's a good point. You can't see it because you don't have your glasses, right?

A. That's right.

Q. And, sir, would you use the word -- if I asked you where do you live now, what would you say?

A. 4 Church Street.

Q. I'm sorry?

A. 4 Church Street.

Q. Do you have any idea why they asked you to sign this piece of paper without your having read it?

MR. WIENER: Objection to the form of the question.

A. I don't know.

Q. But you remember at some point your son said sign here and then took it back from you, right?

A. If my son said -- because my son was with me, right? If he told me to sign it, I signed it.

Q. Regardless of what it said, right?

MR. WIENER: Objection.

A. Because he would put -- he wasn't going to put me in trouble.

Q. Well, your son said he wasn't in the room when you were talking to these people and he said he didn't read the paper.

A. Well, I don't know.

MR. WIENER: Objection.

Q. But at least nobody read that paper out loud to you, right?

A. I can't remember that.

Q. Well, your son testified yesterday that no one read it out loud to you; does that --

A. All right. If he said it --

MR. WIENER: Objection.

A. -- it's got to be so.

MR. HERSCHMANN: Let me ask the question because you jumped in the middle, all right? The reporter, as your starting to see, she has to take down things that I ask. When I'm finished, if you can answer.

Q. Your son said -- well, withdrawn.

You said a moment ago what your son said happened is what happened, right?

A. Right.

Q. Your son said yesterday that nobody read this document out loud to you before you signed it. Do you agree with that?

MR. WIENER: Objection.

A. I don't know. How long ago was that anyway?

Q. I don't know, sir. We weren't there.
A. I can't see the date.
MR. WIENER: Would you read the date to him, please, sir? It's in the document.
MR. HERSCHMANN: The point is that he can't see the date. That's exactly the point. Let the record reflect it that no one read it to him and he couldn't see it.
MR. WIENER: And let the record reflect no one has told him what the date is.
MR. HERSCHMANN: That's fine.
MR. WIENER: That might help refresh his recollection.
MR. HERSCHMANN: Sure.
Q. Sir, do you remember whether or not they had you sign this document this year or a year ago?
A. A year ago? I don't remember that.
Q. And do you have any respiratory problems, sir?
A. What's that?
Q. What's respiratory problems?
A. Yeah.
Q. Breathing problems.
A. No. Why should I have breathing problems. I'm alive, ain't I?

Q. Thank God, sir. Have you ever had any breathing problems?
A. Not that I remember.
Q. Do you ever remember some fumes making you have trouble breathing at any point during your life?
A. No.
Q. Now, how long have you lived on Church Street?
A. Oh, boy, I don't know. I think I came up there in the forties anyway.
Q. Sir, a little while ago you told us you lived on Davis Street I thought in the forties.
A. Yes. Before I went in the service.
Q. You lived on Davis Street before you went in the service?
A. Yeah.
Q. Okay. And then after you came back from the service, you moved to Church Street?
A. Yeah. I bought the house.
Q. What did you do in New Jersey working on that boardwalk?
MR. WIENER: Objection. Asked and answered in the previous deposition.
A. Well, we repaired the places for tenants

to move in.

Q. But that was -- was that always roofing work that you were doing?

A. No. We were doing everything. We were doing everything.

Q. Well, what does everything mean?

A. Like doing the carpentry work and everything else.

Q. A little while ago you said you did roofing when you were in New Jersey?

A. That's right.

Q. When did you decide only to do roofing versus everything?

MR. WIENER: Objection.

A. I don't know.

Q. You just can't remember?

A. No. You're going back too far for me.

Q. This is after World War II, right?

A. Yeah.

Q. So you can't remember back to that time because it's just too long ago, right?

A. Of course. Hey, I hope you can remember everything.

MR. HERSCHMANN: Why don't we take a little break, okay?

THE WITNESS: A little break?

VIDEOGRAPHER: The time is 10:55 a.m. and we are now off the record.

( R E C E S S )

VIDEOGRAPHER: The time is 11:04 a.m. and we are now back on the record.

BY MR. HERSCHMANN:

Q. Mr. Souza, we just took a break and I know you had a chance to talk with your son, right? Just for a little bit, right?

A. Yeah.

Q. And did you just tell your son that you can't remember these things because it's too long ago?

A. Right.

Q. Now, Mr. Souza, yesterday we asked your son about some of the things that they said you did. And I asked your father what did -- I'm sorry -- I asked your son, "What did your father tell you?" And his answer was, "I didn't do none of this." Do you remember telling your son that?

MR. WIENER: Objection.

