# Exhibit 7

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

GAIL CERVELLO, ET AL; :
KEVIN BURNS, ET AL; :
COLLEEN BIGELOW, ET AL; and :
SHEILA REIS, ET AL :
: Civil Action Nos.:
vs. : 05-221T, 05-274T,
: 05-370T, 05-522T
NEW ENGLAND GAS COMPANY, :
INC. :

VIDEOTAPED DEPOSITION OF JOSE SOUZA, JR.
Wednesday, March 7, 2007
11:00 a.m.
ADLER, POLLOCK & SHEEHAN, INC.
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903

- - -

Lori P. Hamel, RPR, CRR
Capitol Court Reporting, Inc.
931 Jefferson Boulevard
Warwick, Rhode Island 02886





APPEARANCES

For the Plaintiff: (Cervello)
BRAD J. MITCHELL, ESQ.
THORNTON & NAUMES, LLP
100 Summer Street, 30th Floor
Boston, MA 02110

For the Defendant:
ERIC D. HERSCHMANN, ESQ.
SETH A. DAVIS, ESQ.
DAVID E. ROSS, ESQ.
KASOWITZ, BENSON, TORRES & FRIEDMAN
1633 Broadway
New York, NY 10019

For the Deponent:
MICHAEL A. MARRAN, ESQ.
LAW OFFICES OF MICHAEL A. MARRAN
321 South Main Street
Providence, RI 02903

ALSO PRESENT:
Bert Tomasone - Videographer





I N D E X


DEPONENT: PAGE

JOSE SOUZA, JR.
Examination by Mr. Herschmann 5 Examination by Mr. Mitch
Further Examination by Mr. Herschmann 241






E X H I B I T S


NO. DESCRIPTION PAGE
1 Subpoena 6 2 E-mail be
Souza from 10/6/06 and 10/10/06 3 Disclosure of Expected
Joseph "Jose" Souza 4 E-mail between Bob McConnell and J
Souza on 12/8/06 5 E-mail between Bob McConnell and Joe
Souza on 12/11/06 and 12/12/06 6 E-mail from Bob McConne
on 12/12/06 through 12/22/06 7 E-mail from Bob McConnell
on 1/11/07 and 1/17/07 8 E-mail from Bob McConnell and J
Souza on 1/10/07 9 Letter dated 1/13/07 from Patty
Fairweather to Joseph Souza 10 E-mail between Bob McConne
Souza 1/17/07 and 1/18/07 11 E-mails between Bob McConnel
Souza on 1/10/07, 1/16/07 and 1/17/07 12 E-mails between
Souza on 1/10/07, 1/16/07, 1/16/07, 1/17/07 and 1/18/0
13 E-mails between Bob McConnell and Joe 172 Souza f
14 Letter dated January 22, 2007 from 176 Robert
15 E-mails between Bob McConnell and Joe 180 Souza o
16 E-mails between Bob McConnell and Joe 196 Souza o
17 E-mail exchanged between Bob McConnell 209 and Joe


- - -

A. I have a brother John, and I have a half brother Alan.
Q. And how old is John?
A. Not a hundred percent sure. About two or three years younger than I am.
Q. And how old is Alan?
A. Again, not a hundred percent sure. A couple of years older than I am.
Q. Now, sir, you've had occasion to speak with someone named Bob McConnell; is that correct?
A. That's correct.
Q. And how do you know Mr. McConnell?
A. I received a phone call from him regarding my father talking about this Bay Street incident.
Q. And when did you receive that first phone call?
A. I have no idea.
Q. Was it in 2004?
A. No. It was sometime this year.
Q. This year being 2007?
A. 2007.
Q. Do you recall ever speaking to him before 2007?
A. No.
Q. What did you do to prepare for your testimony today?
A. Nothing.
Q. Did you talk to Mr. Marran?





