# Exhibit 5

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

GAIL CORVELLO, ET AL, KEVIN BURNS, ET AL, COLLEEN BIGELOW, ET AL, and SHEILA REIS, ET AL
Plaintiffs

- against -

NEW ENGLAND GAS COMPANY, INC.
Defendant and
Third-Party Plaintiff

- against -

BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC; BRIDGESTONE AMERICAS HOLDINGS, INC.; HONEYWELL INTERNATIONAL, INC.; TOWN OF TIVERTON; GULF OIL CORPORATION; INLAND FUEL TERMINALS, INC.; DOMINION RESOURCES, INC.; and DOMINION ENERGY BRAYTON POINT, LLC
Third-Party Defendants

Civil Action Numbers:
05-221T, 05-274T
05-370T, 05-522T

VIDEOTAPED DEPOSITION OF JOSEPH SOUZA
Friday, October 12, 2007
10:30 a.m.
White's of Westport
66 State Road
Westport, Massachusetts

- - -

Lori P. Hamel, RPR, CRR
Capitol Court Reporting, Inc.
931 Jefferson Boulevard
Warwick, Rhode Island 02886



APPEARANCES

For the Plaintiffs:
McROBERTS, ROBERTS & RAINER, LLP
MARK W. ROBERTS
53 State Street
Boston, MA 02109

THORNTON & NAUMES, LLP
NEIL T. LEIFER
100 Summer Street, 30th Floor
Boston, MA 02110

For the Defendant:
KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP
ERIC D. HERSCHMANN
DAVID E. ROSS
SETH DAVIS
1633 Broadway
New York, New York 10019

HINCKLEY, ALLEN & SNYDER
GERALD J. PETROS
1500 Fleet Center
Providence, Rhode Island 02903

BISHOP, LONDON & DODDS
CHRISTINA CARLSON DODDS
3701 Bee Cave Road, Suite 200
Austin, Texas 78746

For the Deponent:
MICHAEL K. MARRAN
321 South Main Street
Providence, Rhode Island 02903

ALSO PRESENT:
RATCLIFFE BURKE HARTEN & ELIAS
RICHARD J. ZABBO
1600 Financial Plaza
Providence, Rhode Island 02903

Also present for Third-Party Defendants:
VETTER & WHITE
BENJAMIN V. WHITE
20 Washington Place
Providence, Rhode Island 02903
(Attorney for Bridgestone)
NIXON PEABODY, LLP
GREGORY L. BENIK, ESQ.
JASON P. MARINO, ESQ.
One Citizens Plaza
Providence, Rhode Island 02903
(Attorneys for Honeywell)

PULLMAN & COMLEY, LLC
CHRISTOPHER P. McCORMACK
850 Main Street
Bridgeport, CT 06601
(Attorney for Inland Fuel)

URSILLO, TEITZ & RICH, LTD.
JEANNE M. SCOTT
2 Williams Street
Providence, Rhode Island 02903
(Attorney for Town of Tiverton)

PILLSBURY WINTHROP SHAW PITTMAN, LLP
DAVID GOLDBERG
1540 Broadway
New York, NY 10036
(Attorney for Gulf)

LEGAL MANAGEMENT SERVICES
DAVID B. WILLIS
55 Hammarlund Way
Middletown, Rhode Island 02842
(Attorney for Gulf)

BURNS & LEVINSON, LLP
LYNNE M. RADICHES
One Citizens Plaza
Suite 1100
Providence, Rhode Island 02903



INDEX


| DEPONENT: | PAGE |
| --- | --- |
| JOSEPH SOUZA | |
| Examination by Mr. Herschmann | 6 |


---

EXHIBITS

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 18 | Providence Journal publication entitled The Great Hurricane and Tidal Wave, Rhode Island, September 21, 1938 | 66 |

---

(COMMENCED AT 10:31 A.M.)

THE VIDEOGRAPHER: Today is October 12, 2007. The time is approximately 10:31 a.m. The location is White's of Westport in Westport, Massachusetts. My name is Tim Kenny, video specialist, Power Showz, Inc. This case number is -- the numbers are 05-221T, 05-274T, 05-370T and 05-522T. And the deponent is Joseph Souza.

Would the Notary Public please swear in the witness.

JOSEPH SOUZA

Being duly sworn, deposes and testifies as follows:

EXAMINATION BY MR. HERSCHMANN

MR. ROBERTS: Can I make a -- I just want to make a quick statement and then we should talk about stipulations just -- and the only statement I wanted to make was this is a discovery deposition so that you can prepare for your cross; and given that Mr. Souza's been deposed for several hours in the DEM case, I hope that we're not going to be going over a lot of material that was covered there.

And do you want to do anything about stipulations or just by the Rules?

MR. HERSCHMANN: Go by the Rules. He has not been deposed in this matter and we're gonna proceed as a



totally separate matter with different standards and different claims and just take a deposition.

MR. ROBERTS: Sounds good.

Q. Mr. Souza, my name is Eric Herschmann. I'm an attorney representing New England Gas Company, right? I'm gonna ask you some questions today. If you don't understand the question, will you tell me so I can try to rephrase it for you, okay?
A. Yup.
Q. You have to answer all of the questions verbally, which means you have to say yes or no.
A. Yes or no, right.
Q. Okay. And if I ask you a question and you answer it, then it's okay for all of us to presume you understood the question and you obviously understood the answer you gave, okay?
A. Yup.
Q. We don't want you to answer any questions that you don't understand. Okay? You have to answer verbally?
A. Verbally, okay, yeah.
Q. And we've spoken to your son so we've agreed that we're going to take some breaks during the course of your testimony. We've agreed we'll take your testimony for about two or two and a half hours today and then you're



gonna go home, all right? Okay?
A. Yes. Boy. Two and a half hours, holy Christ.
Q. Mr. Souza, do you remember whether we've ever met before?
A. I remember seeing your face before, yeah.
Q. Do you recall where?
A. Right here.
Q. Right -- when you say right here, what do you mean?
A. In White's.
Q. In White's?
A. Yeah. Last time.
Q. And White's is the location we're sitting at right now, right?
A. I know it.
Q. Do you remember when that occurred?
A. Oh, no, I don't remember that.
Q. Well, do you remember if it was during this year or prior years?
A. Well, it was last year, wasn't it? I think so.
Q. Do you know what today's date is?
A. Today's date? The fifteenth?
Q. The fifteenth of what, sir?
A. October.
Q. Okay. And of which year?



A. Oh, boy. 2000 -- 2000 what? I don't know. 2007, yeah? 2007. I don't -- see I don't remember that.
Q. I didn't hear what you said, I'm sorry.
A. I said 2007.
Q. And afterwards did you say "I don't remember that"?
A. I don't -- I says I don't remember everything, no, I don't. I'd be lying if I said I did.
Q. And do you recall the circumstances as to how we met at White's previously, as you said?
A. No.
Q. Do you know the gentleman sitting to your left?
A. The lawyer?
Q. I'm sorry?
A. Him?
Q. Yes.
A. I've met him before, yeah.
Q. When did you first meet him?
A. Last time we were here at a meeting.
Q. Last time we were where at a meeting?
A. Right here.
Q. And that's when you think you were with me and he was here as well, right?
A. Yeah.
Q. Do you know his name?





815163bd-c86d-419b-8941-5364520db3ac



A. No, I don't.
Q. Other than the last time that you think you were here with this lawyer, did you ever meet him before that time?
A. I think so. Right? You was at my son's house?

MR. MARRAN: You have to answer the question.

A. Oh.
Q. The lawyers on this side can't answer any questions for you, okay?
A. Okay, you're the guy -- all right, I'll talk to you then.
Q. So do you know whether this lawyer was ever with you at your son's house?
A. Yeah.
Q. You think he was?
A. Yeah.
Q. And do you recall when that would have been?
A. Oh, I don't remember that, no.
Q. Do you recall whether it was this year or last year?
A. Had to be last year because I never been out this year.
Q. When you -- when you say you've never been out this year, what do you mean?
A. I never went to a meeting this year.
Q. Okay. And "this year", you mean 2007, right?



A. Yeah.
Q. Do you know any of the other lawyers that are sitting at this -- on this side of the table?
A. It's the same guys that were here before.
Q. When you say the same guys that were here --
A. I know all their names? No, I don't.
Q. I have to -- you have to let me ask the question and I'll give you the chance to answer, okay? Because the reporter has to take everything down that we say.
A. Yeah.
Q. When you say they were here before, you mean here at White's?
A. Yeah.
Q. And that would be the same time the lawyer that's sitting next to you you think was here, right?
A. Right.
Q. The lawyer that's -- which one of these three lawyers is your lawyer?
A. I don't know.
Q. Do you have your own lawyer?
A. I ain't got no lawyer. My son takes care of all my business.
Q. So none of these three lawyers sitting here represents you as your lawyer, right?



A. I don't know, are you? I don't know.
Q. But you never asked them to be your lawyer, right?
A. No, my son took care of everything, I told you that before.
Q. Do you remember last time that you were asked questions, you said you don't have a lawyer?
A. Yeah.
Q. And is that still correct today?
A. Well, you guys are saying they're my lawyers so -- sitting right next to me, right?
Q. Well, sir, some of these people I only met for the first time today.
A. Well, so have I.
Q. Fair enough. Do you recall whether Mr. Roberts -- have you ever heard Mark Roberts' name?
A. Yeah.
Q. Do you remember ever seeing him before --
A. Yes.
Q. -- other than at White's?
A. Yeah.
Q. Where did you see him other than at White's?
A. My son's house.
Q. You sure he was at your son's house?
A. Yeah.



