# Exhibit 5

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

GAIL CORVELLO, ET AL, KEVIN BURNS, ET AL, COLLEEN BIGELOW, ET AL, and SHEILA REIS, ET AL
Plaintiffs

- against -

NEW ENGLAND GAS COMPANY, INC.
Defendant and
Third-Party Plaintiff

- against -

BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC; BRIDGESTONE AMERICAS HOLDINGS, INC.; HONEYWELL INTERNATIONAL, INC.; TOWN OF TIVERTON; GULF OIL CORPORATION; INLAND FUEL TERMINALS, INC.; DOMINION RESOURCES, INC.; and DOMINION ENERGY BRAYTON POINT, LLC
Third-Party Defendants

Civil Action Numbers:
05-221T, 05-274T
05-370T, 05-522T

VIDEOTAPED DEPOSITION OF JOSEPH SOUZA
Friday, October 12, 2007
10:30 a.m.
White's of Westport
66 State Road
Westport, Massachusetts

- - -

Lori P. Hamel, RPR, CRR
Capitol Court Reporting, Inc.
931 Jefferson Boulevard
Warwick, Rhode Island 02886

APPEARANCES

For the Plaintiffs:
McROBERTS, ROBERTS & RAINER, LLP
MARK W. ROBERTS
53 State Street
Boston, MA 02109

THORNTON & NAUMES, LLP
NEIL T. LEIFER
100 Summer Street, 30th Floor
Boston, MA 02110

For the Defendant:
KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP
ERIC D. HERSCHMANN
DAVID E. ROSS
SETH DAVIS
1633 Broadway
New York, New York 10019

HINCKLEY, ALLEN & SNYDER
GERALD J. PETROS
1500 Fleet Center
Providence, Rhode Island 02903

BISHOP, LONDON & DODDS
CHRISTINA CARLSON DODDS
3701 Bee Cave Road, Suite 200
Austin, Texas 78746

For the Deponent:
MICHAEL K. MARRAN
321 South Main Street
Providence, Rhode Island 02903

ALSO PRESENT:
RATCLIFFE BURKE HARTEN & ELIAS
RICHARD J. ZABBO
1600 Financial Plaza
Providence, Rhode Island 02903

Also present for Third-Party Defendants:
VETTER & WHITE
BENJAMIN V. WHITE
20 Washington Place
Providence, Rhode Island 02903
(Attorney for Bridgestone)

NIXON PEABODY, LLP
GREGORY L. BENIK, ESQ.
JASON P. MARINO, ESQ.
One Citizens Plaza
Providence, Rhode Island 02903
(Attorneys for Honeywell)

PULLMAN & COMLEY, LLC
CHRISTOPHER P. McCORMACK
850 Main Street
Bridgeport, CT 06601
(Attorney for Inland Fuel)

URSILLO, TEITZ & RICH, LTD.
JEANNE M. SCOTT
2 Williams Street
Providence, Rhode Island 02903
(Attorney for Town of Tiverton)

PILLSBURY WINTHROP SHAW PITTMAN, LLP
DAVID GOLDBERG
1540 Broadway
New York, NY 10036
(Attorney for Gulf)

LEGAL MANAGEMENT SERVICES
DAVID B. WILLIS
55 Hammarlund Way
Middletown, Rhode Island 02842
(Attorney for Gulf)

BURNS & LEVINSON, LLP
LYNNE M. RADICHES
One Citizens Plaza
Suite 1100
Providence, Rhode Island 02903



INDEX


| DEPONENT: | PAGE |
|---|---|
| JOSEPH SOUZA | |
| Examination by Mr. Herschmann | 6 |


\- - -

EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 18 | Providence Journal publication entitled The Great Hurricane and Tidal Wave, Rhode Island, September 21, 1938 | 66 |


\- - -

(COMMENCED AT 10:31 A.M.)

