UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| GAIL CORVELLO, et al.,<br>KEVIN BURNS, et al.,<br>COLLEEN BIGELOW, et al., and<br>SHEILA REIS, et al.<br>Plaintiffs<br>v.<br><br>NEW ENGLAND GAS COMPANY<br>Defendant and Third Party Plaintiff,<br>v.<br><br>BRIDGESTONE FIRESTONE NORTH<br>AMERICAN TIRE, LLC, et al.<br>Third Party Defendants. | Case Numbers: 05-221T (Lead Case)<br>(Related and Consolidated cases:<br>05-274T; 05-370T, 05-522T) |

**NEW ENGLAND GAS COMPANY'S RESPONSE TO THE COURT'S JANUARY 9, 2008 SHOW CAUSE ORDER**

The Court has proposed separating the trial in these consolidated cases into two phases.

In Phase I, the Court will ask a single jury to decide the following questions:

1. Have substantial coal gasification wastes containing hazardous substances been deposited in or near any of the plaintiffs' properties?

2. If so, is New England Gas Company ("NEGasCo") legally responsible for those wastes being deposited there?

3. If so, is NEGasCo legally responsible to the plaintiffs for the moratorium imposed by the Town of Tiverton on the Bay Street Area ("BSA")?

4. Do any of plaintiffs' properties contain hazardous substances caused by the presence of coal gasification wastes on their properties for which the Fall River Gas Company ("FRGC") is legally responsible?

The Court recognized that a "no" answer from the jury on either of the first two questions will terminate this proceeding. The Phase II trial, if necessary, will determine damages and the third

party claims. The Court invited the parties to show cause why the trial of these consolidated cases should not proceed in this manner.[1]

NEGasCo objects to the Court's Order separating for trial the third party claims, and the Court's proposed order bifurcating the trial of plaintiffs' claims for liability from the trial of plaintiffs' claims for damages and other relief (along with the third party claims) in a Phase II trial. NEGasCo also objects to the Court's proposed formulation of the issues to be tried in a Phase I trial. NEGasCo maintains that this case should proceed as proposed by NEGasCo in its memorandum in response to the plaintiffs' trial plan. Dkt. # 449. That proposal matches closely the plan submitted by the plaintiffs, and is not opposed by any of the parties to this proceeding. NEGasCo's proposal recognizes the efficiency in trying each plaintiff's claim in a unified trial that determines both liability and damages. Among other due process and constitutional issues, a second jury cannot fairly assess damages based on a focused finding of liability with respect to each plaintiff's individual lot made by the first jury. The same jury that determines the extent of the contamination, if any, on a plaintiff's property for which NEGasCo is legally responsible should also determine the damages caused by that contamination.[2] The First Circuit approved a similar trial plan in *Acevado-Garcia v. Monroig, 351 F.3d 547 (1st Cir. 2003).*

On January 16, 2008, the Court heard argument on the trial plans proposed by NEGasCo and the plaintiffs and indicated that it would not accept either plan. The Court denied that motion in an order dated January 24, 2008. Dkt. # 415. In that Order, the Court went on to outline four questions addressing the tentative issues to be tried in the Phase I trial. Accordingly, in this

---

[1] This brief also responds to an issue that was raised before the Court: whether the Court should dismiss claims by plaintiffs who own lots in the BSA who fail to prove that those lots contain hazardous substances caused by the presence of coal gasification wastes for which FRGC is legally responsible.

[2] For example, assume that the first jury concludes that NEGasCo is legally responsible for the PAHs in the surficial soil on the northwest corner of Lot 1, but not responsible for the arsenic, lead, and beryllium found in the soil throughout Lot 1 both near the surface and at depth. It is neither efficient nor fair to attempt to "instruct" a second jury of these findings and to ask them to assess damages.

submission, NEGasCo comments on those questions and the Phase I trial as proposed by the Court. NEGasCo will also address one other issue identified by the Court: putting aside the moratorium issue, should the Court dismiss claims by plaintiffs who own lots in the BSA who fail to prove that those lots contain hazardous substances caused by the presence of coal gasification wastes for which FRGC is legally responsible?[3]

**ARGUMENT**

A. The Phase I Trial

NEGasCo's recitation of the four Phase I questions identified by the Court reflects the substance of the Court's proposal with some minor but important clarifications proposed by NEGasCo.

1. Have substantial coal gasification wastes containing hazardous substances been deposited in or near plaintiffs' properties?