A. If I told him, I said it.

Q. And that's the truth, right?

A. Right.

MR. WIENER: Objection to the form of the question.

Q. Sir, do you know how many pounds are in a ton by the way?

A. How many pounds in a ton? 2000.

Q. So do you think that's a lot?

A. No. I can't pick it up, I know that.

Q. Where was Russo's Bakery, do you remember?

A. On South Main Street.

Q. South Main?

A. Yeah. The corner of East Main, South Main and East Main.

Q. South Main and East Main?

A. Yeah.

Q. And what did you do when you worked at Russo's Bakery?

MR. WIENER: Objection. Asked and answered.

A. I was a baker.

Q. I'm sorry. What do you do as a baker?

A. Well, we were baking bread.

Q. And what was your job in the baking of the bread?

A. Working the bread, the ovens.

Q. I'm sorry?
A. Working the oven.
Q. Working the oven?
A. Yeah.
Q. How old were you when you started driving?
A. Oh, boy, I don't know.
Q. Well, most people start driving around 17 or 18; is that about the right age?
A. Yeah. I would say about that. Drove a farm truck earlier than that.
Q. You mean a tractor you mean?
A. A truck. My father never had no tractors.
Q. What's a farm truck?
A. You know, a truck you work around the farm with.
Q. But you keep it on the farm itself, right?
A. Yeah.
Q. How old is your brother Pete?
A. How old is he? I don't know. I really don't know. I can't tell you.
Q. Is he a lot younger than you or --
A. Oh, no, no. Only five or six years

younger than me.

Q. Okay. How often do you talk to him?

A. Well, I talked to him last week. He came to the house.

Q. Why did he come to the house last week?

A. Because he came to pay a visit. That's all. We didn't talk about nothing.

Q. What do you do when you want to relax?

A. When I want to relax? Watch TV.

Q. Your son told us yesterday about Foxwoods.

A. Oh, I go there. Yeah. I go there quite a bit.

MR. WIENER: Objection.

Q. Why do you go to Foxwoods?

A. To enjoy it. I enjoy playing the slots.

Q. Do you play any other games?

A. No. I only play the machines.

Q. You just said you go there a lot. How often do you go?

A. Once a month anyway.

Q. And how long have you been doing that?

A. Oh, come on now. I don't know.

Q. A long time?

A. Oh, yeah.

Q. Do you have any grandchildren?
A. Yeah.
Q. What are their names and their ages, sir?
A. Now you're going to confuse me on the ages. I don't know their ages. I got two grandsons. No. Three grandsons, right? And two granddaughters. I think so.
Q. I don't know, sir. Do you know how many grandchildren you have?
A. All together? No.
Q. Can you tell us their names?
MR. WIENER: Objection.
A. I know Kimberly. I know Joe Boy, and I know Matthews, Keith. That's about it. Right?
Q. Who is Doughboy?
A. My son's son.
Q. And do you know -- is that his -- does he have -- is that his nickname?
A. Well, we've called him Joe Boy as long as I remember.
MR. WIENER: Did you say Joe Boy or Doughboy?
A. His name is Jose Souza. He's a junior.
Q. Did you say -- what name do you call him?
A. Jose.

Q. I'm sorry. We're all a little confused for a minute. Did you call him your grandson Doughboy?

A. Yeah.

Q. Okay. With a "D", right?

A. With a D?

MR. WIENER: Or Joe Boy with a "J"?

THE WITNESS: Yeah.

MR. WIENER: That's what we are trying to figure out. Is it Joe Boy or Doughboy?

THE WITNESS: Joe Boy.

MR. WIENER: Joe Boy.

THE WITNESS: Boy. Do you know what boy is?

MR. WIENER: Right. But Joe is the first name?

THE WITNESS: Yeah, Joe. His name is Jose but we only call him Joe.

BY MR. HERSCHMANN:

Q. Can we start again? I'm sorry. I'm confused now. Can you tell me the names of your grandchildren?

MR. WIENER: Objection. Relevance.

A. Kimberly, Joe Boy, Matthews, Keith. That's about it.

Q. You said it's your son's boy. How many sons do you have?

A. Two.

MR. WIENER: Objection. Objection. Relevance.

Q. What's their names?

A. John and Joe.

Q. So which one -- which grandchildren are which children's children?

MR. WIENER: Objection. Relevance.