A. Yes.
Q. And when did you first talk to Mr. Marran about this matter?
A. I had a phone conversation with him prior to going on vacation, and this morning.
Q. And how did you get his name and telephone number?
A. From Bob McConnell.
Q. And when did Mr. McConnell give you Mr. Marran's name and telephone number?
A. Prior to me going on vacation which would have been somewhere around February 27th or 28th.
Q. And did Mr. McConnell give you Mr. Marran's name via e-mail or a telephone call?
A. Telephone call.
Q. And did you call Mr. McConnell or did Mr. McConnell call you?
A. I called Mr. McConnell.
Q. Prior to contacting Mr. McConnell -- withdrawn.
Did you ask Mr. McConnell to refer a lawyer to you?
A. Did I ask him to refer a lawyer to me. No.
Q. Do you know somebody at the Tamulevitz, Hultquist & Bianchi firm?
A. Say it again, please.
Q. Do you know anybody at the Tamulevitz, Hultquist &





Bianchi firm?
A. Okay, yeah, I had a conversation with Chris Hultquist.
Q. How do you know Chris Hultquist?
A. Again, Mr. McConnell.
Q. Let me take a step back then. When's the first time, just by date, that you had a conversation with Mr. McConnell about a lawyer?
A. The first time I had a conversation about a lawyer, I couldn't tell you by date but it was this year. And it was asking him whether or not he thought I would need one, and asking him what my liability would be getting involved in this.
Q. Now, did Mr. McConnell recommend first someone from -- Mr. Hultquist to you?
A. Yes.
Q. And did you have a chance to speak to Mr. Hultquist?
A. Briefly.
Q. Did you retain Mr. Hultquist?
A. No.
Q. Did -- what did you discuss with Mr. Hultquist at the time?
A. The situation that I was going on vacation, and I didn't want anyone bothering my father while I was gone.
Q. When you say bothering your father, you mean talking to





your father?
A. Correct.
Q. Do you know if any of the plaintiffs came to talk to your father at any point without you being present?
A. Come to talk to him, no.
Q. Do you know if they tried to talk to him?
A. What do you mean by plaintiffs? Explain that.
Q. Well, do you know that this is testimony involves a lawsuit?
A. Yes.
Q. And you understand that Mr. McConnell represents some of the individuals in the lawsuit, right?
A. Yes.
Q. And you understand that New England Gas Company is a defendant in the lawsuit, right?
A. Yes.
Q. Do you know any people in the neighborhood that are plaintiffs in that lawsuit?
A. I believe the woman down the street is a plaintiff. Down the street to my father.
Q. That's the woman you refer to as the Simpson girl; right?
A. Yes, I do.
Q. And is that Janice Carroll?

A. If that's the Simpson girl I'll say yes.
Q. And why do you refer to her as the Simpson girl?
A. Because that's how my mother refers to her.
Q. And when you say that's how your mother refers to her, do you know if she had any relationship, Janice Carroll had any relationship to any of the Simpsons?
A. I can only assume so by my mother calling her the Simpson girl.
Q. Now, do you know if the Simpson girl has had conversations with your parents without you being present?
A. Yes.
Q. And do you know actually that she's shown up at your parents' house on occasion, right?
A. Yes.
Q. And she's brought cookies for your parents, right?
A. Yes.
Q. And she's baked for them as well, right?
A. That I don't know.
Q. Well, do you know that she's asked your parents to help her out in this lawsuit?
A. Yes.
Q. Now, when you first contacted Mr. Hultquist at the Tamulevitz firm, you said Mr. McConnell gave you his name





and number; is that correct?
A. I believe so.
Q. And do you have a note as to the name and -- Mr. Hultquist's name and telephone number that you took down when Mr. --
A. No, I put it directly in my cell phone.
Q. So, let me take a step back. Was the first lawyer you contacted Mr. Hultquist prior to Mr. Marran?
A. The first lawyer I contacted for me?
MR. HERSCHMANN: If I'm not pronouncing that correctly, I apologize.
MR. MARRAN: Marran.
MR. HERSCHMANN: Marran, okay.
MR. MARRAN: Close enough.
Q. Let me take it a step back then, okay?
A. Okay.
Q. I'm going to try to be specific and I appreciate -- if I pronounce it incorrectly --
MR. MARRAN: That's all right.
MR. HERSCHMANN: -- then I'm apologizing in advance.
Q. You had a conversation with Mr. McConnell, correct?
A. Correct.
Q. Mr. McConnell had previously offered to get a lawyer for





you, right?
A. I asked him if I needed one, if he would provide one for me, and he said yes.
Q. And he actually sent you a letter telling you that he would provide one for you pro bono, right?
A. I required that.
Q. And what does pro bono mean to you?
A. That it wouldn't cost me or my father anything.
Q. And had you ever heard of the term pro bono before?
A. Television.
Q. Other than on television?
A. No.
Q. And did Mr. McConnell tell you who would be paying for these lawyers?
A. No.
Q. You're certain you're not paying, right?
A. That's what the letter says.
Q. Right. And you're certain your father's not paying, right?
A. Correct.
Q. And at some point Mr. McConnell even arranged for people from the Rhode Island Department of Environmental Management to come and see you, right?
A. Correct.