Q. And that would have been in -- last year, 2006?
A. I don't -- yeah, I guess so.
Q. Could it have been even before that?

(Pause)

A. I said no, didn't I?
Q. I'm sorry, I didn't hear you.

Now, Mr. Souza, are you married?

A. Oh, I hope so. For 57 years or 58 years, something like that. I don't remember how long I've been married.
Q. Do you recall in which year you got married?
A. Oh, God. No, I don't.
Q. Can you tell us the name of your children, please?
A. Which one you want?
Q. All of them, please.
A. All of them. Joey, John, that's it. Two boys.
Q. Do you have any grandchildren?
A. Oh, yeah.
Q. What are your grandchildren's names?
A. Let's see. Keith, Matthews[sic]. Want the girls too?
Q. Please.
A. Kimberly.
Q. Keith, Matthew and Kimberly?
A. Right.
Q. And those are all your grandchildren? You have to





815163bd-c86d-419b-8941-5364520db3ac

Page 14

answer verbally.
A. Yes.
Q. Sir, do you have any stepchildren?
A. Stepchildren.
Q. Yes.
A. No.
Q. Do you know someone named Alan Souza?
A. Yeah.
Q. Who is that?
A. That's my son. That's from my first wife.
Q. Sir, you told us a moment ago you had two sons, Joey and John, right?
A. Yes, well, he's my -- from my first wife.
Q. So you have another son named Alan from your first wife?
A. Yeah.
Q. So you have three sons?
A. Yup. Well, yeah.
Q. When were you married to your first wife?
A. Oh, boy. I don't know. During the war anyway.
Q. Was it before or after World War II?
A. It was during the war.
Q. During the war you married --
A. Yeah.
Q. -- your first wife?

Page 15

A. Yeah.
Q. What was your first wife's name?
A. I don't know. Can't remember.
Q. You can't remember your first wife's name?
A. No. Never. We never got along anyway.
Q. You said that it was during the war you got married?
A. Yeah.
Q. Do you recall going into the Armed Services when you were 18 years old?
A. Yeah.
Q. And what year did you go into -- I'm sorry, which part of the Armed Services were you in?
A. Air Force.
Q. So at 18 years old, you went to the Air Force, right?
A. Right.
Q. And do you recall in which year you went to the Air Force?
A. I don't know, I think it was in 1940 or '42.
Q. I didn't hear you, sir.
A. I don't know.
Q. Do you recall whether it was before or after Pearl Harbor?
A. Well, it was during Pearl Harbor.
Q. Well, Pearl Harbor, sir, was on December 7th of 1941,

Page 16

okay?
A. '41?
Q. So, were you in --
A. I was already in when it happened.
Q. So you were in the Armed Services prior to December 7th of 1941, right?
A. Right. I was gonna be drafted --
Q. I didn't hear what you said.
A. I said I was going to be drafted so I joined the Air Force.
Q. You were going to be drafted so you joined the Air Force?
A. Yeah.
Q. Prior to Pearl Harbor, right?
A. Right.
Q. And you're certain about that?
A. Yeah.
Q. Now, where did you go when you first joined the Air Force?
A. Let's see. I don't know. I don't know if I went to Springfield or what.
Q. I'm sorry, I didn't hear what you said.
A. I don't know if I went to Springfield. Yeah, Springfield, Mass. I think it was in Springfield, Mass,

Page 17

that's where I was stationed.
Q. Do you recall where else you were stationed during World War II?
A. Up in Utah.
Q. Okay. I'm sorry, I didn't hear you.
A. Utah.
Q. Anywhere else?
A. No. Not that I know of.
Q. What was -- when you first entered -- when you first entered the military, what was your rank?
A. When we first started?
Q. Yes.
A. Went in as a buck private.
Q. And when you left your military service, what was your rank?
A. First sergeant.
Q. When did you become a sergeant?
A. Oh, how do I know.
Q. Well, was it shortly after you joined the service?
A. Oh, no. I was there good -- over -- over two years before I made it.
Q. And, sir, you said to us you were in Utah?
A. Yeah.
Q. But you think you may have started in Massachusetts?



815163bd-c86d-419b-8941-5364520db3ac

Page 18

A. I started in Springfield, Mass.
Q. What did you do at Springfield, Mass?
A. That was the recruiting station.
Q. So that's where you went to enlist?
A. I enlisted in Fall River, right? I mean, then I went to Springfield. That's where they sent me. Did my basic training.
Q. And then after you did your basic training, then where did you go?
A. Springfield. I went to Utah, I think. I'm not sure now.
Q. You're not sure where you went?
A. No. I think it was Utah.
Q. Could it have been somewhere else?
A. I don't know.
Q. Is it that you can't remember back that far?
A. No. I went to Springfield, Mass. Right?
Q. Right.
A. And from there I went to Utah.
Q. Did you go anywhere else?
A. No. I came home.
Q. You say you came home from Utah?
A. They didn't want me in the service. No, I put my time in, so it was -- you know, it was all over. The war was

Page 19

over, so I came home.
Q. Well, how long were you in the military all together?
A. Over three years.
Q. Do you remember going to New Jersey before you came back to Rhode Island?
A. Yes, yes.
Q. So when did you do that? When did you go to New Jersey?
A. I went to New Jersey before I went to Utah.
Q. You went to New Jersey before you went to Utah?
A. Yeah. That's where my basic training was.
Q. Your basic training was in New Jersey?
A. Yeah, I think so. Yeah.
Q. Sir, I thought a moment ago you told us your basic training was in Springfield, Massachusetts?
A. Well, it's where it was.
Q. I'm sorry, sir, where was it; was it in Massachusetts or was it in New Jersey, or was it in Utah?
A. No, Massachusetts -- I went to New Jersey after. But it was in Massachusetts all the time.
Q. I'm sorry, I didn't hear what you said. You were in Massachusetts all the time?
A. Yeah.
Q. For the whole time you were in the military?
A. No, no, no. Then I went to Utah.

Page 20

Q. Okay, I'm trying to understand, when did you go to New Jersey; was it in between Massachusetts and Utah, or after Utah?
A. I was in Massachusetts, then I went to New Jersey.
Q. Okay. And how long were you in New Jersey?
A. Oh, God almighty. How the hell do I know.
Q. When you say "how the hell do I know", is it just hard to remember many, many years ago?
A. Of course.
Q. And time periods get very messed up in your mind because we're talking about going back --
MR. ROBERTS: Objection.
Q. -- a long time, right?
MR. ROBERTS: Objection.
Q. You can answer.
A. I don't remember. You're going back too far for me.
Q. And it's difficult for you to remember anything from back in the World War II time period, right?
MR. ROBERTS: Objection.
Q. You can answer.
A. He says to me objected so. If he tells me that, I can't talk to you.
Q. Sir, the rules are that he's --
MR. MARRAN: You can answer the question.

Page 21

Q. You have to answer the question.
A. Yeah. All right. What is it? Boy, all these people.
Q. Sir, the time periods that we're talking about, around World War II, it's just too long ago for you to remember about, right?
MR. ROBERTS: Objection.
A. I remember some of it, yes.
Q. But a lot of it's confusing, right?
A. It's confusing because you guys are making it.
Q. Well, sir, I'm just asking you questions because I don't know where you were in the military, and I don't think anyone else in this room was with you back then. So you're the only one that can tell us, okay? So, what I'm trying to understand in the sequence, right, is, you've said to us you went to Springfield, Massachusetts, and then to New Jersey, and then to Utah. And then you also said you were in New Jersey the whole time. So I'm just trying to get the sequence from you.
MR. ROBERTS: Objection.
Q. So, do you recall how long you were in Springfield, Massachusetts?
A. No, I don't.
Q. Okay. Do you recall how long you were in Utah?
A. No.



815163bd-c86d-419b-8941-5364520db3ac

Q. Do you recall how long you were in New Jersey?
A. No.
Q. And you're certain you were in New Jersey when you were in the military?
A. Yes.
Q. Do you ever remember doing any roofing work on a boardwalk in New Jersey?
A. Yes.
Q. And that was after you came out of the military, right?
A. That's right.
Q. Do you remember in which state you were discharged from the military?
A. What's that?
Q. Do you remember in which state you were when you were discharged from the military?
A. I think it was in Utah. I'm sure. I got out in Utah.
Q. So, you finished in Utah. And after you finished in Utah, then did you go to New Jersey to do roofing work?
A. I came home after that.
Q. All right, so when are you in New Jersey in this time period?
A. I don't know.
Q. Sir, do you recall previously saying that you were stationed in Louisville, New Jersey and Utah?



A. Louisville?
Q. Yes.
A. Millville, not Louisville.
Q. I'm sorry?
A. Millville, New Jersey.
MR. LEIFER: Millville?
MR. ROBERTS: Millville?
A. Yeah.
Q. Well, sir, this is your question and answer --
MR. LEIFER: Has he read and signed it?
MR. HERSCHMANN: Is that an objection?
MR. LEIFER: Yes, it is.
MR. ROBERTS: Yes, yes, it's an objection.
Q. Well, okay, February 15 so we can deal with the rules afterwards, but I don't want to have speaking objections or debates. Okay?
MR. LEIFER: It's not a speaking --
MR. HERSCHMANN: Which one of you are going to be objecting?
MR. ROBERTS: I'm going to be objecting.
MR. HERSCHMANN: Okay. Let's leave it at that. We've all been experienced enough. Objection to form will preserve it and we'll go forward. All right?
Q. Sir, do you recall on how many occasions you've ever



been sworn in to give testimony?
A. Here?
Q. Ever in your life.
A. Twice. That's all.
Q. Twice?
A. Yeah.
Q. And when? Which two times?
A. With you people.
Q. With you people, what do you mean? Which people in this room do you recognize as being there before?
A. I recognize him, him, and that fellow over there.
Q. Do you recognize me?
A. Yeah, of course.
Q. And you recognize me from being at White's with you, right?
A. Right.
Q. Can you tell us, your first wife that you mentioned, you said you married her when you were in the military?
A. Yes.
Q. Where was that?
A. When I married her?
Q. In which state?
A. Right in Westport. Westport, Mass.
Q. When you -- when? When you were in basic training?