THE VIDEOGRAPHER: Today is October 12, 2007. The time is approximately 10:31 a.m. The location is White's of Westport in Westport, Massachusetts. My name is Tim Kenny, video specialist, Power Showz, Inc. This case number is -- the numbers are 05-221T, 05-274T, 05-370T and 05-522T. And the deponent is Joseph Souza.

Would the Notary Public please swear in the witness.

JOSEPH SOUZA

Being duly sworn, deposes and testifies as follows:

EXAMINATION BY MR. HERSCHMANN

MR. ROBERTS: Can I make a -- I just want to make a quick statement and then we should talk about stipulations just -- and the only statement I wanted to make was this is a discovery deposition so that you can prepare for your cross; and given that Mr. Souza's been deposed for several hours in the DEM case, I hope that we're not going to be going over a lot of material that was covered there.

And do you want to do anything about stipulations or just by the Rules?

MR. HERSCHMANN: Go by the Rules. He has not been deposed in this matter and we're gonna proceed as a



totally separate matter with different standards and different claims and just take a deposition.

MR. ROBERTS: Sounds good.

Q. Mr. Souza, my name is Eric Herschmann. I'm an attorney representing New England Gas Company, right? I'm gonna ask you some questions today. If you don't understand the question, will you tell me so I can try to rephrase it for you, okay?
A. Yup.
Q. You have to answer all of the questions verbally, which means you have to say yes or no.
A. Yes or no, right.
Q. Okay. And if I ask you a question and you answer it, then it's okay for all of us to presume you understood the question and you obviously understood the answer you gave, okay?
A. Yup.
Q. We don't want you to answer any questions that you don't understand. Okay? You have to answer verbally?
A. Verbally, okay, yeah.
Q. And we've spoken to your son so we've agreed that we're going to take some breaks during the course of your testimony. We've agreed we'll take your testimony for about two or two and a half hours today and then you're



gonna go home, all right? Okay?
A. Yes. Boy. Two and a half hours, holy Christ.
Q. Mr. Souza, do you remember whether we've ever met before?
A. I remember seeing your face before, yeah.
Q. Do you recall where?
A. Right here.
Q. Right -- when you say right here, what do you mean?
A. In White's.
Q. In White's?
A. Yeah. Last time.
Q. And White's is the location we're sitting at right now, right?
A. I know it.
Q. Do you remember when that occurred?
A. Oh, no, I don't remember that.
Q. Well, do you remember if it was during this year or prior years?
A. Well, it was last year, wasn't it? I think so.
Q. Do you know what today's date is?
A. Today's date? The fifteenth?
Q. The fifteenth of what, sir?
A. October.
Q. Okay. And of which year?



A. Oh, boy. 2000 -- 2000 what? I don't know. 2007, yeah? 2007. I don't -- see I don't remember that.
Q. I didn't hear what you said, I'm sorry.
A. I said 2007.
Q. And afterwards did you say "I don't remember that"?
A. I don't -- I says I don't remember everything, no, I don't. I'd be lying if I said I did.
Q. And do you recall the circumstances as to how we met at White's previously, as you said?
A. No.
Q. Do you know the gentleman sitting to your left?
A. The lawyer?
Q. I'm sorry?
A. Him?
Q. Yes.
A. I've met him before, yeah.
Q. When did you first meet him?
A. Last time we were here at a meeting.
Q. Last time we were where at a meeting?
A. Right here.
Q. And that's when you think you were with me and he was here as well, right?
A. Yeah.
Q. Do you know his name?

A. No, I don't.
Q. Other than the last time that you think you were here with this lawyer, did you ever meet him before that time?
A. I think so. Right? You was at my son's house?
MR. MARRAN: You have to answer the question.
A. Oh.
Q. The lawyers on this side can't answer any questions for you, okay?
A. Okay, you're the guy -- all right, I'll talk to you then.
Q. So do you know whether this lawyer was ever with you at your son's house?
A. Yeah.
Q. You think he was?
A. Yeah.
Q. And do you recall when that would have been?
A. Oh, I don't remember that, no.
Q. Do you recall whether it was this year or last year?
A. Had to be last year because I never been out this year.
Q. When you -- when you say you've never been out this year, what do you mean?
A. I never went to a meeting this year.
Q. Okay. And "this year", you mean 2007, right?