The first question is a direct factual determination. NEGasCo submits that the question must contain some substantiality requirement – a certain threshold level of coal gasification wastes. NEGasCo submits that it would not make sense to proceed with this lawsuit if plaintiffs can demonstrate only the presence of some *de minimis* quantity of coal gasification wastes on a few or more lots in the BSA. Such a finding would suggest a 2-plaintiff case, not a case with

[3] On November 3, 2006, this Court granted in part, and denied in part, NEGasCo's motions to dismiss the complaints in this case. Dkt. # 65. The Court granted NEGasCo's motion to dismiss plaintiffs' claims for gross negligence, private nuisance, infliction of emotional distress and violation of the Hazardous Waste Management Act. In sustaining plaintiffs' strict liability claim, the Court noted that because "[a]t this juncture, the relevant facts are unknown", the Court was not then in a position to determine the legal question (among others) whether NEGasCo's alleged activities were "abnormally dangerous" noting, generally, that "an activity is not abnormally dangerous if the risks therefrom could be limited by the exercise of reasonable care." *Id.* at 11. Following the close of discovery, NEGasCo intends to move for summary judgment dismissing plaintiffs' claim for strict liability. In sustaining plaintiffs' claim for public nuisance, the Court identified several fundamental requisites to plaintiffs' public nuisance claims which could not be resolved on a motion to dismiss. *Id.* at 13-20. Following the close of discovery, NEGasCo's also intends to move for summary judgment dismissing plaintiffs' public nuisance claim. NEGasCo also intends to seek dismissal of plaintiffs' claim for damages in connection with the imposition of the moratorium.

129 plaintiffs. Indeed, it is black letter law that a plaintiff must prove by a preponderance of the evidence that defendant's conduct was a "substantial factor in bringing about the harm." Restatement (Second) Torts § 433B(1), comment a.[4]

2. If so, is NEGasCo legally responsible for those wastes being deposited there?

The second question framed by the Court properly focuses the inquiry on whether NEGasCo is legally responsible for any coal gasification wastes that may have been deposited in the BSA. The mere presence of such wastes neither proves that they came from FRGC, nor that NEGasCo is legally responsible for the presence of such wastes in the BSA. The first part of this inquiry – did such wastes come from FRGC – is primarily a factual issue. The second part of this inquiry – is NEGasCo legally responsible for such wastes having been deposited there – addresses the legal elements of plaintiffs' claims, including duty, breach, and proximate causation. These elements vary somewhat with respect to each of plaintiffs' three currently pending claims.

To sustain their negligence claims, plaintiffs must prove that (1) NEGasCo owed a duty of care to the plaintiffs to refrain from negligent activities with respect to the disposition of its wastes; (2) NEGasCo breached that duty; (3) NEGasCo's breach is the proximate cause of plaintiffs' injuries; and (4) actual loss or damages resulted from such breach. *See Gray v. Derderian*, 365 F. Supp. 2d 218, 226 (D.R.I. 2005); *Splendorio v. Bilray Demolition Co.*, 682 A.2d 461, 466 (R.I. 1996). The mere presence in the BSA of coal gasification wastes from FRGC – without more – proves none of these required elements. For example, FRGC could

---

[4] *See Damon v. Sun Company, Inc.*, 87 F.3d 1467, 1476 (1st Cir. 1996) (in context of gasoline spill); *see also Callender, McAnslan & Troup Co. v. Baccala*, 42 A.2d 511, 513 (R.I. 1945) (rejecting plaintiff's claim in negligence action for additional damages where defendant's conduct not the proximate cause or a "substantial factor" in plaintiff's claim for enhanced property damages).

have made reasonable arrangements for the disposition of its products and wastes, and therefore breached no duty to the plaintiffs. Such wastes could have been sought, brought to or deposited in the BSA by plaintiffs, their predecessors in interest, or by the Town of Tiverton, other third-party defendants or other third-parties.