A. From both of them.

Q. I know, sir, but -- I know they're both your children but which grandchildren go with which children?

A. One lives in Newport and one lives in Tiverton.

Q. Okay. So do you remember which grandchildren go with which one of your children?

A. What do you mean go?

Q. Do you remember which grandchildren are Joey's grandchildren -- I mean Joey's children?

A. I know them all.

Q. Sir, I understand that you know them all. Do you know which of your grandchildren where Joey is the father?

A. Yeah.
Q. Which ones?
A. Joe Boy.
Q. And is that his only child?
A. Yeah.
Q. And the other grandchildren are from John?
A. John.
Q. Mr. Souza, were you already in the Air Force when Pearl Harbor occurred?
MR. WIENER: Objection.
A. I -- I was there when it happened. I was there when it happened.
Q. You were there when it happened?
A. Yeah. No. No. It happened and I went in.
Q. It happened and then you went in?
A. Yeah.
Q. Last time --
A. They drafted me. I joined because they were going to draft me, so I joined.
Q. Last time you were questioned, you said you were already in the Air Force when Pearl Harbor occurred.
A. Yes.

Q. Which is right?
A. I was already in.
Q. And where were you stationed when Pearl Harbor occurred?
A. New Jersey I think.
Q. New Jersey?
A. Yeah.
Q. Where did you first -- you said you volunteered because they were going to draft you, right?
A. That's right.
Q. Where did you volunteer?
A. Where I volunteered? In Tiverton.
Q. And then they sent you to New Jersey?
A. No. They sent me to Camp Edwards.
Q. And away where was Camp Edwards?
A. In Massachusetts.
Q. So when did you end up in New Jersey when you were in the Air Force?
MR. WIENER: Objection.
A. Well, after my basic training.
Q. Why don't you explain to us where you first went into the military and then where you were stationed because last time you told us you were already in the military when Pearl Harbor

occurred and then --

A. That's right.

Q. That's correct, right?

A. Yeah.

Q. And then -- but a little while ago you just said you weren't in the military when Pearl Harbor occurred.

MR. WIENER: Objection. You're not showing me his prior testimony.

MR. HERSCHMANN: He just gave it this minute.

MR. WIENER: But you are referring to his prior testimony. Not this prior testimony but prior day's testimony.

MR. HERSCHMANN: Okay.

BY MR. HERSCHMANN:

Q. Sir, if I showed you papers now, you can't read because you don't have your glasses, right?

A. Right.

Q. Okay. So last time you said you went into the military before Pearl Harbor. Do you remember now when you went in?

MR. WIENER: Objection. It's been asked and answered.

A. I don't know. I think it was in '45. I don't know.

Q. Sir, last time -- let me read it to you because I found the page now. It's on Page 67.

"Do you know whether you were in the service before or after the invasion of Pearl Harbor?"

Answer: "Before, yeah, I went in before Pearl Harbor."

A. Right.

Q. And now -- is that correct?

A. Yeah.

Q. Are you sure about that?

A. Yeah.

Q. Are you sure about that of everything else they've asked you going back to that time period?

MR. WIENER: Objection.

A. I don't know. They were going to draft me anyway so I joined.

Q. Sir, I understand but if you can listen to my --

A. Then Pearl Harbor came in. The war started -- there was no war when I went in. All they were doing drafting people.

Q. So you -- they were only doing drafting

people?

A. Yeah.

Q. So you went in then before Pearl Harbor?

A. I joined, yes, because I didn't want to get caught in a -- in a draft --

Q. And --

A. -- because I wanted to go where I wanted to go, not where they wanted to put me.

Q. And, sir, do you know that Pearl Harbor was on December 7th of 1941?

A. Yes.

Q. Now, are you sure about that as you are about everything else you've told the people in this case about that time period?

MR. WIENER: Objection to the form of the question.

A. I don't know.

Q. Sir, Pearl Harbor was a big thing back then, right?

A. Oh, yes. Oh, yes.

Q. Clearly the biggest thing that happened to this country in the 1940s, correct?

A. Oh, you can say that again.

Q. And that would stand out in your mind probably clearer than anything else, right?

A. Hey, I can't remember what the hell happened all those years ago.

Q. Sir, you know that the military keeps records for a long time?

A. Yes.

Q. And the military has records as to when you went in; do you know that?

A. Right. They should have.

Q. And you think their records would be right?

A. I hope so.

Q. Their records have you going in after Pearl Harbor.

MR. WIENER: Objection to the form of the question.

THE WITNESS: After?

MR. WIENER: There is no foundation.