Q. And they gave you, on behalf of your father, a letter of immunity, right?
A. Again, something I required.
Q. Okay. And that means that they won't bring any actions against you or your father, right?
A. Correct.
Q. And at some point after that, your father signed what we now know is an affidavit, right?
A. I'm not sure which one you're talking about. I believe he may have signed something prior to that. Whether or not that's an affidavit, I have no idea. There was a point in time where he had testimony that I wasn't involved in at all. I didn't even know this was going on.
Q. What, what documents did he sign that you're aware of beforehand?
A. The one that was sent to me as an attachment in an e-mail from Bob McConnell.
MR. HERSCHMANN: We call for production of that document.
A. You have it in the stuff that I sent you.
Q. Well, sir, I've gone through documents and let me start with the other side because they have an obligation to produce documents to us.

A. Okay.
Q. So, so you've seen a document, you said -- let me take a step back. Your father has signed two documents that you've seen, right?
A. Yes.
MR. HERSCHMANN: Once again we call for the production of --
MR. MITCHELL: Everything's been produced.
MR. HERSCHMANN: Let me make the record. Since there's only one signed document that's been produced to us, we can take it up with the Court later on, I'm calling for production of whatever additional signed document exists that has not been produced to us to date.
MR. MITCHELL: I'm telling you that everything that has been signed has been produced.
MR. HERSCHMANN: All right. Well, we'll continue with the deposition.
MR. MITCHELL: Yes.
BY MR. HERSCHMANN:
Q. So, you had a conversation with Mr. McConnell and at some point he arranged for representatives from -- if I say DEM, you'll understand that's the Department of Environmental Management?





A. Yes, I will.
Q. So Mr. McConnell arranged for representatives of DEM to come and see you, right?
A. Actually, I saw the representative from DEM and Bob McConnell together for the first time.
Q. So the first -- the first time you met Mr. McConnell in person, DEM was with him?
A. Yes.
Q. Let me try to walk through some things in chronological order then. The first lawyer that Mr. McConnell recommended to you, was that Mr. Hultquist or Mr. Marran?
A. Mr. Hultquist.
Q. And at some point Mr. McConnell gave you the telephone number of Mr. Hultquist, right?
A. Correct.
Q. And at some point you called Mr. Hultquist, correct?
A. I believe so.
Q. And at some point you sent him an e-mail as well, right?
A. Yes.
Q. How did you get his e-mail address?
A. From the Internet.
Q. And did Mr. McConnell tell you how he had selected Mr. Hultquist to represent you and your father?





A. No, just that it was someone that would represent us if we needed it.
Q. And did you sign a retainer with Mr. Hultquist at any point?
A. No.
Q. Have you signed a retainer with Mr. Marran?
A. No.
Q. Do you have any idea what either of the attorneys' fees are?
A. No.
Q. Did you meet with Mr. Marran in his office today?
A. Yes.
Q. And where are his offices located?
A. Over on South Main Street.
Q. Who does -- well, withdrawn.
Do you know if your father has spoken to Mr. Marran?
A. No, I don't know.
Q. Did you arrange for a meeting between Mr. Marran and your father?
A. No, I did not.
Q. Do you have any idea whether your father has decided that he wants to retain Mr. Marran?
A. No, he would do what I tell him to do.





Q. But to date your father -- well, withdrawn.
Your father's an adult obviously, right?
A. Yes, he is.
Q. And your father has not, to your knowledge, spoken to Mr. Marran, right?
A. Correct.
Q. And to your knowledge he has not retained Mr. Marran, right?
A. Correct.
Q. And to your knowledge Mr. Marran has never even spoken to your father, right?
A. Correct.
Q. And it's your father's decision whether or not he wants to retain counsel, right?
A. It would be. He would ask my advice.
Q. But it is his decision, right?
A. Of course.
Q. And you know your father's already started to give testimony, right?
A. Yes.
Q. And when he started to give testimony, he wasn't represented by counsel, right?
A. Correct.
Q. And, now DEM has finished asking their questions in that