A. Yeah.
Q. Did you know your first wife before you went in the military?
A. No, I didn't.
Q. So you went to basic training, you met somebody, and you married her when you were in basic training?
A. Yeah.
Q. And then did she go with you when you left Massachusetts?
A. I think she was there for a little while, that's all.
Q. So your son Alan, where was he born?
A. My son Alan? Let's see now. Westport.
Q. Do you know how old your son Alan is?
A. I don't know, he's 50 something years old. I can't tell you how old he is because I don't remember.
Q. What is your current wife's name?
A. My current wife? Now?
Q. Now.
A. Elsie.
Q. And when did you marry Elsie?
A. Oh, come on. I don't know.
Q. After the war?
A. Yeah, of course after the war. What's this got to do with all this baloney?





815163bd-c86d-419b-8941-5364520db3ac



Q. Sir, let me just ask you, we're trying to understand your memory from these -- from a while ago, right? So, and most times we ask just general pedigree information that we call. But I've gotten some information that seems to conflict so I'm trying to understand it. If you got married to your first wife...
A. Yeah.
Q. And you went in before Pearl Harbor, which is before 1940 -- December of 1941.
A. Yeah.
Q. Then how old would Alan be now?
A. I don't know.
MR. ROBERTS: Objection.
A. He's a grown man, that's all I know. He's a grown man.
Q. Have you had any conversations with the two lawyers here, not the one -- not the gentleman right next to you, you've told us you don't know his name, but the other two lawyers here about why you're here today?
A. No, I didn't talk to nobody why I'm here today.
Q. Okay. Did anyone show you any papers to look at before you came today, about this?
A. No.
Q. Mr. Souza, when did you graduate from high school?
A. God Almighty. How the hell do I know.



Q. Well, were you -- did you graduate from high school shortly before you went into the military?
A. Oh, yes.
Q. So at about 18 years old you graduated?
A. I don't know how old I was.
Q. Well, you told us you went into the military at 18?
A. Right.
Q. And before you went to the military, you said you graduated high school, right?
A. Right.
Q. How old are you now?
A. Eighty-seven? I think. I don't know how old I am.
Q. You said 87 you think?
A. I think so, yeah. Eighty-seven or eighty-eight, I don't know. One of the two.
Q. Sir, what's the address and where you grew up?
A. What's that?
Q. What -- where is the address where you grew up?
A. Where I grew up? Cornell Street in Tiverton.
Q. And where do you currently live, sir?
A. 4 Church Street, Tiverton.
Q. Where do your sons Alan, Joey and John live?
A. Alan lives in Westport, Joey lives in -- John lives in Tiverton, next door to me. He's up in Newport now.



Q. Sir, do you have any brothers or sisters?
A. Oh, boy, have I got brothers. I had seven brothers and five sisters.
Q. You had seven brothers and five sisters?
A. Yeah. Or it was seven boys anyway, let's put it that way. Including me.
Q. And how old are your brothers or sisters?
A. Oh, come on, I don't know.
Q. Are they all living?
A. All -- yeah, yeah. But they're younger than me.
Q. Are you the oldest of the whole family?
A. No, my sister is.
Q. But all your brothers and sisters are still alive, right?
A. Oh, yes.
Q. Are you sure about that, sir?
A. Yeah, yeah. Why, somebody died?
Q. Sir, I don't know, but did you have a brother, do you have a brother named John?
A. John? Oh, yeah, yeah, he's dead.
Q. So what you just told us a minute ago about all your brothers and sisters being alive, that wasn't right, right?
A. Well, you know, I don't know. You got me confused now.



My brother John was my oldest brother.
Q. John?
A. He was the oldest in the boys.
Q. I thought you said you only had an older sister?
A. My sister's oldest of them all. My brother John was the oldest of the boys.
Q. But you had forgotten that your brother John passed away?
A. What's that?
Q. Did you forget that your brother John had passed away?
A. I know he passed away, yes.
Q. But when you said everyone was alive, you had just forgotten that, right?
A. You got me all confused.
Q. Well, sir, are you taking any medications?
A. No, I don't.
Q. Do you recall recently taking any medications?
A. What?
Q. Do you recall taking any medications recently for pain?
A. Oh, I take for pain pills, yeah.
Q. Sir, let me ask the question again.
A minute ago I asked you are you taking any medications and you said no.
A. I take a pill. Aspirin a day.





815163bd-c86d-419b-8941-5364520db3ac

Q. You only take an aspirin a day?
A. That's right. Boy, oh, boy, I gotta write everything down before I come here.
Q. Sir, do you take any pills for your arteries?
A. My arteries?
Q. Yes.
A. What the hell is that?
Q. Do you take anything -- any pills for your blood pressure or?
A. I told you I take a aspirin a day, that's all I take. I used to take -- I don't know. Some kind of a pill anyway. But I dropped that out.
Q. Sir, you don't recall ever taking medication Lopressor?
A. A what?
Q. Lopressor, a medication Lopressor?
A. No, I don't. I don't know the names of pills I take.
Q. Do you take several pills a day?
A. No, I take -- I told you, I take one a day, aspirin.
Q. That's the only one you take now?
A. Yeah.
Q. Okay. Do you remember the name of the high school you attended?
A. I didn't go to high school.
Q. Sir, a minute ago you told us you graduated high school?



A. No. I graduated through grammar school.
Q. You graduated from grammar school and you didn't graduate from high school?
A. No, I didn't even go to high school.
Q. Sir, I want to show you something, and tell me if this refreshes your recollection because this is from your prior testimony, okay? I'm sorry, just wait.
MR. ROBERTS: Can I see what you're going to show the witness?
Q. Sir, this is on your prior testimony, let me read it to you. Okay? It's on page -- I'm going to give you -- one second.
MR. MARRAN: You're going to give it to him. The rules require you to show it to the witness before you cross-examine on a prior statement.
MR. HERSCHMANN: Are you going to wait a second? Right.
MR. MARRAN: I did.
MR. HERSCHMANN: You've asked for it, I haven't read it to him, and I'm going to get a larger print.
Q. Do you have your reading glasses with you today?
A. No.
Q. Can you read without your reading glasses?



A. Well, I can if the letters are big enough, yes.
MR. ROBERTS: And just so the record's clear, has this been signed? Read and signed?
MR. HERSCHMANN: Why don't you ask his counsel.
A. Boy, I tell you.
MR. ROBERTS: Just for the record, I don't believe the transcript's been read and signed, and I don't believe that Mr. Souza was represented at that time.
MR. HERSCHMANN: I don't know which date he was retained or not.
Q. Mr. Souza, I put a box around the questions and answers, it's on page 21 of your February 15th testimony of 2007, lines 15 through 18. Can you look and tell me if you could see that writing. Just the yellow box, to help you focus on what we're looking at. Do you see the yellow box?
A. Oh, yeah, all right.
"Did you go to high school?"
"No."
Q. Sir, do you see the answer you gave?
A. Huh?
Q. The answer is, "Did you go to high school?" Then your



answer is, "Yes".
A. I didn't go to -- I didn't -- I didn't go.
Q. All right. So, sir, do you see on your testimony from February 15th of 2007, the question was:
"Did you go to high school?"
Answer: "Yes."
"Did you graduate from high school?"
And your answer is: "Yes."
Do you see that?
A. I didn't see that, I didn't go to high school.
Q. So when you testified that you went to high school --
MR. MARRAN: Can we -- hold on one minute. Let him read it again.
Q. Hold on. When you testified that you went to high school previously, that was incorrect, right?
A. Yes.
Q. Okay. Can I have the transcript, please.
A. I had to go work on a farm.
(Pause)
THE WITNESS: Boy, oh, boy. Are these mine?
MR. MARRAN: Yup.
THE WITNESS: That's my son's. I better keep them.
Q. So those are your son's reading glasses?





815163bd-c86d-419b-8941-5364520db3ac



A. Yeah.
Q. And when did your son give you the reading glasses?
A. Over here.
Q. Here just now when you came in?
A. Yeah.
Q. And you didn't bring your own reading glasses right?
A. No, I don't have any reading glasses. I can read the paper without reading glasses.
Q. Do you know who's paying for your lawyer?
A. Who?
Q. Do you know who's paying for your lawyer?
A. No, I don't.
Q. But you're not paying for him, right?
A. I don't know.
Q. Well, you haven't give --
A. My son takes care of all my business.
Q. Well, your son has said he's not paying the lawyer either, so do you --
A. Oh, I --
Q. Do you know if anyone else in your family is paying the lawyer?
MR. ROBERTS: Objection.
A. No. Why should anybody else pay for my lawyer?
Q. That's a very good question, sir. Why should anyone



else pay for your lawyer?
MR. ROBERTS: Objection.
A. Yeah, why?
Q. Did you ask any of these lawyers why they got you a lawyer?
A. Did I ask them why I got a lawyer? Because my son told me to get them.
Q. Earlier today you told us you met with the attorney in the -- in between the two other attorneys, Mr. Roberts, here at White's. Do you remember that?
A. Yup.
Q. Do you remember ever meeting him at anyone else's houses?
A. My son's house.
Q. Any other occasions?
A. No.
Q. Do you remember him ever coming to your house?
A. He came to my house, I think so. I'm not sure.
Q. You just don't remember, right?
A. That's right.
Q. Do you recall how many times you met with Mr. Roberts?
A. No, I don't.
Q. Do you recall which year?
A. No, I don't.