A. Yeah.
Q. Do you know any of the other lawyers that are sitting at this -- on this side of the table?
A. It's the same guys that were here before.
Q. When you say the same guys that were here --
A. I know all their names? No, I don't.
Q. I have to -- you have to let me ask the question and I'll give you the chance to answer, okay? Because the reporter has to take everything down that we say.
A. Yeah.
Q. When you say they were here before, you mean here at White's?
A. Yeah.
Q. And that would be the same time the lawyer that's sitting next to you you think was here, right?
A. Right.
Q. The lawyer that's -- which one of these three lawyers is your lawyer?
A. I don't know.
Q. Do you have your own lawyer?
A. I ain't got no lawyer. My son takes care of all my business.
Q. So none of these three lawyers sitting here represents you as your lawyer, right?



A. I don't know, are you? I don't know.
Q. But you never asked them to be your lawyer, right?
A. No, my son took care of everything, I told you that before.
Q. Do you remember last time that you were asked questions, you said you don't have a lawyer?
A. Yeah.
Q. And is that still correct today?
A. Well, you guys are saying they're my lawyers so -- sitting right next to me, right?
Q. Well, sir, some of these people I only met for the first time today.
A. Well, so have I.
Q. Fair enough. Do you recall whether Mr. Roberts -- have you ever heard Mark Roberts' name?
A. Yeah.
Q. Do you remember ever seeing him before --
A. Yes.
Q. -- other than at White's?
A. Yeah.
Q. Where did you see him other than at White's?
A. My son's house.
Q. You sure he was at your son's house?
A. Yeah.



Q. And that would have been in -- last year, 2006?
A. I don't -- yeah, I guess so.
Q. Could it have been even before that?
(Pause)
A. I said no, didn't I?
Q. I'm sorry, I didn't hear you.
Now, Mr. Souza, are you married?
A. Oh, I hope so. For 57 years or 58 years, something like that. I don't remember how long I've been married.
Q. Do you recall in which year you got married?
A. Oh, God. No, I don't.
Q. Can you tell us the name of your children, please?
A. Which one you want?
Q. All of them, please.
A. All of them. Joey, John, that's it. Two boys.
Q. Do you have any grandchildren?
A. Oh, yeah.
Q. What are your grandchildren's names?
A. Let's see. Keith, Matthews[sic]. Want the girls too?
Q. Please.
A. Kimberly.
Q. Keith, Matthew and Kimberly?
A. Right.
Q. And those are all your grandchildren? You have to

Page 14

answer verbally.
A. Yes.
Q. Sir, do you have any stepchildren?
A. Stepchildren.
Q. Yes.
A. No.
Q. Do you know someone named Alan Souza?
A. Yeah.
Q. Who is that?
A. That's my son. That's from my first wife.
Q. Sir, you told us a moment ago you had two sons, Joey and John, right?
A. Yes, well, he's my -- from my first wife.
Q. So you have another son named Alan from your first wife?
A. Yeah.
Q. So you have three sons?
A. Yup. Well, yeah.
Q. When were you married to your first wife?
A. Oh, boy. I don't know. During the war anyway.
Q. Was it before or after World War II?
A. It was during the war.
Q. During the war you married --
A. Yeah.
Q. -- your first wife?