To sustain their public nuisance claims, plaintiffs must prove that (1) there was an identifiable site-based activity; (2) the activity was deliberate and, at least in some respect, culpable (*e.g*., negligent); (3) NEGasCo had control over the activity at the time the harm occurred; (4) the resulting harm unreasonably interfered with a right common to the general public, such as public space or the environment; and (5) as private plaintiffs, they sustained special damages. *See Citizens for the Preservation of Waterman Lake v. Davis*, 420 A.2d 53, 59 (R.I. 1980); *Friends of the Sakonnet v. Dutra*, 738 F. Supp. 623 (D.R.I. 1990) (Dutra I*); Friends of the Sakonnet v. Dutra*, 749 F. Supp. 381 (D.R.I. 1990) (Dutra II); Restatement (Second) of Torts § 822. The culpability requirement is consistent both with Rhode Island law and the Restatement (Second) of Torts dealing with public nuisances. *See* Restatement (Second) of Torts § 822 and the previous authorities cited. Although *Wood v. Picillo*, 443 A.2d 1244, 1247 (R.I. 1982), contains a statement that "[p]ublic nuisance concerns injury or harm caused, rather than conduct which gives rise to the injury," it is a misreading of *Wood* to conclude that culpability is not relevant to the inquiry of whether the defendant can be liable for creating a public nuisance. Rather, the culpability requirement is confirmed in the Restatement (Second) of Torts § 822. A showing of culpability may be excused in certain limited circumstances where a defendant's interference with a public right "result(s) from abnormally dangerous activity for which there is strict liability." *Id*.; *see also* Restatement (Second) of Torts § 520. As shown below, the plaintiffs cannot sustain their strict liability claim for ultrahazardous or abnormally dangerous

activity and, therefore, the potential circumstance where lack of culpability might come into play in public nuisance does not apply here.

To sustain their strict liability claim, plaintiffs must prove that their injuries were "proximately caused by some ultrahazardous or abnormally dangerous activity" by NEGasCo and not simply by an ultrahazardous or dangerous material. *Selwyn v. Ward*, 879 A.2d 882, 889 (R.I. 2005) (citing *Splendorio*, 682 A.2d at 465-66). To determine whether an activity is ultrahazardous or abnormally dangerous, the Rhode Island Supreme Court in *Splendorio* has set forth the following factors for the Court to consider: (a) the existence of a high degree of risk of some harm to plaintiffs or plaintiffs' land; (b) the "likelihood that the harm that results from it will be great;" (c) the "inability to eliminate the risk by the exercise of reasonable care;" (d) the "extent to which the activity is not a matter of common usage;" (e) the "inappropriateness of the activity to the place where it is carried on;" and (f) the "extent to which its value to the community is outweighed by its dangerous attributes." *Id.* at 466 (quoting Restatement (Second) Torts § 520). The factors are to be viewed as a whole, and whether NEGasCo has engaged in ultrahazardous or abnormally dangerous activity is a question of law for the Court. *See Selwyn*, 879 A.2d at 889; *Splendorio*, 682 A.2d at 466.

Thus, the concept of "legal responsibility" is an integral part of this second question, and each of the plaintiffs must prove each element of their claims in the Phase I liability trial. Similarly, NEGasCo must have the opportunity to present its liability defenses in the Phase I trial, including defenses that relate to third parties, including third-party defendants. For example, NEGasCo is entitled to demonstrate that PAHs that plaintiffs seek to attribute to coal gasification wastes are in fact attributable to the actions of a third party or to some other source. And NEGasCo is also entitled to demonstrate that the contamination present on some of the lots

is attributable to the fact that these lots sit on top of a dumping ground. In short, under the Court's current plan, the parties should be required to prove and defend against all elements and aspects of the then extant claims asserted by the plaintiffs.

3. If so, is NEGasCo legally responsible to the plaintiffs for the moratorium imposed by the Town of Tiverton on the BSA?

The third question also incorporates both factual and legal elements in its inquiry. First, the Court will determine the legal standard for imposing responsibility on a private party for the regulatory actions taken by a municipality. NEGasCo anticipates filing motions with the Court to challenge plaintiffs' attempt to assign responsibility for the moratorium to a private party that had no role in the imposition of that moratorium, and no input in its scope, extent, duration, or features. Plaintiffs' claim in this regard raises serious due process concerns, among others. Second, assuming *arguendo* a cause of action exists, the Court will need to address the various proximate cause issues interlaced with the legal standard for imposing liability. For example, the evidence may demonstrate that contamination unrelated to coal gasification wastes caused, in whole or in part, the imposition of the moratorium, even though at the time the Town attributed such contamination to coal gasification wastes. The evidence may also demonstrate that the moratorium was unwarranted, not needed as a matter of scientific fact or to preserve public health, or was imposed on an arbitrary and capricious basis. Plaintiffs' claim also raises substantial foreseeability defenses. Third, the questions of legal liability and proximate cause with respect to the moratorium will both require factual determinations by the jury.