A. I don't think so. I don't think so.

Q. You can't remember that far back, right?

A. No. I know I was working in the baker shop. That's all I know.

Q. You were working in a bagel shop?

A. Yeah. Baker.

Q. Baker shop?

A. Right.

Q. When you went in, right?
A. Yeah. They were drafting people so I joined because I didn't want to go on the draft.
Q. Why did you leave the farm to go work at the bakery?
A. Why did I leave the what?
Q. The farm.
A. Wouldn't you leave the farm to go work someplace else and make more money?
Q. Okay.
A. I wasn't getting paid working on the farm.
Q. You weren't getting paid?
A. No. My father owned it.
Q. So how did you get the job at the bakery?
A. My father got it for me.
MR. WIENER: Objection. Relevance.
Q. And then you went straight from the farm to the bakery?
A. Yeah.
MR. WIENER: Objection. This has been covered in the previous day's deposition. These questions have been asked and answered. The whole intent is to try to confuse this witness.
MR. HERSCHMANN: I'm not trying to

confuse the witness at all. I think the transcript is going to speak for itself, and clearly these will be issues that get raised later on but --

Q. Sir, you just told us that you volunteered for -- withdrawn.

Did you volunteer specifically for the Air Force?

A. No. I volunteered for the Infantry. They put me in the Air Force.

Q. Okay. So you were at the bakery and you decided you wanted to go volunteer so you don't get drafted, right?

A. That's right.

Q. And how long did you work at the farm before you went to the bakery?

A. All my life.

Q. So you went straight from the bakery to the farm, right?

MR. WIENER: Objection.

A. Yeah.

MR. WIENER: Asked and answered in the previous day's deposition.

A. No. The farm to the bakery.

Q. I'm sorry. You're right. You're right. You went straight from the farm to the bakery,

right?

A. Right.

Q. And then you decided you were going to volunteer while you were working at the bakery, right?

A. That's right. The war was breaking out and I went -- I went so I wouldn't be drafted and go some place I didn't want to go.

Q. And when you went to fill out the forms for the military, they asked you what do you do, and you wrote down you work in a bakery, right?

A. Right.

Q. And that was true, right?

A. Of course it was.

Q. And then you went to the military for four years right, is that right?

A. Right.

MR. WIENER: Objection. Asked and answered.

Q. And then after you left the military, did you come back to Rhode Island or did you go straight to New Jersey?

A. I stood in New Jersey because I had a job working on the boardwalk.

Q. So when you got discharged, you went to

work on the boardwalk there for four years, right?

A. Yeah. I worked for a contractor there.

Q. And then you came back and formed your own business here?

A. Right.

MR. WIENER: Objection. Asked and answered.

A. No. I went to work for Russo -- I mean National.

Q. For National. Okay. And that's all -- and then you stayed in that roofing business until you retired, right?

A. That's right.

Q. And that's all the jobs you ever had, right?

MR. WIENER: Objection.

A. Oh, I don't know. I guess so.

Q. When did you get married?

A. Oh, come on. I don't know. I don't even know the year, never mind that.

Q. Was it before or after you were in the service?

A. Oh, I wasn't in the service. I was out of the service when I got married.

Q. You were out of the service?

A. Yeah.

Q. How did you decide to go from being a baker to being a roofer?

MR. WIENER: Objection.

A. Because the job was paying more money. I didn't like being locked up in a baker shop.

MR. HERSCHMANN: Why don't we take -- we're going to take a five-minute break; okay?

THE WITNESS: Yeah.

MR. HERSCHMANN: All right. Thank you, sir.

VIDEOGRAPHER: The time is 11:21 a.m. and we are now off the record.

( R E C E S S )

VIDEOGRAPHER: The time is 11:35 a.m. and we are now back on the record.

BY MR. HERSCHMANN:

Q. Mr. Souza, when did the neighborhood in which you live start to get developed?

A. Where I live now?

Q. Right.

A. I don't know. I don't know. I couldn't tell you that.

Q. You just can't remember?

A. No.

Q. Can you tell us how it got developed?
MR. WIENER: Objection. Vague.
A. People build houses. That's why. They bought the lot, they build a house, right?
Q. Sir, I don't know. I wasn't there. I wasn't there back then.
A. Well, people bought the lots so they built houses on them. They didn't buy the lots for nothing.
Q. Well, do you have general information about the development of the whole area?
A. No.
Q. Sir, do you remember that Firestone was around in the forties in this area?
A. Oh, yeah.
Q. They were the biggest employer of people around here, right?
A. Well, I can't tell you that, but I know they were big.
Q. You knew a lot of people that worked there, right?
A. Oh, yes.
Q. Do you remember where the Firestone plant was in relationship to Davis Street?
A. Davis Street? I don't remember Firestone

on Davis Street.