Q. Any conversations.
A. As far as I know.
Q. Well, you've told us that you lied to Mr. McConnell in the e-mail dealing with the proffer testimony to the Court, right?
A. Yes.
Q. Did you lie to Mr. Ross in any times?
A. Don't recall.
Q. Well, why don't you take a moment to think about -- well, withdrawn.
A. Actually, the answer's not going to change because I don't recall having any lengthy conversations with Mr. Ross. So I wouldn't have any -- I'm gonna say no, I don't recall any reason why I would want to lie to him.
Q. Sir, do you take lying seriously?
A. Yeah.
Q. And I presume so, and that's why I'm asking it that way.
A. Yeah.
Q. So if you lied to somebody on some matter related to a litigation, that's serious stuff, right?
A. I would assume so.
Q. Well, I'm asking your opinion.
A. I've never been involved in litigation so I'm gonna assume, you know, when you ask me to take an oath to





tell the truth, I'm gonna tell you the truth. Prior to that, I'm gonna do what I feel is gonna be convenient for me.
Q. And I understand that, sir.
A. Okay.
Q. You understand that Mr. McConnell may do what's convenient for him also, right?
A. Of course.
Q. Like he didn't give you any explanations about indemnification, right?
A. Didn't ask.
Q. But he didn't tell you either, right?
A. Correct.
Q. And you understand that -- well, withdrawn.
Do you understand that Mr. McConnell's firm is doing this on a contingency fee basis or trying to get a lot of money themselves?
A. Never really thought about it.
Q. And he never explained that to you?
A. No.
Q. Now, you told Mr. Ross at some point in December of 2006, right, that you would prefer that everybody contact you directly versus contacting your father, right?

Q. So, was that a truthful statement that you told Mr. Ross, or did you lie to Mr. Ross?
A. That was a truthful -- as truthful a statement as it was to Bob McConnell.
Q. Well, sir, you've told us you lied to Mr. McConnell, right?
A. Okay.
Q. You've told us you were always truthful for Mr. Ross; you just told us that two minutes ago, right?
A. Right.
Q. Are you now telling us that you lied to Mr. Ross and you lied to Mr. McConnell?
A. No. If you want me to give you a complete answer I will.
Q. I just want to get down to what point -- who you're being truthful to. So I'm going -- you told us everything you told Mr. Ross is truthful, right?
A. Yes.
Q. So, do you recall telling Mr. Ross that your father told you that he didn't have anything to do with that?
A. I probably said that he said he didn't do none of this.
Q. Okay. Now, do you recall having a conversation with Mr. Ross when you told him -- this is a quote -- "Off the record, and if I'm asked to repeat this I will deny





it. If my father testifies, you will not find him reliable." Did you use those words, sir?
A. No, I don't recall.
Q. Did you ever say anything like that, sir?
A. Say it again?
Q. Sure. Quote: "Off the record, and if I'm asked to repeat this I will deny it. If my father testifies, you will not find him reliable." End quote.
A. I don't ever recall using the words "off the record" and "if I'm asked to repeat this I'll deny it". I don't ever recall saying that.
Q. How about "if my father testifies you will not find him reliable"?
A. I don't know that I used those terms. I may have suggested that.
Q. And you were being honest as you told us a minute ago, right? Over and over again you told us you were honest with Mr. Ross, right?
A. Right.
Q. Okay. Now, do you recall also telling Mr. Ross that your father is an old man who, quote, exaggerates things, end quote, that happened a long time ago?
A. I don't recall if I said that.
Q. Is that accurate, sir?





A. He may have. Just like all of us.
Q. And Mr. Ross was talking to you in his capacity as a lawyer for New England Gas Company, right?
A. I would assume so, I don't really know.
Q. Well you're not social friends with Mr. Ross, right?
A. No. And again I, you know, let's go back to how much -- how little this means to me, and whether or not he was a representative for the gas company or for the Bay Street area --
Q. Well, sir --
A. -- I may not have made note of that.
MR. HERSCHMANN: All right, let's move to strike as non responsive.
Q. Sir, are you telling us, because -- withdrawn.
You've been telling us over and over again about Bob, right? About Bob McConnell, right?
A. Yes.
Q. And Mr. McConnell e-mailed you back in October, right?
A. Yes.
Q. And he spoke to you on the telephone, right?
A. Yes.
Q. And he's gotten a lawyer for you, right?
A. Yes.
Q. And his client shows up at your parents' house and