Q. Do you know if it was five years ago?
A. I don't remember.
Q. Could it have been as far back as ten years ago?
A. No, no. Ten years ago I wasn't -- I wasn't around here in trouble. Only in trouble now.
Q. Mr. Souza, in the past year, have you been in the hospital?
A. The hospital?
Q. Yes.
A. Yeah. Yeah.
Q. Why were you in the hospital?
A. Let's see. They cut me from here to here. They opened me up because I was having chest pains. And they sewed me back up again.
Q. And that's why you were in the hospital?
A. I was in the hospital because I couldn't breathe.
Q. Do you remember having any gallbladder problems?
A. That's what that was.
Q. How -- I'm sorry, how long were you in the hospital?
A. Oh, God, I don't -- I don't know.
Q. Do you recall whether it was a year or months?
A. In the hospital a year? Like hell.
Q. Do you recall whether it was more than a couple of days?
A. Oh, yeah. It was more than a couple of days, I think it



was a week or so.
Q. Do you recall going to a doctor's appointment with your son and then forgetting why you were going to see -- or who you were going to see?
A. Yeah. Yeah.
Q. When you say your gallbladder was causing you pain, that's why you had the surgery, right?
A. Right.
Q. And it wasn't any breathing problems you were having, right?
A. No.
Q. And you've never had any breathing problems before, right?
A. No.
Q. And it was never a time when you were overcome by any fumes and you couldn't breathe, right?
A. No.
MR. ROBERTS: Objection.
Q. And that's true of your whole life, right?
MR. ROBERTS: Objection.
A. Oh, I worked -- yeah, on my job I did, yes.
Q. When you worked at a bakery?
A. I worked on a bakery and I worked on roofs.
Q. And you were a roofer for most of your adult life,





815163bd-c86d-419b-8941-5364520db3ac

right?
A. Right.
Q. Sir, when you first got out of the military, do you remember going to New Jersey?
A. Yeah.
MR. ROBERTS: This had been --
Q. And how long --
MR. ROBERTS: This has been asked and answered and gone over.
MR. HERSCHMANN: That's a form objection, right?
MR. ROBERTS: Objection. This has been asked and answered, gone over several times. This is probably four times?
Q. Okay. Sir, when you came out of the military, you went to New Jersey to work on the boardwalk, right?
A. Right.
Q. And you did general contracting, right?
A. Right.
Q. And then you did roofing there, right?
A. Right.
Q. And you were there for four years after the military, right?
MR. ROBERTS: Objection.



A. I stayed there because I had a girlfriend there.
Q. I'm sorry, you stayed in New Jersey because you had a girlfriend there?
A. Right, of course. That's where she was living.
Q. That's where the girlfriend was living?
A. Yeah.
Q. And how long were you in New Jersey with this girlfriend?
A. I don't know, three years. Something like that.
Q. And what was the girlfriend's name?
A. Oh, God. I don't remember.
Q. And then after you finished -- well, the girlfriend did not become your wife, right?
A. No.
Q. And then after you finished working in New Jersey, then you came back to where?
A. To -- back to Tiverton.
Q. So you were in the military for four years, and then you were in New Jersey for three years after that, right?
MR. ROBERTS: Objection. Objection. Mischaracterizing testimony and leading.
Q. Okay. Sir, you can answer the question.
A. Can I?
MR. ROBERTS: If you can.



Q. He's not your lawyer so you can't ask him that, and he's not even allowed to say that under the Rules. So, the only lawyer that we think you have, but you told us you don't know, is the gentleman sitting next to you, right?
MR. MARRAN: You can answer the question.
MR. ROBERTS: Stop advising the witness.
MR. HERSCHMANN: One of you gets to make objections. I don't want to debate a lot of stuff.
Q. Let me ask the question. Let me ask the question, sir. You've told us you were in the military for four years, right?
MR. ROBERTS: He said three years.
MR. HERSCHMANN: I'm sorry, the record is what the record is, okay?
MR. ROBERTS: Okay, but you're mischaracterizing his testimony.
MR. HERSCHMANN: Listen, let's just say objection, let's move on, we'll deal with it. Okay?
MR. ROBERTS: But if you mischaracterize his testimony.
MR. HERSCHMANN: And that's an objection as to form, right?
MR. ROBERTS: That's correct.
MR. HERSCHMANN: Okay, and that's all the



rules allow you to do. I don't want to debate any time or waste any time on this stuff.
Q. Sir, do you recall saying you were in the military for four years?
MR. ROBERTS: Objection.
A. Yeah.
Q. And you've testified previously that you were in the military for four years, right?
MR. ROBERTS: Objection.
MR. MARRAN: You can answer.
Q. You can answer.
A. I can answer that?
MR. MARRAN: Yes.
Q. Yes.
A. Yeah.
Q. And after you got out of the military, you went to New Jersey for three years, right?
A. Right.
MR. ROBERTS: Objection, leading.
Q. And the girlfriend was there and that's why you stayed there for three years, right?
A. Correct.
MR. ROBERTS: Objection, leading.
Q. So that's seven years total, right?





815163bd-c86d-419b-8941-5364520db3ac



MR. ROBERTS: Objection, leading.
A. I don't know. Sounds...
Q. Is that correct?
A. Right.
(Pause)
THE WITNESS: All these people. I'll tell you, a lot of people just to take down a lot of bullshit.
Q. So, sir, if you went in before Pearl Harbor, so prior to December 7th of 1941...
A. Yeah.
Q. And you were gone, you've told us, approximately seven years, then you would have come back to Tiverton somewhere around 1948; is that right?
A. I don't know.
Q. Well, if you were in the military for four years and you stayed in New Jersey for three years, then it's somewhere in that range, right?
A. Yeah.
MR. ROBERTS: Objection.
Q. You mentioned before that you worked on a farm. Do you remember that?
A. Worked on a farm? Yeah, when I was a kid. That's the life. Had to make money for my family. Mother and



father never had no money.
Q. Did your father pay you when you worked on the farm?
A. My father paid me? Why should he pay me, I was working for somebody else. To bring the money home.
Q. Sir, do you recall testifying previously that you worked with your father on the family farm?
MR. ROBERTS: Objection.
A. We have our own farm.
Q. Did you work on that farm?
A. Yes, my father, he owned a farm. We had a farm. I told you before we had a farm.
Q. So what I'm trying to understand is did you work on your own family farm?
A. Yes, of course I did. Who the hell do you think is gonna do it?
Q. Did anyone else work on your family farm?
A. All my family worked on it.
Q. When you worked on your own family farm, did anybody pay you?
A. No.
Q. And what did you do on that farm?
A. We took -- we planted everything for the house.
Q. And did you use fertilizers and things?
A. Right, we used fertilizer, and used manure, too. All



right?
Q. And did you use pesticides also?
A. Yeah. Horse shit.
Q. And did -- were there other farms in the area at the time?
A. Other farms? No. We had the only farm in Tiverton.
Q. You're sure you had the only farm in Tiverton?
A. In Tiverton, yes. Because going to Portsmouth there was other farms, but we were the only farm in Tiverton.
Q. And were there any animals on the farm?
A. Yes, we had cows, we had pigs.
Q. Do you recall something called Russo's Bakery?
A. I worked for him.
Q. And did you go from working at the farm to Russo's Bakery?
A. Yes.
Q. Did you have chickens on your farm?
A. Chickens? My father had a lot of chickens.
Q. Have you -- when you -- have you been living in Tiverton your whole life?
A. Yes.
Q. Other than being in the military, have you lived anywhere else?
A. No.



Q. And which house have you been living in other than the Cornell Street house that you told us you grew up on?
A. What -- where I lived? I lived on Cornell Street.
Q. And after that, where else in Tiverton have you lived?
A. Went up on Bottom Road.
Q. Bottom Road?
A. (Witness nods affirmatively).
Q. And how long did you live on Bottom Road?
A. I'm still there.
Q. Now -- you live on Bottom Road today?
A. Corner of Church and Bottom Road, yes.
Q. Sir, on which -- on which street do you live, Church or --
A. Church Street.
Q. So when have you lived on Bottom Road?
A. Oh, forget it. You're confusing me.
Q. Sir, I don't know where you've lived, so what -- you just said to us you lived on Bottom Road, after --
A. I live on Bottom -- on Church Street in Tiverton.
Q. Are the only two places you've ever lived in your life --
A. Was on Cornell Street was the first when I was brought up on Cornell Street. Then I went to bought -- up the hill to the house, I bought a house up the hill. I got





815163bd-c86d-419b-8941-5364520db3ac

Page 46

married and we bought a house.
Q. And that's the house you still live in?
A. That's right.
Q. And other than being in the military, those are the only two places you've ever lived, right?
A. Yes.
Q. Are you sure about that?
A. Well, I lived in New Jersey, I told you.
Q. Okay. Other than at the military and the three years in New Jersey, and the house you grew up in and the house on Church Street where you are now, those are the only places you've ever lived, right?
MR. ROBERTS: Objection.
Q. Is that correct?
A. Yeah.
Q. Are you sure about that?
A. Well, do you know different?
Q. Sir, I don't know you, I'm just asking you questions.
A. If you know different, tell me if you know different. I don't know.
Q. But those are the only ones you remember?
A. Yes.
Q. Before going in the military, you were working at Russo's Bakery, right?