Page 15

A. Yeah.
Q. What was your first wife's name?
A. I don't know. Can't remember.
Q. You can't remember your first wife's name?
A. No. Never. We never got along anyway.
Q. You said that it was during the war you got married?
A. Yeah.
Q. Do you recall going into the Armed Services when you were 18 years old?
A. Yeah.
Q. And what year did you go into -- I'm sorry, which part of the Armed Services were you in?
A. Air Force.
Q. So at 18 years old, you went to the Air Force, right?
A. Right.
Q. And do you recall in which year you went to the Air Force?
A. I don't know, I think it was in 1940 or '42.
Q. I didn't hear you, sir.
A. I don't know.
Q. Do you recall whether it was before or after Pearl Harbor?
A. Well, it was during Pearl Harbor.
Q. Well, Pearl Harbor, sir, was on December 7th of 1941,

Page 16

okay?
A. '41?
Q. So, were you in --
A. I was already in when it happened.
Q. So you were in the Armed Services prior to December 7th of 1941, right?
A. Right. I was gonna be drafted --
Q. I didn't hear what you said.
A. I said I was going to be drafted so I joined the Air Force.
Q. You were going to be drafted so you joined the Air Force?
A. Yeah.
Q. Prior to Pearl Harbor, right?
A. Right.
Q. And you're certain about that?
A. Yeah.
Q. Now, where did you go when you first joined the Air Force?
A. Let's see. I don't know. I don't know if I went to Springfield or what.
Q. I'm sorry, I didn't hear what you said.
A. I don't know if I went to Springfield. Yeah, Springfield, Mass. I think it was in Springfield, Mass,

Page 17

that's where I was stationed.
Q. Do you recall where else you were stationed during World War II?
A. Up in Utah.
Q. Okay. I'm sorry, I didn't hear you.
A. Utah.
Q. Anywhere else?
A. No. Not that I know of.
Q. What was -- when you first entered -- when you first entered the military, what was your rank?
A. When we first started?
Q. Yes.
A. Went in as a buck private.
Q. And when you left your military service, what was your rank?
A. First sergeant.
Q. When did you become a sergeant?
A. Oh, how do I know.
Q. Well, was it shortly after you joined the service?
A. Oh, no. I was there good -- over -- over two years before I made it.
Q. And, sir, you said to us you were in Utah?
A. Yeah.
Q. But you think you may have started in Massachusetts?

Page 26

Q. Sir, let me just ask you, we're trying to understand your memory from these -- from a while ago, right? So, and most times we ask just general pedigree information that we call. But I've gotten some information that seems to conflict so I'm trying to understand it. If you got married to your first wife...
A. Yeah.
Q. And you went in before Pearl Harbor, which is before 1940 -- December of 1941.
A. Yeah.
Q. Then how old would Alan be now?
A. I don't know.
MR. ROBERTS: Objection.
A. He's a grown man, that's all I know. He's a grown man.
Q. Have you had any conversations with the two lawyers here, not the one -- not the gentleman right next to you, you've told us you don't know his name, but the other two lawyers here about why you're here today?
A. No, I didn't talk to nobody why I'm here today.
Q. Okay. Did anyone show you any papers to look at before you came today, about this?
A. No.
Q. Mr. Souza, when did you graduate from high school?
A. God Almighty. How the hell do I know.

Page 27

Q. Well, were you -- did you graduate from high school shortly before you went into the military?
A. Oh, yes.
Q. So at about 18 years old you graduated?
A. I don't know how old I was.
Q. Well, you told us you went into the military at 18?
A. Right.
Q. And before you went to the military, you said you graduated high school, right?
A. Right.
Q. How old are you now?
A. Eighty-seven? I think. I don't know how old I am.
Q. You said 87 you think?
A. I think so, yeah. Eighty-seven or eighty-eight, I don't know. One of the two.
Q. Sir, what's the address and where you grew up?
A. What's that?
Q. What -- where is the address where you grew up?
A. Where I grew up? Cornell Street in Tiverton.
Q. And where do you currently live, sir?
A. 4 Church Street, Tiverton.
Q. Where do your sons Alan, Joey and John live?
A. Alan lives in Westport, Joey lives in -- John lives in Tiverton, next door to me. He's up in Newport now.