4. <u>To what extent do any of the individual lots in the BSA contain coal gasification wastes that are hazardous substances for which FRGC is legally responsible?</u>

This fact specific determination involves all the elements of plaintiffs' legal claims. The Court has properly acknowledged that determinations of liability, including those implicated in

question 4, must be tried by a single jury under the Seventh Amendment. For example, with respect to each plaintiff's negligence claim, did NEGasCo breach a duty to this plaintiff, and did that breach proximately cause the damages sought by such plaintiff? Does that plaintiff's lot contain any hazardous substances that came from coal gasification wastes from FRGC? And is NEGasCo legally responsible to that plaintiff for the placement of those hazardous substances on plaintiff's lot?[5]

NEGasCo suggests that the Court should consider several measures that could make the Phase I trial, as presently proposed by the Court, more efficient. First, the Court should structure the trial to determine initially the answers to questions 1 and 2 as set forth above.[6] If the jury concludes that there is no coal gasification waste in the BSA or that NEGasCo is not legally responsible for any such wastes, there will be no need to proceed further with the extensive and divergent evidence required to decide questions 3 and 4. Second, the Court should reverse the order of questions 3 and 4. Determining which lots, if any, contain hazardous substances caused by coal gasification wastes for which NEGasCo is legally responsible should precede any determination of liability for the moratorium because those findings may determine the scope of NEGasCo's liability, if any, for the consequences of the moratorium.

B. The Phase II Trial

Discussion concerning the contours of the Phase II trial of damages and the third party claims should await the Court's clarification of the matters tried and decided in the Phase I trial. For instance, the determination of how the Court intends to try and resolve the issues raised by question 4 will influence, to a large extent, what remains to be tried in Phase II and the procedure

---

[5] NEGasCo has previously stated its proposal for trying a subset of 6 claims, given the practical difficulties in trying all 129 cases, as the Court's current proposal now contemplates.
[6] The Court's January 24, 2008 Order suggests that this is how the Court intends to proceed.

for deciding any individual damage claims that may survive. For these reasons, NEGasCo respectfully asks the Court for permission to reserve its comments on the Phase II trial at this time.

C. <u>The Court should dismiss claims by plaintiffs who own lots in the BSA and who fail to prove that those lots contain coal gasification wastes for which FRGC is legally responsible.</u>

The Court should dismiss the negligence, strict liability and public nuisance claims of the plaintiffs who have failed to demonstrate that their properties are contaminated. By plaintiffs' counsel's own description, some plaintiffs have not suffered any physical damage to their properties. Mot. for Trial Plan Hr'g Tr. 9:20-10:2 (Jan. 16, 2008). Absent actual physical contamination of their properties, these plaintiffs have not suffered any legally cognizable injury; damages such as loss of use and enjoyment and emotional distress are not legally sufficient "self-standing" injuries and cannot sustain any of the three remaining causes of actions. Additionally, these particular plaintiffs cannot sustain a public nuisance claim because they have not suffered any "special damages" that are different in kind from the damages claimed by the greater "public."

In order to prevail on a negligence claim, the plaintiffs with no contamination must demonstrate the various elements of negligence as stated above in Section 2.[7] The plaintiffs with no physical contamination can never satisfy these requirements because they have not suffered an "actual loss or damage." Moreover, they cannot recover for consequential damages such as "loss of use and enjoyment" and "emotional distress" because, under Rhode Island law, such damages are not self-standing injuries sufficient to sustain a negligence cause of action. The Rhode Island Supreme Court addressed this very issue in *Hawkins v. Scituate Oil Co., Inc.*, 723

---

[7] *See Gray v. Derderian*, 365 F. Supp. 2d 218, 226 (D.R.I. 2005); *Splendorio v. Bilray Demolition Co., Inc. et al.*, 682 A.2d 461, 466 (R.I. 1996).

A.2d 771 (R.I. 1999), in which plaintiffs sought consequential and compensatory damages for the "inconvenience, discomfort and annoyance" resulting from the defendant's flooding of the plaintiffs' basement with heating oil. The Court explained that it is a "*condition precedent* to obtaining damages for any resulting inconvenience, discomfort, or annoyance" that the plaintiffs demonstrate *some physical interference* or loss of a possessory interest with their property. *Id.* at 773 (emphasis added). The Court only allowed plaintiffs to recover for inconvenience, discomfort and annoyance because the defendant had physically damaged the plaintiffs' property. The Court explained that generally a plaintiff must demonstrate some physical damage to either her person or to her property in order to recover for intangible damages such as inconvenience or annoyance. The Court reasoned that where there is property damage or interference, then the plaintiff does not have to *also* demonstrate personal physical injury because evidence of property damages prevents "trumped-up or specious-damage demands for alleged intangible personal injuries." *Id.* at 773. *See also In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717 (3rd Cir. 1994) (explaining that plaintiffs must demonstrate, in part, that defendants caused some physical damage to plaintiffs' property in order to recover for diminution of value damages).