Q. No. Do you remember how close it was to Davis Street?

A. Oh, Christ Almighty, about 5 miles I guess.

Q. You're sure about that?

A. I don't know. Hey, I don't measure roads.

Q. Well, sir, how long would it take you to walk 5 miles, your guess?

MR. WIENER: Objection.

A. When I was in the Boy Scouts, 15 minutes a mile.

Q. So when you were in the Boy Scouts, you walked 15 minutes a mile?

A. That was -- that was our ruling. We had to walk it that way.

Q. And do you remember when you were older about how long it would take you to walk a mile?

A. No. I didn't walk -- I walked when I had to, go to work and that's it.

Q. Do you remember where the Firestone plant was?

A. On Shaw Street is it? Shaw or Front Street. One of the two.

Q. And you think that's 5 miles away from Davis Street?

A. From Davis? No. I don't think so.

Q. It's closer, right?

A. Yeah.

Q. When you normally went to work, did you drive or walk?

MR. WIENER: Objection.

A. I never had a car.

Q. I didn't hear you.

A. I never had a car so I had to walk.

Q. And when you went to work, how long would it take you to walk there?

A. Hey, I don't keep track of that. I left early enough and I get there on time.

Q. Well, did you have set hours when you worked at the bakery?

A. Of course you did.

Q. Did you have set hours when you worked at the farm?

A. Farm? No. You go there when you want or when your father made you go. That's when you go.

Q. And what about National Roofing?

A. Well, National Roofing, I had a job there. I used to be there, let's see, seven

something, 7:00 o'clock, 7:30.
Q. Where were they located?
A. On Shaw Street.
Q. I'm sorry. I didn't hear you.
A. Shaw Street.
Q. Shaw Street?
A. Yeah.
Q. The same street as Firestone?
A. Let's see, Firestone -- I don't know. Down near the -- down near the Merck and Tread Company (phonetic) there. Down near Merck and Tread Company.
Q. Merck and Tread?
A. Yeah. Used to be -- oh, God, the printing company they had down there. Used to print cloth.
Q. Do you remember there being a hat company around?
A. Oh, gosh, you're talking before my times.
Q. Before your times?
A. Oh, yes.
Q. What do you remember about the hat company?
A. My father bought the -- rented the place to -- to raise his horses.

Q. Your father bought the hat company to raise his horses?

A. No, he rented the place.

Q. He rented the hat company building?

A. The land. Yes. Yes.

Q. I thought you told us before your father had the only farm around.

A. Yeah.

Q. Are you saying the hat company was on the farm?

MR. WIENER: Objection. That's a mischaracterization of his testimony.

A. No. No. No. No.

Q. I'm trying to understand.

A. No. It wasn't on the farm. The hat company was down near Firestone.

Q. Near Firestone?

A. Yeah.

Q. And your father rented the hat company for what reason?

A. My father rented the hat company? Oh, God...

Q. Sir, I don't know. I thought that's what you said.

A. I don't know. You got me all mixed up.

Q. Sir --

MR. HERSCHMANN: Can we go back up for a second?

( P A U S E )

BY MR. HERSCHMANN:

Q. Sir, you told us your father bought the hat company and then you said he rented the hat company?

A. No, my father never bought that. He's never had the money. How could he buy it?

Q. Sir, that's what --

A. He rented the place.

Q. How did he get the money -- why did he rent the hat company?

A. Because we had horses.

Q. Where were the horses before that?

A. We bought the horses and put them in my yard and we bought too many so we had to rent the place to keep them.

Q. Did you have horses on the farm?

A. Yes.

Q. So why didn't you just keep the horses on the farm?

A. There's no buildings there.

Q. What did you do with the horses?

A. What do you do with the horses? You work them. What do you think you do with horses?

Q. How far was the hat company from your house?

MR. WIENER: Objection. Relevance.

A. From my house? When I was working? I don't know. Half a mile. Maybe a mile. I don't know. I'm not -- I'm not -- I didn't know what a mile was.

Q. Do you remember there being a big fire in the 1930s?

A. Yes.

Q. And what was that about?

A. What was that about? A fire.

Q. Well, what -- fair enough. What type of fire? How did it happen?

A. Well, one of the -- one of the tanks down there blew up where they were working. The workers started the fire. They were welding and they caused the tank caught on fire. So when the tank caught on fire, everything went up.

Q. And that was an oil company, right?

A. Yep.

Q. And it caused a lot of smoke and ashes to go around?

A. Oh, I don't know. Hey, you're asking me. I don't know. I wasn't paying attention. I was running for my life.

Q. Do you remember Keith Oil?

A. Who?

Q. Keith Oil.

A. No.

MR. WIENER: Objection. Is that the name of a company or a person?