nod off, sleep.
Q. Find he's a little less focused later in the day?
A. Never really wondered about whether or not he was focused. You know, just tired.
Q. You -- in your experience in dealing with your father, you haven't found that at times he seems confused?
A. Oh, yeah, I found at times that he seems confused.
Q. Have you found that later in the afternoons he seems even more confused?
A. I don't know if I've actually made a conscious assessment of what time of the day he seems more confused. But I may have and probably did say to everyone who was contacting him, talk to him in the morning, it's better, because, number one, we're gonna go back to my mother will not answer the phone or open the door later in the day.
Q. Well, sir, you -- I think you figured this part out already that if I ask you a term sundown, I'm getting it out of some document, right?
A. Yeah.
Q. So rest assured that if I'm saying the term sundown, I'm probably taking it from some exhibits you just gave us recently.
A. Okay.





Q. Okay? So, if you would tell somebody, Dad tends to sundown later in the day, what did you mean by that when you used it?
A. He gets tired.
Q. And in your experience, I mentioned my father-in-law being 91, you find when later in the day and they get tired they're a little more confused?
A. I -- if you could put confused with tired, sure, yeah.
Q. Sir --
A. I can say yeah, I mean, you know.
Q. I'm just basing it on --
A. Everybody does.
Q. Right. I'm basing it on life's experiences, as people get older their memory tends to be worse, and as the day goes on later they tend to get more confused. And I'm trying to understand, is that your same understanding?
A. Sure.
Q. All right. Now -- I'm going to mark this as Exhibit 10.
A. Yeah, but you looked first.
Q. I learned.

(Plaintiff's Exhibit 10 marked for identification)

Q. Take a look at Exhibit 10, please. Sir, this is a series of e-mails, is it correct, between you and





Mr. McConnell?
A. Yes.
Q. And this is where you're trying to arrange a time for Mr. McConnell to come and see you and your father, right?
A. Yes.
Q. And you see in the middle of the first page of Exhibit 10, where you send an e-mail to Mr. McConnell at 11:58 a.m. and you say, "I will call my dad tonight when I get home and tell him I will pick him up around 4ish so assume we are a go." See that?
A. Yes.
Q. And you were planning to pick up your father and bring him to meet with Mr. McConnell some point on the following Thursday at around 4, right?
A. Was it the following Thursday?
Q. Sir, if you look at the e-mail below, you state "If Thursday at 4:00 is still okay..."
A. Yes, okay, I see it, yup.
Q. So is that correct?
A. Yes.
Q. And Mr. McConnell responds back to you and says, "Hi, Joe. The address is 145 Judson Street. However, instead of 4ish, is it possible for you to meet at 5:30





instead? Bob." Right?
A. Yes.
Q. And by this team -- by this time, in the January time period, you and Mr. McConnell are clearly on first name basis, right?
A. I'm pretty much on first name basis with everybody the first time I meet them.
Q. Well, did you ever talk to Mr. Ross and called him David?
A. No.
Q. So, at least with Mr. Ross and the attorneys --
A. I never called him Mr. Ross either.
Q. Well, we saw back in October Mr. McConnell introduced himself and said he's Mr. McConnell, right?
A. I don't know. If you say so. Yes.
Q. And subsequent to -- and you can look at Exhibit 2 where it says, "Dear Mr. Souza, my name is Bob McConnell."
A. Okay. So he didn't say Mr. McConnell. Okay.
Q. And at least some point during this numerous communications you started to have with Mr. McConnell, you started to refer to him as Bob and he refers to you as Joe, right?
A. Right upfront.
Q. And do you know where 145 Judson Street is?