Page 47

A. Right.
Q. And then you applied to go into the military, right?
A. Because you were gonna get drafted. So instead of being drafted I joined the service.
Q. Right. And you went from your family's farm to work at Russo's Bakery, right?
A. Right.
Q. And you -- did your father help you get the job at Russo's Bakery because he knew Mr. Russo?
A. Yes.
Q. And how many years did you work with Mr. Russo?
A. Oh, I don't know. I think four years.
Q. Four years?
A. I think. I'm not sure.
MR. HERSCHMANN: Excuse me one second.
(Brief pause)
MR. HERSCHMANN: Mr. Souza, why don't we take a five-minute break, okay?
THE WITNESS: Go ahead.
THE VIDEOGRAPHER: Going off the record, it's 11:19 a.m.
(Recess taken)
MR. ROBERTS: I'd just like to put one thing on the record. This is supposed to be a discovery

Page 48

deposition for preparation for cross, and not cross. And so I object to the continuing use of leading questions because he's not a hostile witness.
MR. HERSCHMANN: Well...
THE WITNESS: Boy, I'll tell you, a lot of people here are ganging up on us.
(Long Pause)
MR. ROBERTS: Just to be clear, do I have to do that again on the record?
MR. ROSS: Yeah, it was not on the written record.
MR. HERSCHMANN: It's on the written record. Doesn't need to be on the video.
MR. ROSS: Okay.
THE VIDEOGRAPHER: It's 11:32 a.m., we're back on the record.
BY MR. HERSCHMANN:
Q. Mr. Souza, in which town or city are we right now?
A. What town we in? We're in Westport. Mass.
Q. And do you know who the current president is of the United States?
A. Let's see. Gotta be Clinton, right?
Q. And who was the president before Clinton now?
A. John F. Kennedy?

Page 49

Q. Do you know who the governor of Rhode Island is now?
A. No, I don't know him. I think it's Roberts, ain't it?
Q. You said Robbins?
A. I think it's Roberts. Yeah, I don't know.
Q. Roberts?
A. I think so, I'm not sure.
Q. But you don't -- you don't know who the current -- you're not sure who the current governor is, right?
A. No.
Q. Mr. Souza, you told us that you went from the -- working on your family's farm, right?
A. Yup.
Q. To Russo's Bakery, right?
A. Right.
Q. And in the bakery, did you bake bread?
A. Yeah.
Q. And were you over an oven at the time?
A. Yup.
Q. Is that what you did? And then while you were working at the bakery, you went into the military, right?
A. Right.
Q. And we've covered that after the military, you then went to New Jersey, right?
A. Right.





815163bd-c86d-419b-8941-5364520db3ac

Page 50

Q. And that -- is that where you learned roofing?
A. Roof -- yeah, I roofed in New Jersey, I roofed in Fall River, too.
Q. Well, did you -- you didn't roof before you went to the military, right?
A. No, no, no.
Q. And when you came back, that's when you worked for National Contracting first, right?
A. Right.
Q. And then you decided to open up your own business, right?
A. Right.
MR. ROBERTS: Objection.
Q. And that's when you had Souza Roofing, right?
MR. ROBERTS: Objection.
A. Right.
Q. And you worked in Souza Roofing until you retired, right?
MR. ROBERTS: Objection.
A. (Witness nodding).
Q. You have to answer verbally, sir.
A. Right.
Q. And, so that would cover from when you were a little kid all the way till you retired, right?

Page 51

MR. ROBERTS: Objection.
A. Who do I listen to? He's telling me objection, objection.
MR. MARRAN: You can answer the question.
A. Oh, yeah?
Q. So, sir --
A. What was the question?
Q. Okay. You've told us from when you were a little kid you worked at the farm, and then you went to Russo's Bakery, and then you did the roofing, you learned the roofing there, and then you came back, and eventually -- let me try to do that again, I'll withdraw that question, I apologize.
You said that you worked on the family's farm right when you were really young, right?
A. Yeah.
MR. ROBERTS: Objection.
Q. And then you went to Russo's Bakery, right?
MR. ROBERTS: Objection.
A. Right.
Q. And then after going to Russo's Bakery, you went into the military, right?
MR. ROBERTS: Objection.
MR. HERSCHMANN: Please let me finish the

Page 52

questions because we're going to try to play the video one day, and what I want to be able to do is not have the objections overlapping. So if you want to give -- I'll give you a standing --
MR. ROBERTS: No.
MR. HERSCHMANN: -- set of objection --
MR. ROBERTS: I don't want it.
MR. HERSCHMANN: Okay. Then please let me finish it and then objection, okay?
MR. ROBERTS: Okay. And if you could just give me a second rather than answering.
MR. HERSCHMANN: Mr. Souza, we're going to come to an agreement. I'm going to ask a question, he's going to object, and then you still have to answer it, but we have to have you give a gap so the question is clear on the record, the objection is there, and no one speaks over each other, okay? All right?
THE WITNESS: Right. A lot of people here just to -- a lot of baloney.
Q. Sir, after you went from the family's farm, then you worked to work at Russo's Bakery, right?
A. Right.
MR. ROBERTS: Objection.

Page 53

Q. You have to let him -- sorry. All right. Do you want to do it again?
MR. ROBERTS: No -- yes. Let's do it again.
Q. Just give a pause, okay?
MR. ROBERTS: Because I'm going to object to these questions.
Q. And then we'll tell you when we're done with -- when we're certain we're gonna be, all right?
MR. ROBERTS: Okay.
Q. You ready, Mr. Souza?
A. Right, go ahead.
Q. You worked first at your family's farm, right?
MR. ROBERTS: Objection.
Q. Now you answer.
A. Well, we had to. We lived on a farm, right?
Q. And, sir, after you worked at the family's farm, you went to work at Russo's Bakery?
A. Right.
MR. ROBERTS: Objection.
MR. MARRAN: You gotta wait until after he's done.
A. Oh, well, he said it.
Q. And then you told us while you were working at Russo's Bakery, you volunteered for the military, right?





815163bd-c86d-419b-8941-5364520db3ac

MR. ROBERTS: Objection.
A. Right.
Q. And then after you got out of the military, you went to New Jersey for about three years to do roofing, right?
MR. ROBERTS: Objection.
A. Right.
Q. You have to answer again.
A. Yes.
MR. ROBERTS: That's the way to do it.
Q. And then, sir, you said you had a girlfriend in New Jersey for three years and that's why you stayed there, right?
A. Right.
MR. ROBERTS: Objection.
Q. And then after being there, you came back and you worked at National Contracting as a roofer, right?
A. Right.
MR. ROBERTS: Objection.
Q. You have to answer again.
A. Yes.
Q. And then eventually National Contracting went out of business, right?
MR. ROBERTS: Objection.
A. Right.



Q. Please say right again.
A. Yeah.
MR. MARRAN: Wait until after the objection.
A. I stood there till I locked the place out.
Q. And eventually after National Contracting went out of business, then you formed Souza's Roofing, right?
A. Right.
MR. ROBERTS: Objection.
MR. HERSCHMANN: Why don't we do this. If you make it afterwards...
MR. ROBERTS: It'll count.
MR. HERSCHMANN: ...it will be preserved. That's much easier. All right?
Q. And after you formed Souza's Roofing, that was your business till the day you retired, right?
A. Right.
MR. ROBERTS: Objection.
Q. And that covers all the jobs that you did from being in the farm all the way to your retirement when you had your own business, right?
MR. ROBERTS: Objection.
A. Yup. Someone must have record of that before. Boy, oh, boy, a lot of people here, that's all I can say.



Q. Mr. Souza, what did you do in the military?
A. What did I do in the military? I was in Air Force.
Q. I know, but what did you do in the Air Force?
A. Well, I'll tell you, I don't know. Repair the planes, things like that. Worked on the gas station. I supplied all the gas.
Q. To the planes?
A. Yeah.
Q. Did -- were you involved in any baking or anything like that?
A. Any what?
Q. Baking?
A. Not in the service, no.
Q. No, okay.
(Pause)
A. A lot of people ganging up on me. A lot of people here ganging up on me, I'll tell you.
MR. MARRAN: Wait for a question.
Q. Mr. Souza, do you remember anyone else having a farm other than your family?
A. Where, in Tiverton?
MR. ROBERTS: Objection.
Q. Yes.
A. No.



Q. You only remember your family only -- owning the only farm, right?
A. Well, everybody had land, let's face it.
Q. But on the land, did people grow plants the way you were?
A. Not as much as we did, yes.
Q. But they did some, right?
A. Yeah.
Q. And did they also take care of fertilizing their plants?
A. Well, who the hell's gonna do it if they don't do it.
Q. You said who the hell was gonna do it if they don't do it?
A. Yeah.
Q. And so you saw people that would fertilize the plants the same way you did, right?
A. Right.
Q. And what else did you use other than manure to fertilize the plants?
A. We used seaweed.
Q. Seaweed?
A. Yeah.
Q. And do you remember people ever using pesticides to kill off weeds and stuff?
A. No, we didn't do that.





815163bd-c86d-419b-8941-5364520db3ac



Q. Do you know what other people were using?
A. No, I don't.
Q. And how long did you go ahead and have plants on your farm?
A. How long I what?
Q. Did you have plants on your farm.
A. How long? I don't know. Good many years, that's all I can tell you.
Q. Do you remember there being a hurricane in 1938?
A. Oh, yes.
Q. Was that a big hurricane?
A. Yeah. I was working at Russo's Bakery then.
Q. You were working at Russo's Bakery in '38?
A. Yeah, that's when the hurricane came.
Q. And did anything happen to Russo's Bakery from the hurricane?
A. No.
Q. Did any damage occur to any other areas?
A. Oh, a lot of signs blew down on the main road.
Q. Do you remember there being a lot of flooding back then?
A. Oh, that was on Island Park.
Q. You don't remember the whole neighborhood being flooded?
A. Whole neighborhood? No way. We lived on a hill, how the hell could we get flooded.