Page 28

Q. Sir, do you have any brothers or sisters?
A. Oh, boy, have I got brothers. I had seven brothers and five sisters.
Q. You had seven brothers and five sisters?
A. Yeah. Or it was seven boys anyway, let's put it that way. Including me.
Q. And how old are your brothers or sisters?
A. Oh, come on, I don't know.
Q. Are they all living?
A. All -- yeah, yeah. But they're younger than me.
Q. Are you the oldest of the whole family?
A. No, my sister is.
Q. But all your brothers and sisters are still alive, right?
A. Oh, yes.
Q. Are you sure about that, sir?
A. Yeah, yeah. Why, somebody died?
Q. Sir, I don't know, but did you have a brother, do you have a brother named John?
A. John? Oh, yeah, yeah, he's dead.
Q. So what you just told us a minute ago about all your brothers and sisters being alive, that wasn't right, right?
A. Well, you know, I don't know. You got me confused now.

Page 29

My brother John was my oldest brother.
Q. John?
A. He was the oldest in the boys.
Q. I thought you said you only had an older sister?
A. My sister's oldest of them all. My brother John was the oldest of the boys.
Q. But you had forgotten that your brother John passed away?
A. What's that?
Q. Did you forget that your brother John had passed away?
A. I know he passed away, yes.
Q. But when you said everyone was alive, you had just forgotten that, right?
A. You got me all confused.
Q. Well, sir, are you taking any medications?
A. No, I don't.
Q. Do you recall recently taking any medications?
A. What?
Q. Do you recall taking any medications recently for pain?
A. Oh, I take for pain pills, yeah.
Q. Sir, let me ask the question again.
A minute ago I asked you are you taking any medications and you said no.
A. I take a pill. Aspirin a day.

Page 30

Q. You only take an aspirin a day?
A. That's right. Boy, oh, boy, I gotta write everything down before I come here.
Q. Sir, do you take any pills for your arteries?
A. My arteries?
Q. Yes.
A. What the hell is that?
Q. Do you take anything -- any pills for your blood pressure or?
A. I told you I take a aspirin a day, that's all I take. I used to take -- I don't know. Some kind of a pill anyway. But I dropped that out.
Q. Sir, you don't recall ever taking medication Lopressor?
A. A what?
Q. Lopressor, a medication Lopressor?
A. No, I don't. I don't know the names of pills I take.
Q. Do you take several pills a day?
A. No, I take -- I told you, I take one a day, aspirin.
Q. That's the only one you take now?
A. Yeah.
Q. Okay. Do you remember the name of the high school you attended?
A. I didn't go to high school.
Q. Sir, a minute ago you told us you graduated high school?

Page 31

A. No. I graduated through grammar school.
Q. You graduated from grammar school and you didn't graduate from high school?
A. No, I didn't even go to high school.
Q. Sir, I want to show you something, and tell me if this refreshes your recollection because this is from your prior testimony, okay? I'm sorry, just wait.
MR. ROBERTS: Can I see what you're going to show the witness?
Q. Sir, this is on your prior testimony, let me read it to you. Okay? It's on page -- I'm going to give you -- one second.
MR. MARRAN: You're going to give it to him. The rules require you to show it to the witness before you cross-examine on a prior statement.
MR. HERSCHMANN: Are you going to wait a second? Right.
MR. MARRAN: I did.
MR. HERSCHMANN: You've asked for it, I haven't read it to him, and I'm going to get a larger print.
Q. Do you have your reading glasses with you today?
A. No.
Q. Can you read without your reading glasses?