The alleged injuries of the plaintiffs with no contamination are like those of plaintiffs in *Wilson v. Amoco Corporation*, in which the court held that "Plaintiffs … may not recover damages based solely on stigma *absent proof of some physical injury or harm to the specific Plaintiff's property* (i.e., separate establishment of a claim for trespass, nuisance, or negligence)." 33 F. Supp. 2d. 969, 980 (D. Wyo. 1998) (emphasis added). In *Wilson*, some of the plaintiffs sought damages for diminution in their properties' value because their properties were in close proximity to properties contaminated by defendant. *Id.* at 980. The *Wilson* court

followed the rationale of "[v]irtually every court to consider this proposition" and refused the plaintiffs' claim for stigma damages because these types of damages are "simply too speculative to warrant serious consideration." *Id.*

As explained above in Section 2, the plaintiffs with no contamination must "prove that their injuries were proximately caused by some ultrahazardous or abnormally dangerous activity by NEGasCo" in order to sustain their strict liability claim. *See Selwyn*, 879 A.2d at 889. Rhode Island follows the standard of strict liability set forth in the Restatement (Second) of Torts. *Id.* The drafters of the Restatement explained that "[f]or an activity to be abnormally dangerous, not only must it create a *danger of physical harm* to others but the danger must be an abnormal one." Section 520, cmt. f (emphasis added); *see also Great Lakes Dredging & Dock Co. v. Sea Gull Operating Corp.*, 460 So.2d 510, 513 (Fla. 1984) (explaining that central to the strict liability doctrine is "a finding that the ultrahazardous or abnormally dangerous activity poses some physical, rather than economic, danger to persons or property in the area, which danger must be of a certain magnitude and nature). Thus, strict liability is limited to the kind of *physical* harm, the possibility of which makes the activity abnormally dangerous. Here, plaintiffs with no contamination simply have not suffered any physical harm, thus they may not sustain a strict liability claim.

The plaintiffs with no contamination also do not have a public nuisance cause of action. Rhode Island law requires private plaintiffs raising a public nuisance claim to demonstrate that they have suffered special injury – distinct in kind, not just degree – from the injury allegedly creating the public nuisance itself. *Corvello v. New England Gas Co.*, 460 F. Supp. 2d 314 (D.R.I. 2006). These special damages must result from an interference with the public right, and

may include personal injury, "damage to the plaintiff's property or substantial interference with the use and enjoyment of the plaintiff's property." *Id.* at 325.

Here, the plaintiffs with no contamination have not alleged damages that are "special" or different in kind than those damages alleged by the rest of the "public" affected by the nuisance. As stated by plaintiffs' counsel, the "nature of the damages being claimed are property damage, loss of use and enjoyment and emotional distress," with loss of use and enjoyment and emotional distress having been "suffered by everyone." Mot. for Trial Plan Hr'g Tr. 9:20-10:2 (Jan. 16, 2008). Thus, no matter how the plaintiffs may explain the "public nuisance" claim, any of its effects on the plaintiffs with no contamination are the same as those suffered by "everyone."[8]

NEW ENGLAND GAS COMPANY

*/s/Gerald J. Petros*

Gerald J. Petros (#2931)
Robin L. Main (#4222)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
Tel. (401) 274-2000
gpetros@haslaw.com

John A. Tarantino (#2586)
David A. Wollin (#4950)
Kristen W. Sherman (#5595)
Adler Pollock & Sheehan P.C.

[8] A decision by New York's highest state court is instructive here. In *Madison Ave, Gourmet Foods v. Finlandia Center, Inc.*, the plaintiffs alleged that construction collapses resulting from defendants' actions created a public nuisance, and that the plaintiffs suffered special economic damages because the collapses forced the closure of their businesses. 96 NY 2d 280, 292 (Ct. App. NY 2001). The court determined that this type of economic loss was the same type of economic loss suffered by the "public" at large; thus plaintiffs could not recover. *Id.* at 294 (citing Restatement (Second) of Torts § 821C Comment h); *see also Allen v. Gen. Elec. Co.,* 2003 WL 22433809 *4 (N.Y. Sup., Sept. 29, 2003) (stating that a private plaintiff must show more than economic injury/diminution in property value because this is the very injury that defines the scope of the public "within the orbit of the stigma alleged"), *aff'd,* 16 A.D.3d 1095 (N.Y. 2005). As is the case under Rhode Island law, under New York law, "[a] public nuisance is actionable by a private person only if shown that the person suffered special injury beyond that suffered by the community at large." *Finlandia*, 96 N.Y. 2d 280 at 292. Like in *Finlandia*, any economic harm suffered by the plaintiffs with no contamination is shared by the public affected by the nuisance. Because these plaintiffs cannot allege special damages distinct from those "suffered by everyone," the plaintiffs with no contamination cannot recover under a public nuisance theory.