MR. HERSCHMANN: Okay. Good point.

Q. Have you ever heard of the company Keith Oil?

A. Keith? I don't know.

Q. Do you remember being a really, really big fire back then?

A. Oh, yes. Oh, yes.

Q. I mean oil burning and --

A. Everybody moved out of the neighborhood, that's how big it was.

Q. And why did everybody have to move out of the neighborhood?

A. Because of the fire.

Q. And was there a lot of debris and smoke and ashes around?

MR. WIENER: Objection. Asked and

answered.

MR. HERSCHMANN: You have to answer. You're nodding your head but you didn't answer.

A. Well, there was smoke and ash.

Q. And how long did the fire burn?

A. Oh, come on now. You're asking me stupid questions.

Q. Did it burn for an hour or did it burn for a few days?

A. Oh, for days.

Q. Sir, I wasn't there so I don't know. So I have to ask you, okay? So I apologize.

For how many days do you recall it burning?

A. You know when we were kids? We didn't pay attention to none of that. All we did was run for our lives.

Q. So you don't remember a lot of things from when you were a kid, right?

MR. WIENER: Objection.

A. No, I don't. I didn't want to.

Q. Have you ever heard of the Bay View Club?

A. Yeah.

Q. What is that?

A. It's a Catholic association club. I was the president of that club.

Q. You were?

A. Yeah.

Q. When were you the president of that club?

MR. WIENER: Objection. Relevance.

A. Now you're going -- now you're looking for trouble. What do I know when? Way back. '36 I think it was or something like that.

Q. When you were 15 or 16 you were president?

MR. WIENER: Objection.

A. Yeah. Yeah. No. Yeah, I was president of that club, yes.

Q. But back in '36?

A. I don't know, '36 or '38, one of the two.

Q. Do you remember when it was built?

MR. WIENER: Objection. Relevance.

A. Yes. I built the goddamn thing. I helped build it myself. We all worked, the neighbors, all the neighborhood worked there building it.

Q. And you did that when you were around 15, right?

A. Right.

Q. And how long did you work building it back then?

MR. WIENER: Objection. Relevance.
A. Oh, come on. We built a little bit at a time. We had no money so we just did what we could. We had no money so we built what we built.
Q. Are you still part of the Bay View Club?
A. Yes.
Q. And have you been part of the Bay View Club since it was built?
A. Yes.
MR. WIENER: Objection. Relevance.
Q. How long did it take you and your friends to build the club?
MR. WIENER: Objection. Relevance.
A. Oh, come on. We never had no money. We just built the way we could, a little at a time.
Q. Do you just remember how long it took?
MR. WIENER: Objection.
A. No. I know we worked on that thing for years.
Q. Do you know anyone who is involved with the Bay View Club now?
A. No.
MR. WIENER: Objection. Relevance.
A. No, I don't because I don't go there no more.

Q. But you are still a member, right?
A. Yeah. Charter member. What do they call it, charter member? Life member.
Q. A life member, right?
A. Yeah.
Q. Did you work on the Bay View Club while you were at the farm or when you were at the bakery?
MR. WIENER: Objection to the form of the question. Objection to relevance.
A. Both. On the farm and in the bakery.
Q. So you used to go when you had free time to do it?
A. That's right.
Q. What happened after the oil company caught on fire? What happened in the neighborhood?
A. Nothing.
Q. Well, you said all the people had to move out, right?
A. Well, they moved out because of the fire.
Q. And you said the fire burned for days, right?
A. Yeah.
Q. How long afterwards were people allowed to move back in?

MR. WIENER: Objection. No foundation.
A. I don't know. I couldn't tell you that because we moved in right away.
Q. How far away was your house from where the fire was?
A. I don't know. A mile, two miles. I don't know. We were kids. What do we know about mileage?
Q. Sir, do you remember whether there was a dump on the corner of Judson and Bay Street?
A. Yes.
Q. And that was a town dump, right?
A. Right.
Q. And the town used to send stuff there to be dumped, right?
A. Yeah.
Q. And you were around back then, right?
A. Right.
Q. And the town sent stuff from all over the place, right?
A. They picked it up in town, the whole town. Dupree had the job of picking it up.
Q. And Dupree worked for the town, right?
A. He had a contract with the town.
Q. And he took everything and dumped it

right on the corner of Judson and Bay Street, right?

MR. WIENER: Objection.

A. Yes.

Q. And how long was the town dump on the corner of Judson and Bay Street?

A. I don't know. Until people started moving in.

Q. And Dupree who had the contract, he would take all the town's garbage and dump it there, right?

MR. WIENER: Objection.