A. Yes.
Q. And what phone message did Mr. McConnell leave for you?
A. No idea. What took place before this? Let me read it.
Q. Why don't you take a second to read it, sure.
(Witness reading)
A. It looks like he was asking me to schedule -- probably the meeting that I really do believe took place in the morning.
Q. Well, sir, you say here -- well, withdrawn.
What happened between Ms. Fairweather and Mr. McConnell coming to your house at 4:30 on the 18th, and January 25th?
A. That's -- that was my confusion a little while ago. I don't know. Um, because I truly do believe the meeting, the only meeting I had with Bob and Patty and my father was in the morning.
Q. Sir, take a look at Exhibit 13 for a minute. Exhibit 13 is a series of e-mails where you're giving Mr. McConnell the address -- the directions to your house, right?
A. Yes.
Q. And then he tells you he's gonna want to bring Patty Fairweather with him, right?
A. Yes.
Q. What exactly happens in that week's time period that all





of a sudden we don't have any documents, we don't have any e-mails or anything from that time?
A. Obviously nothing if there were no documents or e-mails. For some reason this meeting never took place. In my mind, this meeting was canceled and was brought about for a morning meeting. But let me -- let me once again finish reading this.
Q. Okay. Well, also when you're looking at that, can you also tell us how did you get Exhibit 14. That's on January 22. That's in between the time period of the Exhibit 13 --
A. This one probably came in the mail. When you gave me this I said to myself, oh, I may have made a mistake before. Patty handed me her envelope, and this one came in the mail. Patty handed me her envelope at, um -- no, see now, this is confusing.
Q. Memory's kind of like that, isn't it?
A. Oh, yeah, that's why I want stuff in writing. You know, All right, hang on. Let's see. Let me try to remember. Okay, again, I -- ask me the question again.
Q. Sir, what exactly happened between the time period you were expecting Mr. McConnell and Ms. Fairweather to show up at your house on January 18, and these e-mails of January 25th of 2007?





A. Nothing that I recall.
Q. Did they just --
A. Nothing that I have any record of.
Q. Were you waiting home for them to show up on the 18th and they didn't come?
A. No. I'll say no to that.
Q. Sir, this is only a little over a month ago, right?
A. Yeah.
Q. I mean, relatively recent in your memory, right?
A. Well, actually it's a month and a half.
Q. Well --
A. January 18, February 18, we're on March 6, 7.
Q. Well, January 25 and what -- close enough. Whatever between January 25 --
A. Yeah, yeah.
Q. -- and March 7, right? Now, and you're having difficulty remembering some of these things, right?
A. Yes.
Q. And the things that Mr. McConnell's asking your father to testify about are going back more than 70 years, right?
A. Yes.
Q. To when your father was what, 13? Around there?
A. Don't know. If that's what age he told you he was,





yeah.
Q. When you turned 13, did you work anywhere?
A. I might have.
Q. Well, do you remember where?
A. I don't remember how old I was, I can remember what my first job was if that's what you're asking me.
Q. No, was your first job when you were 13?
A. I don't recall how old I was. I wasn't -- I worked under the table so I wasn't legal age to be working, yes.
Q. And do you have a better recollection about the jobs you've done in the last 20 years?
A. Sure.
Q. And you'd expect that to be human nature, right?
A. You would expect.
Q. Pretty sure I'm younger than your father, and I'm having trouble thinking about what I was doing back when I was 13.
A. Okay.
Q. And, you know, you've told us that at this stage your father gets somewhat confused. And I'm just trying to understand, when you had this meeting, Mr. McConnell told you the meeting was only going to be an hour with your father, right?

A. I don't recall. Is that what it says in the e-mail?
Q. Well, do you remember at any point Mr. McConnell telling you, Listen, we just need to get together with your father, okay? Shouldn't take us more than an hour.
If you look at the top of the e-mail.
A. Yes, I can see that, yup.
Q. And when Mr. McConnell said that on January 25, you believed him, right?
A. Sure.
Q. And the meeting actually took less than an hour, didn't it?
A. I don't recall how long it took but it wasn't very long. It might have been longer than an hour. I made coffee.
Q. Well, do you recall they took out the proffer statement that they had given to Court, Exhibit 3, to go over it with your father?
A. They had something that they were going over with my father. Whether or not it was that particular document, I don't know.
Q. Well, do you recall that a document that they put in front of your father and they were going over it with him to confirm things that they wanted?
A. No, they didn't do that. They had the document in front of themselves and they asked him questions.