Q. Where were you living when the hurricane occurred in '38?
A. Where was I living? In Tiverton.
Q. Where in Tiverton, sir?
A. Cornell Street. They got another name for it now.
Q. Is Cornell Street on a hill?
A. No. It's flat land.
Q. Mr. Souza, tell me if this refreshes your recollection.
MR. ROBERTS: Objection.
Q. You were asked, "Do you remember there being a hurricane in 1938?" And you said, "Yes."
A. Yes.
MR. ROBERTS: Objection.
A. '38 hurricane? I was working Russo's Bakery when that happened.
MR. MARRAN: Wait for a question.
Q. Thank you.
MR. ROBERTS: Again, just for the record, has the transcript you're referring to been read and signed? For the record, to the best of our knowledge, the transcript that's being referred to has not been read and signed.
THE WITNESS: Boy, oh, boy. A lot of money here.



Q. I'm showing the witness page 92 of the March 8, 2007 deposition. Mr. Souza, once again I've blocked it. I want you to look at lines 3 and 4 and 6 through 8 for a minute. Can you just take a look and read that?
MR. ROBERTS: And note my objection.
A. Three and four?
MR. MARRAN: For the record, the highlighting on this is not very clear, which is why I'm pointing out to him line 3.
A. Remember about the big hurricane? Yes, I remember that.
Q. Sir, let me read to you the question and answer. Can you hold that in front of you, please.
It says: "Can you describe for us any of the things you remember about the big hurricane."
Answer: "I didn't know what a hurricane was, all right. All we knew, there was a lot of winds and a lot of rains -- a lot of rain, and we had to move out."
Do you see your testimony there, sir?
A. Yeah.
Q. And you had to move out of your house on Cornell Street because of the hurricane, right?
MR. ROBERTS: Objection.
Q. You see your testimony, sir?
A. Okay.



Q. Is that correct?
A. I don't know.
MR. ROBERTS: Objection.
Q. Sir, we weren't there.
MR. ROBERTS: This is argumentative.
Q. I'm -- sir, we weren't there. Do you recall now whether you had to move out or not?
A. We didn't move out. They wanted us to move out, we didn't do it.
Q. So when you said beforehand "we had to move out" in the testimony that's right in front of you, you just didn't remember it correctly, right?
MR. ROBERTS: Objection.
A. We didn't move out.
Q. I understand, sir, but previously you testified that "we had to move out," and I'm asking you now --
A. They wanted us to move out.
MR. ROBERTS: Objection.
Q. Sir, let me finish the question, please. Okay?
When you said previously "we had to move out", when you said that beforehand in your testimony, you just didn't remember correctly whether you were asked to move out or whether you actually did move out, right?
MR. ROBERTS: Objection. And he wasn't asked





815163bd-c86d-419b-8941-5364520db3ac

that in that question.
MR. MARRAN: You can answer the question.
Q. You can answer the question.
A. What was that again?
Q. Okay, sir. They asked you to move out because of flooding, right?
A. Right.
Q. And your family decided not to move out, right?
MR. ROBERTS: Objection.
A. Right.
Q. And you previously testified under oath, where you just saw the words, you said "we had to move out", that's not correct, right?
MR. ROBERTS: Objection.
A. The town. They wanted the whole town to move out.
Q. They wanted the whole town to move out because of the flooding?
A. That's right. But it didn't come up.
Q. And some people actually moved out, right?
MR. ROBERTS: Objection.
A. I don't know.
Q. Sir, going back to the farm for a minute. Was the farm on Cornell Street?
A. No.



Q. So the farm was somewhere else?
A. Yeah.
Q. Did they grow any crops on the farm?
A. Any what?
MR. ROBERTS: Objection. Asked and answered.
Q. Crops.
A. Crops?
Q. Yes.
A. What do you think you do on a farm?
Q. Sir, does that mean the answer is yes?
A. Yeah.
Q. And what kind of crops did they grow on your farm?
A. Potatoes, sweet potatoes, beans, corn, and all that baloney. Okay?
Q. Well, when you say "all that baloney", what other types of --
A. Well, you know, all little stuff you planted.
Q. I didn't hear you, I'm sorry.
A. All the little stuff you planted for the house.
Q. And did you have any apple trees on the property?
A. No.
Q. Any other fruit trees or anything?
A. No. Only wild -- wild apples.
Q. Wild apple trees?



A. Always crab apples on the farm. But we never had them because they were crab apples.
Q. Do you remember if anyone else had any plants or crops growing -- I'm sorry, withdrawn.
Do you remember anyone else having any crops on their properties?
A. Yeah.
MR. ROBERTS: Objection.
Q. And was that common back then?
A. Yeah.
Q. And did people have any apple trees or fruit trees on their properties also?
A. Yeah.
MR. ROBERTS: Objection.
A. Yeah.
Q. Do you remember how far the flooding went in 1938?
A. No, I don't.
Q. Do you remember there being a hurricane in 1954?
A. Yes.
Q. And was there flooding with that hurricane?
A. Oh, I don't -- I don't remember that. I know there was a lot of wind, a lot of signs blew off, that's all I can tell you. Oh, God.
Q. Mr. Souza, are you having trouble remembering things



from a long time ago?
MR. ROBERTS: Objection.
A. Don't you?
Q. Sir, I'm not as old as you and I have trouble remembering.
A. Well, everybody does.
Q. So you're having a lot of trouble remembering things from when you were a little kid, right?
MR. ROBERTS: Objection.
A. Oh, come on.
Q. Is that --
A. What do you want to know?
Q. Sir, I'm just asking you if you're having trouble remembering things from a long time ago?
MR. ROBERTS: Objection.
A. No. I'm gonna say no.
Q. Sir, do you recall testifying previously that you did have trouble remembering things from long ago?
A. Well, so? I told you before. You want me to repeat the same thing I said before?
Q. No, sir, let me ask you a question.
A. I should have never came here.
MR. LEIFER: Did you get that down, what he said just now?





815163bd-c86d-419b-8941-5364520db3ac



(Answer read back by reporter)
MR. HERSCHMANN: Move to strike as non-responsive to any question.
MR. LEIFER: You can move to strike but it's on the record.
MR. HERSCHMANN: Can we mark this as Exhibit 18, please.
(There was a discussion off the record while the exhibit was being marked)
(Exhibit 18 marked for identification)
THE VIDEOGRAPHER: Back on the record, the time is 11:52 a.m.
Q. Mr. Souza, I'm going to hand you what we've marked as Exhibit 18 for a minute. Do you see at the top where it says The Great Hurricane and Tidal Wave, Rhode Island?
A. Right.
Q. September 21, 1938?
A. Yeah.
Q. And then you see the picture that's on the cover?
A. Yup.
Q. And does that look how the -- this area looked back in 1938 with the hurricane?



A. Pretty well. I would say closely.
Q. Close, right?
A. Yeah.
Q. And there was a lot of damage and a lot of flooding from the tidal wave, right?
A. Right.
Q. And can you look at the next two pages of the exhibit.
(Witness perusing document)
Q. Mr. Souza, looking at the pictures...
A. Yup.
Q. Does that refresh your recollection as to what this area in Tiverton looked like from the hurricane in 1938?
MR. ROBERTS: Objection. For the record --
MR. HERSCHMANN: You can object.
MR. ROBERTS: No, for the record.
MR. HERSCHMANN: I don't want a speaking objection now. I asked the witness a question, you wait till he answers the question. Do not coach this witness, please.
MR. ROBERTS: I'm not coaching the witness.
MR. HERSCHMANN: I understand exactly. I'm asking --
MR. ROBERTS: And you're mischaracterizing what this document says.



COURT REPORTER: I can't get both.
MR. HERSCHMANN: I don't want to waste time, I'm sorry. You have an objection as to form. Sir, you can answer the question.
Would you please read back the question, and you have an objection to it already on the record.
(The record was read by the court reporter, as requested)
A. What's that?
MR. MARRAN: That's the question.
MR. HERSCHMANN: Could you read it back again.
MR. MARRAN: Listen, she's going to read you the question.
(The record was read by the court reporter, as requested)
A. What, this picture?
Q. Do the pictures that are in front of you in Exhibit 18...
A. Yeah.
Q. Looking at those, do those refresh your recollection as to how the area of Tiverton looked in 1938?
MR. ROBERTS: Objection.
A. Well, I'll tell you, I don't know. I'll tell you, that



looks like stone bridge.
Q. Sir, just roughly, I'm not asking if it's the exact picture, but is that what things looked like in your neighborhood after the hurricane in '38 and the tidal wave?
MR. ROBERTS: Objection.
A. I don't know.
Q. Was there a lot a lot of damage?
A. Oh, yeah. That's the only hurricane we ever had.
Q. The 1938 hurricane is the only one you ever had?
A. Yeah. Then we had the small ones, '54.
Q. Do you remember the hurricane of 1954?
A. Sure.
Q. And was there flooding with that hurricane?
A. All had high tides.
Q. And some of the streets got flooded, right?
MR. ROBERTS: Objection.
A. No.
Q. Well, not all the streets but at least some of them --
A. No.
Q. -- near the water got flooded?
A. Too far from the water.
Q. What's too far from the water?
A. We were.