Page 32

A. Well, I can if the letters are big enough, yes.
MR. ROBERTS: And just so the record's clear, has this been signed? Read and signed?
MR. HERSCHMANN: Why don't you ask his counsel.
A. Boy, I tell you.
MR. ROBERTS: Just for the record, I don't believe the transcript's been read and signed, and I don't believe that Mr. Souza was represented at that time.
MR. HERSCHMANN: I don't know which date he was retained or not.
Q. Mr. Souza, I put a box around the questions and answers, it's on page 21 of your February 15th testimony of 2007, lines 15 through 18. Can you look and tell me if you could see that writing. Just the yellow box, to help you focus on what we're looking at. Do you see the yellow box?
A. Oh, yeah, all right.
"Did you go to high school?"
"No."
Q. Sir, do you see the answer you gave?
A. Huh?
Q. The answer is, "Did you go to high school?" Then your

Page 33

answer is, "Yes".
A. I didn't go to -- I didn't -- I didn't go.
Q. All right. So, sir, do you see on your testimony from February 15th of 2007, the question was:
"Did you go to high school?"
Answer: "Yes."
"Did you graduate from high school?"
And your answer is: "Yes."
Do you see that?
A. I didn't see that, I didn't go to high school.
Q. So when you testified that you went to high school --
MR. MARRAN: Can we -- hold on one minute. Let him read it again.
Q. Hold on. When you testified that you went to high school previously, that was incorrect, right?
A. Yes.
Q. Okay. Can I have the transcript, please.
A. I had to go work on a farm.
(Pause)
THE WITNESS: Boy, oh, boy. Are these mine?
MR. MARRAN: Yup.
THE WITNESS: That's my son's. I better keep them.
Q. So those are your son's reading glasses?

Page 46

married and we bought a house.
Q. And that's the house you still live in?
A. That's right.
Q. And other than being in the military, those are the only two places you've ever lived, right?
A. Yes.
Q. Are you sure about that?
A. Well, I lived in New Jersey, I told you.
Q. Okay. Other than at the military and the three years in New Jersey, and the house you grew up in and the house on Church Street where you are now, those are the only places you've ever lived, right?
MR. ROBERTS: Objection.
Q. Is that correct?
A. Yeah.
Q. Are you sure about that?
A. Well, do you know different?
Q. Sir, I don't know you, I'm just asking you questions.
A. If you know different, tell me if you know different. I don't know.
Q. But those are the only ones you remember?
A. Yes.
Q. Before going in the military, you were working at Russo's Bakery, right?

Page 47

A. Right.
Q. And then you applied to go into the military, right?
A. Because you were gonna get drafted. So instead of being drafted I joined the service.
Q. Right. And you went from your family's farm to work at Russo's Bakery, right?
A. Right.
Q. And you -- did your father help you get the job at Russo's Bakery because he knew Mr. Russo?
A. Yes.
Q. And how many years did you work with Mr. Russo?
A. Oh, I don't know. I think four years.
Q. Four years?
A. I think. I'm not sure.
MR. HERSCHMANN: Excuse me one second.
(Brief pause)
MR. HERSCHMANN: Mr. Souza, why don't we take a five-minute break, okay?
THE WITNESS: Go ahead.
THE VIDEOGRAPHER: Going off the record, it's 11:19 a.m.
(Recess taken)
MR. ROBERTS: I'd just like to put one thing on the record. This is supposed to be a discovery

Page 48

deposition for preparation for cross, and not cross. And so I object to the continuing use of leading questions because he's not a hostile witness.
MR. HERSCHMANN: Well...
THE WITNESS: Boy, I'll tell you, a lot of people here are ganging up on us.
(Long Pause)
MR. ROBERTS: Just to be clear, do I have to do that again on the record?
MR. ROSS: Yeah, it was not on the written record.
MR. HERSCHMANN: It's on the written record. Doesn't need to be on the video.
MR. ROSS: Okay.
THE VIDEOGRAPHER: It's 11:32 a.m., we're back on the record.
BY MR. HERSCHMANN:
Q. Mr. Souza, in which town or city are we right now?
A. What town we in? We're in Westport. Mass.
Q. And do you know who the current president is of the United States?
A. Let's see. Gotta be Clinton, right?
Q. And who was the president before Clinton now?
A. John F. Kennedy?