One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
(401) 274-7200

Eric D. Herschmann
David E. Ross
Seth Davis
Noelle M. Kowalczyk
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

**CERTIFICATE OF SERVICE**

To:

John J. McConnell, Jr., Esq.
Robert J. McConnell, Esq.
Aileen L. Sprague, Esq.
Jonathan D. Orent, Esq.
Motley Rice
321 South Main Street
Providence, RI 02903

Neil T. Leifer, Esq.
Christian F. Uehlein, Esq.
Thorton & Naumes LLP
100 Summer Street
Boston, MA 02110

Mark W. Roberts, Esq.
David A. Cetola, Esq.
Heather Spurlock Kennealy, Esq.
McRoberts, Roberts & Rainer, LLP
53 State Street
Boston, MA 02109

Matthew B. Smith, Esq.
1206 Westminster Street
Providence, RI 02909

Paul Revere, III, Esq.
297 North Street, Suite 337
Hyannis, MA 02601

Richard J. Zabbo, Esq.
Stephen P. Harten, Esq.
Ratcliffe, Burke, Harten & Elias LLP
1600 Financial Plaza
Providence, RI 02903

Christina C. Dodds, Esq.
Bishop, London & Brophy, P.C.
3701 Bee Caves Road, Suite 200
Austin, TX 78746

Gregory S. Schultz, Esq.
Susan Forcier, Esq.
Office of Legal Services
RI Department of Environmental Management
235 Promenade Street
Providence, RI 02908

Lewis S. Wiener, Esq.
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, N.W.
Washington, DC 20004

Michael D. Mitchell, Esq.
Deputy Chief of Legal Services
State of Rhode Island
Department of Transportation
Two Capital Hill
Providence, RI 02903

Michael K. Marran, Esq.
P.O. Box 6067
321 South Main Street, Suite 200
Providence, RI 02940-6067

Anthony F. Muri, Esq.
Muri Associates LLC
Ten Weybosset Street
Providence, RI 02903

Kerry T. Ryan, Esq.
Emily C. Shanahan
Tarlow, Breed, Hart & Rodgers, P.C.
101 Huntington Avenue, Suite 500
Boston, MA 02199

Benjamin V. White, Esq.
Kimberly A. Simpson, Esq.
Vetter & White
20 Washington Place
Providence, RI 02903

William D. Wick, Esq.
Wactor & Wick LLP
180 Grand Avenue, Suite 950
Oakland, CA 04612

Andrew G. Mauck, Esq.
Matthew B. Kirsner, Esq.
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA 23208

Craig R. Waksler, Esq.
McGivney & Kluger, P.C.
72 Pine Street, 1st Floor
Providence, RI 02903

Bruce G. Tucker, Esq.
David B. Willis, Esq.
Legal Management Services LLC
55 Hammerlund Way
Middletown, RI 02842

David A. Crichlow, Esq.
David Goldberg, Esq.
Catherine C. McCulley, Esq.
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036

Paul M. Sanford, Esq.
Burns & Levinson LLP
One Citizens Plaza, Suite 1100
Providence, RI 02903

Christopher P. McCormack, Esq.
Pullman & Comley LLC
850 Main Street
Bridgeport, CT 06601

Gregory L. Benik, Esq.
Benik & Associates
931 Jefferson Boulevard, Suite 208
Warwick, RI 02886

Jeffrey Bromme, Esq.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, DC 20004-1206

Jeanne M. Scott, Esq.
Ursillo, Teitz & Ritch, Ltd.
Two Williams Street
Providence, RI 02903

I hereby certify that on January 29, 2008, a copy of the foregoing New England Gas Company's Emergency Response to the Court's January 9, 2008 Show Cause Order was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing.

/s/Gerald J. Petros
Gerald J. Petros

866966 (14015-126110)