A. I couldn't tell you. He picked up trash all over town so I don't know what he did with it.

Q. But he took it to Judson and Bay Street where the dump was, right?

A. Not all of it. He took some on Fish Road.

MR. WIENER: Objection to the form of the question.

Q. He took some to Fish Road also?

A. Yeah.

Q. Besides Fish Road -- but he brought other stuff to the dump, right?

A. What do you mean by other stuff?

Q. Some of the garbage and whatever stuff he got from the town, right?

A. He never put garbage in the dump --

MR. WIENER: Objection to the form of the question.

A. -- it was only the trash.

Q. The trash in the dump. Okay. I'm sorry.

So when Dupree had the contract with the town, do you remember him doing that for years, bringing it to the town dump?

A. Yeah.

MR. WIENER: Objection to the form of the question.

Q. Do you remember there being a hurricane in 1938?

A. Yes.

MR. WIENER: Objection. Relevance.

Q. What happened in the neighborhood when the hurricane occurred?

A. What happened in the neighborhood? How do I know?

Q. Well, were you there at the time?

A. Yeah.

Q. Was there water that came in?

A. Yeah.

Q. Can you describe for us any of the things you remember about the big hurricane?

MR. WIENER: Objection. Relevance.

A. I didn't know what a hurricane was. All right? All we knew there was a lot of winds and a lot of rain and we had to move out.

Q. And were you near the water at the time?

A. No. I lived in my house on Cornell Street.

Q. And how far away is that from the water?

A. I don't know, a mile or so.

Q. And was the oil company still there back then?

MR. WIENER: Objection.

A. Let's see -- I don't remember.

Q. Well, do you remember having to move out because the neighborhood was flooded?

A. No. No. Because of the fire. We moved out because of the fire because of the -- the flames.

Q. Was there flames associated with the hurricane also?

MR. WIENER: Objection.

A. No. No. We're talking about the fire now. Now we're talking hurricane. I don't know

with hurricanes.
Q. Sir, a minute ago you said you had to move out of your house when the hurricane came. Do you remember that?
A. No. I didn't move out of my house. I lived too far up the road. The hurricane never, never reached my house. The waters never came to my house.
Q. Did the waters flood streets lower down?
A. Yes. Oh, God --
Q. Do you remember how long you lived on Davis Street?
THE WITNESS: On Davis Street?
MR. WIENER: Objection.
A. I don't remember.
Q. Was it for 10 years you think?
A. I don't know. Lived there for a while. I don't know the years.
Q. When you lived at Davis Street, how long did it take you to walk to work?
MR. WIENER: Objection. Asked and answered.
A. How long did it take me to walk on work?
Q. From Davis Street. A couple of minutes?
A. No. I was working down -- down below.

Let's see, I -- I was working for Russo's Bakery when I was on Davis Street, and I worked for Simpson when I was on Davis Street. That's all I can tell you.

Q. Okay. And did you work at the bakery full time?

A. Yeah. I had my shift. I used to be early morning shift.

Q. And you worked five days a week or more?

A. Seven days a week. We had one -- no, five because we had Sunday off. That's the only day -- not Sunday, Monday off.

Q. So you worked six days a week?

A. Yeah.

Q. And that was full time from morning to night, right?

A. Right.

Q. How long have you known the Simpson girl?

A. All her life.

Q. Do you know her mother also?

A. Yeah.

Q. How do you know her mother?

A. Because she lived in the neighborhood.

Q. Do you know a lawyer named Mark Roberts?

A. No. I heard of the name but I don't know

him.

Q. How would you have heard of the name?

A. Through people talking.

Q. Do you ever remember him coming to your house?

A. A lawyer came to my house. I don't know who the hell he was.

Q. Do you remember what he talked to you about?

A. Talked about the pollution.

Q. Did he tell you he wanted you to help out the neighborhood?

A. No, he didn't tell me. He wanted to know about the pollution.

Q. And, sir, did the Corvello girl tell you about the pollution?

MR. WIENER: Objection.

MR. HERSCHMANN: I'm sorry. Withdrawn.

Q. Did the Simpson girl tell you about the pollution?

A. Well, they were being sued.

Q. They were being sued?

A. Yeah.

Q. And they told you they didn't want to be sued, right?

MR. WIENER: Objection.

A. Well, naturally. Who wants to be sued? It wasn't their fault, you know, so why should they be sued?

Q. Sir, the people that are being sued, it's not their fault, right?

A. No, of course it's not their fault.

MR. WIENER: Objection.

Q. And if someone tried to get you to say it was their fault, that's not truthful, right?

MR. WIENER: Objection.