Q. Did they refer to the document when they were asking the questions?
A. What do you mean by refer to it? Did they look at it? Probably.
Q. Did they say, "Mr. Souza, you previously said this; is that right?"
A. I previously said?
Q. No, did they say things to your father like, "You previously said something like this to us; is that right?"
A. I really -- I really wasn't paying attention. I gotta be honest with you. Actually, like I said, I made some coffee. I was there making sure that my father wasn't being exhausted.
Q. And how do you know they had this other document in front of them?
A. I saw it.
Q. Did your father have a copy?
A. No.
Q. Did they start out generally by just asking your father the most general questions, or did they go -- I mean, they were only there for less than an hour, right?
A. Again, I don't know how long. I -- probably a little longer than an hour. Like I said, I did make coffee.





Actually, yeah, they definitely had to be there a little longer than an hour because they asked questions, they made notes, I made coffee, they typed it up. That ain't happening in under an hour.
Q. Sir, do you know whether they came with something typed up on the computer beforehand?
A. Do I know that?
Q. Right.
A. No, I don't know that.
Q. Did they print it out on your printer?
A. Yes.
Q. Did they load it on to your computer? How did it get on to your printer?
A. From a computer through a wireless network.
Q. Why don't you explain to me how they created the actual document.
A. They typed it up and printed it.
Q. Well, they came with a laptop; is that right?
A. Patty had a laptop.
Q. Who was doing the typing?
A. Patty.
Q. Did they bring their own printer?
A. No.
Q. Did they confirm with you in advance that they could use





your printer?
A. No, they actually -- they said they were going to go to Carroll's house, type it up, print it; and I said you can print it here.
Q. So how did they print it there? Tell me the process that they went through to actually get it printed in your house. Did someone e-mail it to you and then you printed it out?
A. No. They might have used my printer -- no, my computer. They might have used my laptop.
Q. So, at some point -- well, you said to us a moment ago Patty Fairweather came with her own laptop, right?
A. She did.
Q. And you gave them your laptop instead to type it up?
A. I'm thinking yes, because that -- yes. I'm thinking yes.
Q. Did -- when they were first typing or taking notes, was that on a computer or by hand?
A. By hand.
Q. And did anyone give you a copy of those notes?
A. No, but you know what? I'm thinking that you may not have a copy of that document that's on my laptop. Because I forgot all about that.
Q. I'm relatively certain, sir, that we don't have that.

A. Okay.
Q. But let's take a step back. We called for production of it, I think. It's clearly responsive to the subpoena.
A. Yeah, and I apologize. I just forgot about it.
Q. Sir, you have your own obligations but they have theirs also.
A. Okay.
Q. So, the people are taking notes of what your father's saying, right?
A. Yes.
Q. And then subsequently they come and they're gonna go to Janice Carroll's house to type it up, right?
A. Yes.
Q. And you tell them, Just go ahead and use my laptop here and type it up, right?
A. Yes.
Q. And who actually does that typing?
A. Patty.
Q. And did they print out a draft at some point and show it to your father first, or did they just hand it to him and then he signed it?
A. They handed it to me, I browsed through it, and then I told my father to sign it.
Q. Well, sir, you weren't present, you just told us a





moment ago --
A. I said I wasn't paying attention. I was present but I wasn't paying attention.
Q. So let's make sure then that we're clear. You didn't sit there the entire time taking your own notes, right?
A. No.
Q. You were making coffee and doing other stuff, right?
A. Yeah.
Q. And you were walking in and out of the room; is that right?
A. Yeah.
Q. And at some point they say, Okay, we're finished going over stuff, we want to go type up an affidavit; right?
A. They wanted to go type that up. They didn't use the word affidavit.
Q. They wanted to type up whatever they wrote down.
A. Sure.
Q. And then they're gonna -- you say to them, Don't bother going there, you can just use my computer; right?
A. Yeah, just print it here, right.
Q. And then they print it out, right? Is that correct? You have to answer verbally.
A. Yes, sorry.
Q. You're doing really well today.





And then they go ahead and they show it to you, right?
A. Yes.
Q. And you don't read it in detail because you weren't paying attention, right?
A. Yes.
Q. And you hand it to your father and tell your father to sign, right?
A. Yes.
Q. And then you --
A. Actually, I may have even given him glasses and asked him if he wanted to read it and he may have done the same browsing. Because he didn't have his glasses with him.
Q. So, which glasses would you have given him, yours?
A. Reading glasses, yeah. That's all we both need is just reading glasses.
Q. So, but you don't recall whether you gave him reading glasses or not?
A. I don't really recall, no.
Q. And based on what I've seen of your father, he doesn't seem too patient to want to sit there and read the whole thing, right?
A. You would be right.