815163bd-c86d-419b-8941-5364520db3ac

Q. Sir, I'm not talking about your street. I'm saying were there other streets that were closer to the water that got flooded?
A. I told you they're all too far from the water.
Q. All the streets?
A. Yes, yes, yes.
Q. So let me just, I have to get the question out, sir, I'm sorry.
A. Bay Street was the closest street to the water. And beyond that was the river.
Q. So Bay Street is the street closest to the river, right?
A. Yeah.
Q. I'm sorry, Bay Street is the street closest to the water, right?
A. Right.
MR. HERSCHMANN: Can we take a two-minute recess, go off the record, please.
THE VIDEOGRAPHER: Going off the record, the time is 11:57 a.m.
(Recess taken)
THE VIDEOGRAPHER: We're back on the record, the time is 12:01 p.m.
BY MR. HERSCHMANN:
Q. I'm sorry, Mr. Souza, I should have asked you this



before we went on the record. Do you want to take a break to eat something?
A. No.
Q. Do you want a sandwich or something?
A. No.
Q. You're sure?
A. Yeah.
Q. Okay. Mr. Souza, when you were growing up in this area of Tiverton, there were not a lot of houses, right?
A. No.
Q. And did people that lived here -- I'm sorry, withdrawn. Were there a lot of overgrown fields when you were a kid?
A. Overgrown fields?
Q. Yes.
A. What do you mean by overgrown fields?
Q. Just pieces of property that didn't have any houses on it or structures.
A. Everybody has their houses on the --
COURT REPORTER: I didn't understand it.
Q. I didn't understand it.
A. Everybody planted their lots.
Q. Everybody planted their lots?
A. Yeah, of course. Everybody in Tiverton planted their



own gardens.
Q. Did you -- did your family own the farm that you've been discussing?
A. We owned the farm, yes.
Q. You didn't lease it from somebody?
A. What's that?
Q. Did your father lease it from somebody?
A. Yes.
Q. So did your family own it or lease it?
A. He -- my father owned it. He leased it at first. Then he paid the rent, then he bought it.
Q. Okay, so he started out by leasing it --
A. Right.
Q. -- then eventually bought it.
Mr. Souza, do you remember the town dump at Judson and Bay Streets?
A. Right.
Q. And that's the location where the Corvello house is now, right?
A. Carvalho?
Q. Corvello.
A. Who's Corvello?
Q. Mr. Souza, do you remember Gail Corvello?
A. Who?



Q. Gail Corvello?
A. Who the heck are they?
Q. You don't remember who she is?
A. I don't remember the name.
Q. Mr. Souza, I'm going to show you your testimony from March 8th of this year again, okay?
A. Right.
Q. And I'm going to give you page 99 and I highlighted the lines, and for your -- what I'd like for you to look at is lines 19 through 25. Okay?
MR. ROBERTS: And I'd like to note my objection.
MR. HERSCHMANN: Can we show it to the witness, please.
A. Nineteen?
Q. Mr. Souza, looking --
MR. LEIFER: Let him read the --
MR. HERSCHMANN: Is that an objection? I'm asking --
MR. LEIFER: Let him read the documents. You asked him to look at the document.
MR. HERSCHMANN: Is that -- can we not have the speaking objections, please.
MR. LEIFER: It's not a speaking objection.





815163bd-c86d-419b-8941-5364520db3ac



Q. Mr. Souza, do you see on line 13 where you're asked the question: "Do you know that Gail Corvello's house is on top of the dump, the town dump, do you know that?"
A. Yeah.
Q. You say --
MR. MARRAN: Excuse me. You just asked him line 13. Then earlier you told him line 19. Give him a break.
MR. HERSCHMANN: Please, counsel, I'm showing -- I'm asking the witness does he see something.
MR. MARRAN: I know what you're doing.
MR. HERSCHMANN: I'm not having a speaking objection. I'm not having a speaking objection. I'm gonna ask questions, you can object to the form. Okay?
MR. MARRAN: Just ask the question.
Q. Mr. Souza, do you see on line 13 right above it, do you see that?
A. Yeah.
Q. Do you see where it says: "Do you know that Gail Corvello's house is on top of the dump, the town dump, do you know that?"
Your answer was: "Whose house?" On line 16.
Question: "Gail Corvello's house. Do you know that's built on the town dump?"



Your answer is: "Yes."
Do you know -- next question: "And do you know how that house ended up getting developed after it was the town dump?"
Answer: "They built the house on top of the dump."
Do you see that, sir?
MR. ROBERTS: Objection.
Q. Do you see your testimony?
MR. ROBERTS: Objection.
A. I don't see that on this paper.
Q. On line 23, sir.
A. Yeah, I see that.
Q. Could I have the page back for a moment, sir.
MR. MARRAN: Yeah, let's have this marked as an exhibit. You're not gonna let it be marked?
MR. ROBERTS: Let's mark it as number 19, please. Mr. Herschmann.
Q. Mr. Souza, what I'd like for you to do --
MR. ROBERTS: Before we -- before we move on, can we take -- address the exhibit, the issue of the exhibit?
MR. HERSCHMANN: I think you -- we're not having speaking objections.
MR. ROBERTS: We have asked that that be



marked as an exhibit.
MR. HERSCHMANN: I understand.
MR. ROBERTS: This is a discovery deposition.
MR. HERSCHMANN: And I'm taking --
MR. ROBERTS: You've referred to it and we want it marked as an exhibit.
MR. HERSCHMANN: And it's in the record, it'll be -- there'll even be a simpler way of doing this. Let's do this.
Q. Mr. Souza, what I'd like you to do is look at the screen that we have here.
Can you play from March 8, clip 37.
See if you look at this, does this help you remember about Gail Corvello's house being built.
(videotaped testimony being played)
THE WITNESS: That's me.
(Videotape stopped)
MR. HERSCHMANN: Mr. Souza, can you watch the screen and listen to the questions and answers.
- - -
(Beginning of videotaped testimony)
Q. Do you know that Gail Corvello's house is on top of the dump, the town dump? Do you know that?



A. Who?
Q. Gail Corvello's house, do you know that's built on the town dump?
A. Yeah.
Q. And do you know how that house ended up getting developed after it was the town dump?
A. They built the house on top of the dump.
(End of videotaped testimony)
- - -
MR. ROBERTS: Note my objection.
Q. Mr. Souza, now this is clearly in the record because that's you on the video, right?
A. Right.
Q. And that was answers that you gave at your last testimony, right?
A. I don't know.
Q. Well, do you remember your last testimony at all?
A. No.
Q. Did -- watching yourself on the video doesn't help you remember?
A. I remember that, yeah.
Q. And was that accurate, what we just saw?





815163bd-c86d-419b-8941-5364520db3ac

A. The house was built on the town dump, yes.
Q. And so the testimony that we just watched from the video that you gave beforehand, that was accurate, right?
A. I -- the house stayed on town dump, yeah.
Q. And that's Gail Corvello's house, right?
A. Carvalho, it ain't Corvello.
Q. I'm sorry, Carvalho. Gail Carvalho's house. I'm sorry, sir. But that's the house that we're talking about --
A. Right.
Q. -- right? Okay. And the town used to have people bring junk to the dump, right?
A. Right.
MR. ROBERTS: Objection.
Q. And people in the neighborhood used to throw garbage in the dump, right?
A. Right.
MR. ROBERTS: Objection.
Q. And it was a dump for many, many years, right?
A. Right.
MR. ROBERTS: Objection.
Q. Back during the time period when that -- the town dump was on Bay and Judson Streets, were all types of things thrown there?
A. What?



Q. Were all types of garbage and debris thrown there?
A. Yes.
Q. And everybody brought stuff there, right?
MR. ROBERTS: Objection.
A. That was the town dump.
Q. So that's what the town used to dump everything, right?
A. That's right.
Q. And even when the town stopped using it somewhat as a dump, people still dumped stuff there, right?
A. No. They built that house there, that was the end of things. There was nobody throwing junk in there.
Q. Okay. Right, so whenever the house that's there got built, but up until that time, people dumped stuff there but then they stopped, right?
A. Right.
Q. Do you remember there being a lot of rats at that dump?
A. Rats? You ever see a dump without rats?
Q. Actually, no.
A. All dumps have rats because they go after the garbage.
Q. And do you remember seeing like a lot of empty cans from all types of things that were in the dump?
A. Yeah, the dump. What do you think they throw in the dump, good stuff? They don't throw good stuff in the dump. They throw all the junk in the dump.



Q. And that was used as a dump for more than 20, 30 years, right?
A. Oh, I don't know.
MR. ROBERTS: Objection.
Q. But for a really long time, right?
MR. ROBERTS: Objection.
A. It was there for a long time, yeah. But I don't know about 30 years.
Q. Well, up -- at least up until the time when Carvalho's house got built, right?
MR. ROBERTS: Objection.
A. Right.
MR. HERSCHMANN: Why don't we take a short break.
THE VIDEOGRAPHER: Going off the record, the time is 12:12 p.m.
(Short recess taken)
THE VIDEOGRAPHER: We're back on the record, the time is 12:23 p.m.
BY MR. HERSCHMANN:
Q. Mr. Souza, we're just gonna be another few minutes, okay? That's what we've agreed, all right?
Can you tell us, sir, when did you first start driving?