Page 49

Q. Do you know who the governor of Rhode Island is now?
A. No, I don't know him. I think it's Roberts, ain't it?
Q. You said Robbins?
A. I think it's Roberts. Yeah, I don't know.
Q. Roberts?
A. I think so, I'm not sure.
Q. But you don't -- you don't know who the current -- you're not sure who the current governor is, right?
A. No.
Q. Mr. Souza, you told us that you went from the -- working on your family's farm, right?
A. Yup.
Q. To Russo's Bakery, right?
A. Right.
Q. And in the bakery, did you bake bread?
A. Yeah.
Q. And were you over an oven at the time?
A. Yup.
Q. Is that what you did? And then while you were working at the bakery, you went into the military, right?
A. Right.
Q. And we've covered that after the military, you then went to New Jersey, right?
A. Right.

Page 70

Q. Sir, I'm not talking about your street. I'm saying were there other streets that were closer to the water that got flooded?
A. I told you they're all too far from the water.
Q. All the streets?
A. Yes, yes, yes.
Q. So let me just, I have to get the question out, sir, I'm sorry.
A. Bay Street was the closest street to the water. And beyond that was the river.
Q. So Bay Street is the street closest to the river, right?
A. Yeah.
Q. I'm sorry, Bay Street is the street closest to the water, right?
A. Right.
MR. HERSCHMANN: Can we take a two-minute recess, go off the record, please.
THE VIDEOGRAPHER: Going off the record, the time is 11:57 a.m.
(Recess taken)
THE VIDEOGRAPHER: We're back on the record, the time is 12:01 p.m.
BY MR. HERSCHMANN:
Q. I'm sorry, Mr. Souza, I should have asked you this

Page 71

before we went on the record. Do you want to take a break to eat something?
A. No.
Q. Do you want a sandwich or something?
A. No.
Q. You're sure?
A. Yeah.
Q. Okay. Mr. Souza, when you were growing up in this area of Tiverton, there were not a lot of houses, right?
A. No.
Q. And did people that lived here -- I'm sorry, withdrawn.
Were there a lot of overgrown fields when you were a kid?
A. Overgrown fields?
Q. Yes.
A. What do you mean by overgrown fields?
Q. Just pieces of property that didn't have any houses on it or structures.
A. Everybody has their houses on the --
COURT REPORTER: I didn't understand it.
Q. I didn't understand it.
A. Everybody planted their lots.
Q. Everybody planted their lots?
A. Yeah, of course. Everybody in Tiverton planted their

Page 72

own gardens.
Q. Did you -- did your family own the farm that you've been discussing?
A. We owned the farm, yes.
Q. You didn't lease it from somebody?
A. What's that?
Q. Did your father lease it from somebody?
A. Yes.
Q. So did your family own it or lease it?
A. He -- my father owned it. He leased it at first. Then he paid the rent, then he bought it.
Q. Okay, so he started out by leasing it --
A. Right.
Q. -- then eventually bought it.
Mr. Souza, do you remember the town dump at Judson and Bay Streets?
A. Right.
Q. And that's the location where the Corvello house is now, right?
A. Carvalho?
Q. Corvello.
A. Who's Corvello?
Q. Mr. Souza, do you remember Gail Corvello?
A. Who?

Page 73

Q. Gail Corvello?
A. Who the heck are they?
Q. You don't remember who she is?
A. I don't remember the name.
Q. Mr. Souza, I'm going to show you your testimony from March 8th of this year again, okay?
A. Right.
Q. And I'm going to give you page 99 and I highlighted the lines, and for your -- what I'd like for you to look at is lines 19 through 25. Okay?
MR. ROBERTS: And I'd like to note my objection.
MR. HERSCHMANN: Can we show it to the witness, please.
A. Nineteen?
Q. Mr. Souza, looking --
MR. LEIFER: Let him read the --
MR. HERSCHMANN: Is that an objection? I'm asking --
MR. LEIFER: Let him read the documents. You asked him to look at the document.
MR. HERSCHMANN: Is that -- can we not have the speaking objections, please.
MR. LEIFER: It's not a speaking objection.