A. No.

Q. Well, that would be a lie if they tried to get you to say that people that are being sued are responsible, right?

MR. WIENER: Objection.

A. I'll tell you, they never told me to lie and I'm not going to say I was lying and I didn't lie.

Q. Sir, I understand.

A. I always told the truth, what I remembered. That's all I can tell you.

Q. And, sir, we know that they gave you a document to sign that no one ever read to you, right?

MR. WIENER: Objection.
A. I don't know. I can't see. I never had no glasses.
Q. I didn't hear you. You don't have any glasses?
A. No. I don't have them with me, no.
Q. How often have you been to the Simpson girl's house?
A. How often did I go over her house? I worked for her father. I was there every day.
Q. And you worked for --
A. For her father, her grandfather.
Q. Do you know her name?
A. Janet? I think it was -- I think it's her name Janet, isn't it? I don't know. She was only a kid.
( P A U S E )
THE WITNESS: All I know, was older than John because they were my age.
MR. HERSCHMANN: Sir, I didn't ask you anything now. All right?
Q. Sir, you said you worked at the bakery seven days -- six days a week, right?
A. Yes.
Q. And then you built the club, right?

A. Yeah.

MR. WIENER: Objection. Relevance.

Q. And did you build the club on the only day off that you had?

A. Only time I had.

Q. So at some point after you got off of work you built the club?

A. I worked there, yes. We had no money so we had to work to build the club.

Secret Service. Oh, God Almighty, I don't know. Why couldn't you come 15 years ago?

Q. Do you know someone named Arruda?

A. Who?

Q. Arruda.

A. Arruda? Joe Arruda?

Q. Yes.

A. Yes. Of course I know him.

Q. How do you know Joe Arruda?

A. Well, he's a neighbor.

Q. Was he around back then?

A. Of course.

MR. WIENER: Objection. Vague.

Q. How long have you known Joe Arruda?

A. All his life and all mine.

Q. What did Mr. Arruda do when you knew him?

MR. WIENER: Objection.

A. I don't know what he did. I know he worked in Firestone for a while. I don't know. Later in life, I don't know. What he did before that, I don't know.

Q. Do you know someone named John Arruda?

A. John Arruda? That was one of the boys.

Q. That was one of the boys?

A. Yeah.

Q. You're sure about that?

A. Yeah.

Q. How did the dump -- well, withdrawn.

Do you know that Gail Corvello's house is on top of the dump, the town dump, do you know that?

MR. WIENER: Objection.

A. Whose house?

Q. Gail Corvello's house. Do you know that's built on the town dump?

MR. WIENER: Objection.

A. Yes.

Q. And do you know how that house ended up getting developed after it was the town dump?

A. They built a house on top of the dump.

Q. Do you know why the town decided to change its dump into a residential area?

MR. WIENER: Objection.
A. Oh, I don't know anything about that.
Q. But you know at some point it was the town dump and then the town decided to develop the area, right?
A. No. The town did not decide. People bought the land.
Q. Well, if the town dump was owned by the town, who did they buy the land from?
A. From the town.
Q. So the town knew when they were selling the land that it was going to be made into houses, right?
MR. WIENER: Objection. Requires speculation.
A. I don't know what the town knew.
Q. Well, sir, they have given -- I'm sorry. Withdrawn.
Some of the other lawyers who represent the homeowners have given a document saying you do know some of this stuff. Is that true?
A. Some of the stuff? Yeah, I know some of the stuff.
Q. But, sir, specifically they say that you know about the development of the area, so do you

know when the town decided that it should change its dump into a residential area?

MR. WIENER: Objection.

A. No, I don't know that.

Q. But you know that Gail Corvello's house is built on what used to be the town dump, right?

A. Yeah.

MR. HERSCHMANN: Why don't we take another two-minute break, okay? Do you want to go to the bathroom or anything?

THE WITNESS: No. I want to go home.

MR. WIENER: Are you okay?

THE WITNESS: Yeah.

VIDEOGRAPHER: The time is 12:01 p.m. and we're now off the record.

( R E C E S S )

MR. HERSCHMANN: You can walk out to your son now.

(Witness leaves conference room.)

MR. HERSCHMANN: We are just back on the record. The witness has indicated that -- not the video, we are back just on the transcript.

The witness has indicated that he is tired and has called for his son twice and said that he wanted to go home.

We probably have between an hour and two hours more of testimony from the witness and we've agreed to allow the witness to be excused and will work on a mutually-agreed upon date to have the witness return with counsel and obviously the witness and his son.

(Adjourned at 12:15 p.m.)