Q. And, so you hand it to him, he takes a quick turn and signs his name, right?
A. Yes.
Q. Did you show him where to sign?
A. Don't recall.
Q. But you didn't read the document out loud to him and then tell him to sign, right?
A. No.
Q. And Mr. McConnell or Ms. Fairweather, nobody read it out loud to him and told him to sign, right?
A. No.
Q. And you don't have any recollection of saying, Here, Dad, have my reading glasses and take your time to read it --
A. I do have some sort of a recollection that I may have given him some glasses to read the document.
Q. Right, but you don't remember him reading the document entirely, right?
A. No, I don't.
Q. And at some point do you give the document back to Mr. McConnell or to Ms. Fairweather or somebody?
A. Somebody. And actually, they asked me if I needed a copy, and this is why it's embarrassing me because I said no, I got it on my computer.

Q. Fair enough. And, so your father signs, you show him where to sign, he signs, and then what happens?
A. They left.
Q. Okay. And then when's the next time you have any involvement with Mr. McConnell or anybody else?
A. Probably setting up the deposition date.
Q. Did anyone tell you at the time your father signed this that, By the way, the second he signs this, there is no question in the world he's now going to get deposed in this case?
A. Nobody ever said that but I pretty much understood that.
Q. Okay. But, just so I'm clear, nobody swore your father in and said --
A. Right. I -- I don't remember anything like that happening.
Q. You think that would stand out in your mind?
A. Yeah, pretty much.
Q. You know, did it ever happen in your life where somebody swore people in in your living room?
A. No.
Q. Hopefully it never does happen, right?
A. Right.
Q. Okay. And at a certain point after you give the document back to Ms. Fairweather, then what happens?





Your father --
A. I bring my father home.
Q. And do they leave your house at the same time?
A. Of course, I'm not going to leave them in the house, yeah.
Q. Did anyone ever give your father a copy of the Exhibit 3 when he was sitting there to say, Hey, by the way, this is some of the old stuff that we said?
A. You mean during that particular time?
Q. Right.
A. No, he wouldn't have had -- like I said, he wouldn't have had anything, even to read it.
Q. What's your father's education level?
A. I have no idea. Pretty smart guy but you're talking formal education? I don't know. I don't -- I don't believe he -- I really don't know.
Q. Sir, if he testified that he finished up till the eighth grade, is that consistent with what you've understood?
A. I don't know. I never really discussed it with him. You know, I -- he reads, he writes. I never asked him what grade he went to.
Q. I'm not asking you whether he reads or writes, I don't question that.
A. Yeah, I'm answering you the best way I can. I don't





know.
Q. Did he ever tell you whether or not, like, "This is the high school I went to," or anything like that?
A. No. Sorry, no.
Q. Did you ever take a look at the document they wanted your father to sign and see whether it contained certain words you don't think your father would normally use?
A. No.
Q. If you look at Exhibit 15, do you understand why Mr. McConnell would say, "We would like to meet with your Dad to review and to confirm the accuracy of his expected testimony as is set forth in the disclosure statement that we submitted to the Court." May I ask why he needed to do that?
A. Probably because he was nervous over me telling him that my father said he didn't do none of this.
MR. HERSCHMANN: Move to strike as non-responsive.
Q. The question is, sir, did Mr. McConnell ever tell you why he said, "I want to meet with your Dad to review and confirm the accuracy of his expected testimony as is set forth in the disclosure statement that we submitted to the Court"?
A. Not that I recall.





Q. And you told Mr. McConnell months ago that this stuff never happened, right?
A. If it was months ago, yea.
Q. Well, what's ever contained in the e-mails, right?
A. Yes.
Q. And prior to this January 25, time period, Mr. McConnell never said, Hey, listen, I need to review and confirm something with your father because, you know, we submitted it to the Court; right?
A. Correct.
Q. Now -- now, do you recall at any point saying that your meeting will occur "either at my house or the home office of the Simpson women if she is involved at this level"?
A. Did I type that? Yes. I don't recall it but.
Q. All right, well let's show you what I'll mark as Exhibit 16.
(Plaintiff's Exhibit 16 marked for identification)
Q. Now, you told us previously that you weren't certain this was the home office, right, of the Simpson girl?
A. No, I said I wasn't certain it was her house. I did know that where they deposed my father was her home office.