A. Start driving?
Q. Yeah.
A. I was in the service.
Q. When you were in the service you first started driving?
A. Yeah, I drove on the farm. We had a farm, we had our own trucks.
Q. But, didn't -- you first started driving on a road or streets, that was while you were in the service, right?
A. That's when I got my license, I was in the service.
Q. So when you were in the service, that was the first time you had driven any type of vehicle on a road or on a street, right?
A. Oh, no.
MR. ROBERTS: Objection.
A. We used to drive without a license before.
Q. Okay. Did you drive without licenses on your family's farm?
A. Yeah.
Q. Did you drive without licenses when you were 13 --
A. No.
Q. -- out on the streets?
A. Not 13, no.
Q. So, the driving that you did without licenses, that was on your family's farm, right? You have to answer





815163bd-c86d-419b-8941-5364520db3ac



verbally.
A. In our town.
Q. I can't hear you.
A. Right in our town. Town of Tiverton.
Q. So you drove without a license?
A. All over town of Tiverton.
Q. But not when you were 13 or 14 years old?
A. Oh, no, I never drove when I was 13.
Q. At some point when you were around 18 you started driving?
A. Yeah.
Q. Now, can you tell us, who else lived on your block on Cornell Street prior to your going to World War II?
A. The Martins.
Q. The Martins?
A. Yeah.
Q. Anyone else on that street other than the two of you?
A. There was an old timer next door to us. Can't think of his name. There was an old timer that lived there with his wife, that's all.
Q. Did you say there was an old timer who lived with his wife next to you?
A. Yeah.
Q. And do you remember his name?



A. No, I don't. Pinto I think it was.
Q. Pinto?
A. I think so.
Q. Okay. And that was the street you lived on until you got married, right?
A. Right.
Q. And when you moved to Church Street, when you first moved there, how many neighbors did you have on the street?
A. On Cornell Street?
Q. No, no, on Cornell Street you said there was Martin and the old timer, right?
A. Right.
Q. Anyone else on that street or --
A. No.
Q. Okay. And then when you moved to Church Street, when you first got there, how many people lived there?
A. Oh, I don't know. I didn't know the people so I don't know.
Q. Well, were -- all right, let me take a step back so I just want to make sure we understand each other. At a certain point there were very few houses in the area, right?
A. Right.



Q. And then eventually the houses got built, right?
A. Right.
Q. And the town decided they wanted to develop the area more, right?
A. No. Simpson owned all the property down there.
Q. And, sir, at some point people decided to build houses, right?
A. Right.
Q. They didn't all come up in one day, right?
A. No.
Q. So it took many years for houses to get built, right?
MR. ROBERTS: Objection.
A. I don't know.
Q. Well, you -- you were living in the area back then, right?
A. Right.
MR. ROBERTS: Objection.
Q. Okay. And you watched some of the neighborhood get developed, right?
A. Right.
MR. ROBERTS: Objection.
Q. And can you tell us, how did the neighborhood -- how did the houses get built?
A. How did they get built? Guys are working on it, that's



how they got built.
Q. And it took many years for the different houses to get built, right?
A. Well, I don't know, I didn't keep track of that.
Q. Sir, let's take Cornell Street. There's more than three houses on Canal Street now, right? Or Cornell Street now, right?
A. Cornell Street?
Q. Yes.
A. No.
Q. There are only three houses on the whole --
A. Yeah.
Q. -- street still?
A. Yeah.
Q. And on Church Street, when you first moved there, there were fewer houses, right?
A. Right.
Q. And how many houses were on the street, approximately, when you moved there?
A. I don't know. I think it was only four houses. I don't know.
Q. Now, are there more than four houses now?
A. Oh, yeah.
Q. And so --





815163bd-c86d-419b-8941-5364520db3ac

Page 86

A. Don't tell me how many because I don't know.
Q. But somewhere from four houses to however many there are now, it took years for people to buy the lots --
A. Oh, yeah, yeah.
Q. And then they had to bring fill in to develop the property to build the houses, right?
A. Right.
Q. And that was common back then, that people were bringing fill in, right?
A. Right.
Q. And that's been common as you've seen the whole neighborhood being developed, all along, up until today, right?
A. (Witness nodding)
Q. You have to answer verbally.
A. Right.
Q. When you did roofing work -- and you did that for how many years; 40 years or so?
A. Well, I'll tell you.
Q. Well, sir, let me see -- let me -- I'm going to withdraw the question.
When you came back from the military, you told us you did the National Contracting roofing and then your own company, right?

Page 87

A. Yeah.
MR. ROBERTS: Objection. Sorry.
Q. What does it mean to do roofing? How do you do it?
A. What does it mean? Put roofs on the buildings, that's what it means.
Q. Sir, I understand generally that. I mean in more detail, what did you do? Did you put tar paper on the roofs?
A. Yeah.
Q. And before they had tar paper, did you just put regular tar on the roofs?
A. No, no. We never did that. We always had paper as tar and gravel.
Q. I'm sorry, I didn't hear what you said.
A. Tar and gravel.
Q. You've always had paper with tar and gravel on it?
A. Right -- no, we poured it.
Q. Okay. And did you help build some of the houses in the neighborhood?
A. No, no. I didn't build no houses.
Q. Did you help put roofs on the houses?
A. Oh, yes.
Q. Did you put roofs on a lot of the houses in the neighborhood?

Page 88

A. Not in Tiverton, no. I told you, we would travel -- we used to -- most of our work was Newport and Quonset Point. Newport and Quonset Point. That's where most of our jobs were.
Q. Did you see other roofers doing work in Tiverton?
A. Of course.
Q. And do they put roofs on the same way you've been talking about with tar paper?
A. No. Those people down there had the houses already built.
Q. No, sir, I'm talking about the new houses that got built.
A. Oh, hell, I ain't watching everybody for Christ's sake, what the hell do I know. People that build a house had to put a roof on it.
MR. MARRAN: Wait for a question.
THE WITNESS: Huh?
MR. MARRAN: Wait for a question.
THE WITNESS: Yeah, I mean that's a stupid thing to say you build it. Of course you build a roof on it.
MR. HERSCHMANN: Why don't we -- Mr. Souza, we're going to take a break, okay?
THE WITNESS: Okay.

Page 89

MR. ROBERTS: Okay, thanks.
THE VIDEOGRAPHER: We're off the record, the time is 12:30 p.m.
(Off the record)





815163bd-c86d-419b-8941-5364520db3ac

Page 90

CERTIFICATE

I, Lori P. Hamel, hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to Rules of Civil Procedure of the Superior Court, especially but without restriction thereto, under Rule 30(e) of said Rules; that the deponent was first sworn by me; that this deposition was stenographically reported by me and later reduced to print through Computer-Aided transcription; that the foregoing is a full and true record of the proceedings; and that a review of the transcript by the deponent was requested.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of October, 2007.

LORI P. HAMEL, RPR, CRR

My Commission Expires 6/24/09



CAPITOL COURT REPORTING, INC. (401) 739-3600

815163bd-c86d-419b-8941-5364520db3ac

# Exhibit 6

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
ADMINISTRATIVE ADJUDICATION DIVISION

IN RE: AAD NO. 06-011/SRE
SOUTHERN UNION COMPANY
d/b/a NEW ENGLAND GAS COMPANY
NOTICE OF VIOLATION OC&I/SR 06-01

VOLUME II

Videotaped deposition of JOSEPH SOUZA, a Witness herein, taken on behalf of the Respondent, on THURSDAY, MARCH 8, 2007, 10:09 A.M., at the offices of THOMAS BRADY, ESQUIRE, 167 MAIN STREET, TIVERTON, RHODE ISLAND, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.

Vivian S. Dafoulas, RMR-CRR
50 Fieldstone Drive
East Greenwich, RI 02818-2064
(401) 885-0992



recall why your son said you had to go to his house a little while ago?
MR. WIENER: Objection.
A. To whose house?
Q. To your son's house.
A. No.
Q. Do you remember that there were some people in the house talking amongst themselves and just asking you some questions?
A. Not in this house, no.
Q. And do you remember at some point these people created -- made up a piece of paper and they gave it to your son and they said, you know, you have to sign the document, Mr. Souza?
MR. WIENER: Objection.
A. Oh, God, you have to ask my son that because he didn't give me no papers.
Q. Do you recall at some point the Simpson girl coming to see you? Do you know who the Simpson girl is?
A. Oh, yeah, I know who she is but I don't remember -- I mean if she walked across here now, I wouldn't know who she is. She looks something like this.
(Witness indicating the court reporter.)



Q. And you're saying the Simpson girl has blond hair?
A. Yeah.
Q. And do you recall the Simpson girl coming to see you in the last several months, telling you that she wants you to help out the community?
MR. WIENER: Objection.
A. No. No.
Q. Do you recall talking to your son at some point and telling your son, "I don't want to be bothered with all this stuff and you go talk to people"?
A. Yeah, I told him that, yes.
Q. Who was -- who was bothering you?
A. Huh?
Q. Who was coming to bother you?
MR. WIENER: Objection.
A. Oh, I don't know. I didn't want people coming into my house and asking me all stupid questions. That happened 40 years ago.
Q. And you're saying you know this year is 2007, right?
A. Yeah.
Q. So the stuff you're talking about happened 40 years ago from today?



A. I'm talking about before the war.
Q. Before which war?
A. World War II.
Q. And do you know how long ago World War II was?
A. '41.
Q. And, sir, the person that was coming by and was bothering you about this stuff, was that a man or a woman?
A. Oh...
MR. WIENER: Objection to the form.
A. I never had no woman come to my house. I had no woman come to my house. So it had to be a man.
Q. So if the Simpson girl had said that she had come to your house, that's not the truth, right?
MR. WIENER: Objection.
A. Well, she's been to my house, yes, but not for this.
Q. What did she come to your house for?
A. I don't know.
Q. But she never spoke to you about any of this?
A. No.