# EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

GAIL CORVELLO, et al. :
:
VS. : C.A. NO. 05-221T,
: 05-274T, 05-370T,
NEW ENGLAND GAS COMPANY, et al.: 05-522T

Deposition of ERIC SUUBERG, a Witness herein, taken on behalf of the Defendant, on WEDNESDAY, MARCH 12, 2008, 9:40 A.M., at the offices of HINCKLEY, ALLEN & SNYDER, 50 Kennedy Plaza, Suite 1500, Providence, Rhode Island, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.

Vivian S. Dafoulas, RMR-CRR

50 Fieldstone Drive

East Greenwich, RI 02818-2064

(401) 885-0992



d77fa031-f6d9-483a-a540-0e056335983f

Page 58

the nature of that regulation?
A. Well, I know generally that the -- the PUC or PSC, whatever is relevant to a particular state, would hold hearings periodically to basically reaffirm the utility's right to -- to operate and to establish what was the -- the proper rate base and what rates they would be allowed to charge. They would take up matters related to the quality of performance, reliability and product quality.
Q. Okay. And how were the rates determined by the public utilities in these hearings?
MR. ORENT: Objection.
A. Well, the rates were determined on the basis of their looking at the cost base that the utility would claim and then some allowance for the fact that it was supposed to be a -- a profit-making business.
Q. All right. So it was -- they look at the cost, the actual cost of doing business, and then allow for some fair rate of return on that cost?
A. Correct.
Q. I want to talk about the coal gas process, and I think you sometimes refer to that

Page 59

as the coal carbonization process?
A. Correct. I use the two synonymously.
Q. Okay. Let's talk about the by-products of that process. You identify, I think, three primary by-products of that process in your report. The first one is coke. You sometimes call it char, correct?
A. Correct. You -- you use the term by-products. That's why I hesitated a bit as you're formulating your question. Those are the three basic products of a carbonization process. In other words, the solids, the liquids and the gases.
Q. All right. Coke is one of the products, and again you refer to coke as char sometimes, correct?
A. Correct. It depends on who's talking about the material which term is used.
Q. Okay. Coke is -- is coke a smokeless solid fuel?
A. It -- it was often sold as that. Relative to coal it was certainly a lot less prone to generation of -- of obnoxious smokes, yes.
Q. And the MGP facilities typically would either reuse the coke in the facility as fuel or

Page 60

sell it as fuel?
A. That's correct, except when you say reuse it in the facility as fuel, it could be reused as fuel or as a feedstock to another gas-making process.
Q. Was coke often burned in homes or other industry as well?
A. Absolutely. They -- they had a big business as far as I could judge from the record in selling coke out of the Fall River Gas Works.
Q. Okay. So is it fair to say that during the time period from, you know, 1914 to 1960, MGP operators did not throw away coke?
MR. ORENT: Objection.
A. Well, I'm going to have to hesitate a bit here. As you know, my report says that the -- the actual production of coke at this facility was terminated in 1948 rather than in 1960.
I'm -- I'm not sure what -- what the emphasis was in your question as far as that -- that particular date.
Q. I appreciate the clarification. Let's make it even clearer.
A. Okay.
Q. Your testimony in your report and today

Page 61

is that the coal gas process at the Charles Street Facility was terminated in 1948?
A. Correct.
Q. Okay. And using that as -- as the time frame, my point was simply that the operators of the Fall River Gas Company, like the operators of MGPs throughout the country, didn't throw away coke; they either sold it or reused it?
MR. ORENT: Objection to the form.
A. Again, you're -- you're stating it in -- in an absolute term and I would generally agree with what you're saying. Some throwing away of coke did happen as a matter of fact simply by the nature of the process where if it was mingled with ash materials or -- or clinker or something like that, some of it would get thrown away but by and large what you are saying is correct.
Q. Okay. And we'll talk about the ash process in detail in a few minutes, okay? The other -- one of the other products of the coal gas process was gas?
A. Yes.
Q. That was the whole point of the process, right?
A. Exactly.





d77fa031-f6d9-483a-a540-0e056335983f

Page 62

Q. And obviously the -- the MGP facilities sold the gas to customers?
A. Yes.
Q. Okay. And then one of the other products of the coal gas process, I think you described it as liquid tars and oils?
A. Correct.
Q. Is that correct?
A. Yes.
Q. The coal gas process produced both liquid tars and oils, correct?
A. Correct.
Q. These tars and oils generally had significant commercial value and uses, is that correct?
A. Well, again, you've inserted the word "significant" there. The -- the value of these materials would vary quite a bit over time and within that class of materials that you mentioned, there would be differing values for the oils versus the tars but it had some commercial value, yes.
Q. Okay. And during the time frame that we are talking about, we'll keep it at 1914 through 1948, okay?

Page 63

A. Okay.
Q. All right. During that time period, MGP operators typically sold or used most of the tars that they produced in this process?
MR. ORENT: Objection to the form.
A. There was -- there was certainly an incentive, economic incentive, to utilize or sell the tars but again it was always subject to the -- the constraint that you had to be able to recover it economically in order to -- to do so.
Q. Okay. Have you been able to -- strike that.
Have you gone through the records that we produced in this case concerning Fall River Gas Company to determine how much of the tar that they produced they either sold or reused for fuel in the facility?
A. Well, I think if you look in my report, there is a figure here that -- that speaks to tar make, and that is on Page 19, and that speaks to not sales but actually production volumes of -- of tar or collective volumes of tar. And so I've looked at the records with respect to tar. Brown's Directory in some years would also indicate how much of it was sold as opposed to

Page 64

just made, so I guess the short answer to your question is, yes, I've looked at some of the records regarding these -- these materials.
Q. Well, let me -- let me be a little clearer with the question then.
Are you aware of the fact that we have produced over 400 boxes of documents that relate to the Charles Street Facility?
A. I am not aware of -- of the number of boxes, no.
Q. All right. Have you gone through those boxes or any subset of those boxes to look at the documents that specifically talk about the sale or reuse of tars from the -- from the Charles Street Facility?
A. I have requested documents related to that aspect of the operation. Counsel has provided me with a subset of -- of that material. I have not personally gone through those boxes. This is the first time, as I say, I've heard that there are 400 of them --
Q. Okay.
A. -- and so I'm -- I'm now aware that there's -- there's more out there but I'm not sure that that has much of an impact on my opinions.

Page 65

Q. Well, let's find that out. The documents, the invoices or -- let me rephrase the question.
The documents that relate to the Charles Street Facility that counsel gave you, those are included in the reliance materials that you produced for us, correct?
A. I believe they -- the bibliography had all of those listed, yes.
Q. Apart from listing them, you actually produced copies of documents. You gave us two CDs with copies of the documents you relied upon. Am I correct in saying that those CDs contain the -- the documents that relate to the Charles Street Facility that you reviewed?
MR. ORENT: I'm going to object and just state for the record, counsel, we produced the CDs based on the material that Professor Suuberg had provided to us.
MR. PETROS: I assumed you did.
MR. ORENT: While -- while I don't know whether or not this is on there, these would, in fact, be materials that were produced to us by you and, in fact, are Bates labeled, so...
MR. PETROS: Jonathan, my question is

Page 74

A. I -- I didn't know what the mechanism for production or what the requirements were. It was just a logical assumption to believe that since you had given the documents, that you had them all, and I felt that I had been complete in citing what the Bates numbers I had relied upon in my report, so there wouldn't be much question there.
Q. Okay. Coke, gas, tar, those are the three main products of the coal gas process?
A. Well, you left out the oils but --
Q. Oils. I'm sorry. Tar and oils in that third category. Is it fair to say that oils like tar were also commonly either sold or reused by MGP facilities during this time frame?
A. It depended upon the situation. If they could recover the oils, they very frequently did and then did sell them if -- if they could, yes.
Q. Okay. Did they also burn them sometimes?
A. Sometimes. It depended on the nature of the material.
Q. Okay. Let's talk about, I guess, something you would probably call a by-product, coal ash and clinkers. Are they by-products of

Page 75

the coal gas process?
A. Yes. Here again, one would have to recognize that there's a lot of terminology associated with the mineral components that came in with the original coal.
Ash is typically reserved, although not always, for material that is produced in a process in which all of the carbon is burned away, and so we'll distinguish that material from that which contains some residual carbon, and clinker is a good example of where you have a mixture of ash and some residual carbon.
Q. And I appreciate that. So when you use the term "ash," you are referring to coal that has basically had all the carbon burned out of it and ash remains?
A. I'd like to think I was consistent in that. I don't necessarily guarantee I did it always throughout my report but that's -- that's the way I prefer to use the term.
Q. Okay. And when you refer to clinker, you are referring to coal that was burned but not to an extent that all the carbon was burned out and so you have ash and some carbon and that you call clinker?

Page 76

MR. ORENT: Objection.
A. It -- it also is often a sort of physical characteristic that defines it as well that it's a fused kind of a material that was knocked off the -- the insides of -- of a generator and so -- but generally speaking, it's yes, a mixture of some kind of residual carbon and -- and mineral matter.
Q. All right. So the mineral matter that looks just like the ash we talked about a second ago, it is ash, right?
A. That's not correct.
Q. Okay.
A. Mineral matter is not the same as ash. Mineral matter is what comes in with the coal and during the process of combustion, it's converted into an ash. It changes chemical composition.
Q. Okay. Let me go back and see if I understand it. When we are talking about coal where most of the carbon has been burned out of it, you are left with a residue that you call ash, correct?
A. If you have been through a combustion process such as in a boiler, that's correct.
Q. Okay. What does the ash look like?

Page 77

A. It depends on what the source of the coal is. It can look gray, it can look yellowish. I would think that given that they were more than likely here, from what I've seen, working with eastern coals, they would be -- tend to be the grayer kind of ash.
Q. What kind of coals produce the yellowish kind of ash?
A. Western U.S. coals.
Q. Okay. Does it have to do with sulfur content of the coal?
A. No, it -- it actually has to do with a lot of the different mineral components.
Q. Okay. And describe, apart from the color, sort of the physical nature of ash. Is this the kind of ash we all sort of think of as ash or is it something different? Describe it for us.
A. Well, now -- now you're talking about something that really is very much process dependent. If you were to go, for example, to Brayton Point and get the ash from that facility nowadays, it would be a very fine powdery material. That is not the nature of the ash that would have existed at the Fall River Gas Works.





d77fa031-f6d9-483a-a540-0e056335983f

blue-green color or it could be somewhat blackened by the presence of -- of tars. I've seen it described as -- as dark gray/black as well.
Q. Okay. What color was it when it was -- it came from the CWG process?
A. It's been described in literature I've seen on a continuum anywhere from sort of yellowish all the way through black but not the blue.
Q. What would make it yellowish?
A. Sulfur.
Q. Did box waste, regardless of whether it came from the coal gas process or the CWG process, typically contain significant levels of tar?
A. Again, I think we've -- we've touched upon that in a number of points today. It could contain some significant amounts of tar. That was a problem for the operators.
They normally would not want it to contain tar because that would shorten the lifetime of the material.
Nonetheless, in the presence of process upsets and things like that, it was not uncommon to encounter tars in oxide box wastes.
Q. You talked about revivification a few



moments ago. Is it correct that you could essentially continue to recycle the -- the woodchips with the iron oxide by laying them out in the manner you've described and exposing them to oxygen as long as they were not too covered with tar?
A. Well, that was one of the criteria. So I'll parse the question a bit.
Q. Go right ahead.
A. Yes, you could revivify and indeed they would very much have an incentive to do so to the extent that they could.
Tar contamination was one of the things that could end the lifetime. Cyanide formation is another thing that could terminate because that reaction wouldn't reverse in the revivification process, and then my understanding is that there would be phase changes that would take place during the processing that would render the -- the mass much more solid and impenetrable to gases. That is, that the -- the oxide coating would become sort of hard and -- and difficult for gas to penetrate and if that went too far, it couldn't be used either.
Q. Okay. When you would revivify the box



waste, was the typical process that you would basically lay it out and expose it to the air or the sun and the elements?
A. That was a typical way. At this particular plant they had a revivification platform concrete pad onto which they placed the material. I -- I think I also referred to they used bulldozers to spread it out somewhere on the site, so that was a typical way.
Was that the only way? No, there were -- there were some other plants that would revivify in situ by feeding air to the systems.
Q. You'd blow air into the system?
A. Yes.
Q. When the box waste picked up levels of tar that interfered with their performance, those levels of tars, again, are the tars we're talking about that were generated in the coal gas or in the carbureted water gas process, correct?
A. Correct. Yes.
Q. And those tars, as we talked about earlier, often contained or typically contained percent levels of PAHs in them?
MR. ORENT: Objection to the form.
A. Well, the -- the tars were very much



characterized by PAH content, yes.
Q. Okay. Do you have knowledge of the levels of cyanide that were typically present in box waste when it was disposed of after it had outlived its useful life?
A. I think I've seen reference to those numbers. As I sit here, I can't recall off the top of my head but that may be in, for example, the Harkins report or -- or one of those, but I -- I don't remember the number.
Q. Let's see if I can prod your memory. I can probably show it to you after lunch. I'll see if I can find it.
Do you recall, for example, one of the reports, it may be the Harkins report, indicating that typically the cyanide levels were at or about 7500 parts per million?
MR. ORENT: Objection.
A. That number doesn't sound unreasonable. I -- I'd have to look at it.
Q. Okay. I think you also mentioned that in your report that -- well, I'll get to that later. We'll go the other way first.
Let's talk about what MGP facilities did between 1914 and 1970. That will be the period we

Page 134

are talking about, okay?
A. Okay.
Q. Let's talk about how MGP facilities handled box waste.
A. Okay.
Q. All right. What were -- what were the common methods for handling box waste in that time frame by MGP facilities?
A. Well, I think that I cited in my report the report by Wardale that outlined a number of different approaches that were used. Quite often they were used for fill on the -- the site and other times they were disposed of in -- into dumps because they were unpleasant materials.
There was some attempt in a few cases at capturing the Prussian blue value from these materials. I'm not aware that that was attempted here at Fall River. Those are typical ways in which the material was handled.
Q. So the most common options were either to use them as fill both on-site and off-site I assume?
MR. ORENT: Objection.
A. Well, I mean I've seen a lot of reference to it being used as fill on-site. I've

Page 135

seen less reference to it being used as fill off-site.
Q. Do you recall some of the articles that you've cited in this -- in this report describing box waste as commonly being used for off-site filling purposes?
A. Well, again I -- I mentioned the Wardale article. I think he's one who particularly does say --
Q. Right.
A. -- that it is used for that purpose.
Q. Right.
A. Yes.
Q. And roadbed is one of the areas cited for as fill?
A. I believe that's one of them, yes.
Q. And the other method that was very common that you referred to was disposing of it at a dump?
MR. ORENT: Objection.
A. Disposing of it on a dump site somewhere, yes.
Q. Okay. Was that a common way to handle it?
A. Yes.

Page 136

Q. Okay. And I think the third method of handling box waste, which I think you described as being uncommon, unusual, was to sell it for somebody to extract Prussian blue from?
A. Correct.
Q. Any other methods of handling box waste during that time frame or are these the three that you are familiar with?
A. Well, those -- those are the three that I'm recalling here. Wardale, I think, split some of those categories a little bit but those -- those generally cover it.
Q. Okay. And in terms of your knowledge on that specific point we just talked about, that knowledge again, Dr. Suuberg, comes from the literature that you've reviewed?
A. Correct.
Q. Okay. Do you have Page 10 of your report available?
A. Well, I have the report right here.
Q. Okay. Third full paragraph, I think you state in your report, "Spent oxides..." And that's box waste, right?
A. Yes.
Q. "Spent oxides were commonly used as

Page 137

fill, both on MGP sites and off-site"; correct?
A. Correct.
Q. And again that's a statement based on the literature that you reviewed and some of the conclusions in that literature?
A. Correct.
MR. ORENT: Objection. Asked and answered.
Q. Were box wastes a good drying agent?
A. Again, you're -- you're asking -- when you ask drying agent -- and this goes for what you said earlier about the ash as well -- when I hear the term drying agent, I think of desiccants, materials like that, so in that regard I say no because they're not as effective as a -- as a desiccant material that I would use in my laboratory but I am interpreting your question as being can you put it into a swampy area or something like that? Well, sure you can. I mean as you could any other granular material.
Q. You talk about -- in your report, you talk about box waste at some point being banned from certain public dumps in the United States; do you recall saying that in your report?
A. Yes.

Page 210

talked about was an investigation by the state legislature and there again, there was a basis for concern that wastes from the Gas Company were in some sense contributing to despoiling the environment, and so again that's the criterion I used here.
Q. Did anyone ever sue Fall River Gas Company for discharging waste into the Bay?
A. I haven't found any -- any records of that myself. I don't know for a fact that none exist but I don't have anything here right now.
Q. Did you find any claims against Fall River Gas Company prior to 1970 relating to contamination?
A. I'm not aware of any.
Q. Let's talk about the Simpson invoices that you discuss in your report, okay? You have reviewed a number of invoices that reflect transactions between someone named John Simpson and the Fall River Gas Company, is that right?
A. To be precise, John Simpson, Jr. and Fall River Gas, yes.
Q. At least from my reading of your report, those invoices start in February of 1933 and end in 1949, is that right?

Page 211

A. I believe that's what I had found in -- in the records that were produced to me, yes.
Q. How did you obtain those records that were produced to you?
A. It's my understanding that it was production by -- by your client and through counsel I received them.
Q. Okay. Did counsel give you these documents?
MR. ORENT: Objection. Asked and answered.
A. That's the only way I -- I can get those kinds of documents in this case, yes.
Q. Did you -- did you ask counsel for certain documents or did counsel just decide to give you these documents?
A. No. At the original or the early stages of the case, I -- I made a list of -- of certain kinds of things that I would normally look at and I mentioned invoices and work orders as being part of the kinds of things that I look at.
Q. Okay. Did you mention invoices or work orders with respect to what topic or subject matter? What did you ask for?
A. Well, I don't think I cut it that fine.

Page 212

I think I said any relevant work orders or invoices.
Q. Okay. And what did you mean by relevant work orders or invoices?
A. Well, you know if -- if there was purchase of pencils and paper, I wasn't interested in that. If there were invoices for parties, I'm not interested in that. So anything that bears upon the operations of the company in terms of products being produced, by-products being produced, disposed of.
Q. Okay. And again you understand that -- you understand now at least that we produced hundreds of boxes of documents in this case. We've made them available I should say for the plaintiffs to review.
MR. ORENT: Objection. Asked and answered.
A. Well, I -- I take your word for --
Q. I'm representing that to you.
A. I'll take your word for it.
Q. Did you ask -- did you ask to receive -- to look at all of the invoices that had to do with the operation of the facility?
A. I think I made it clear that those were

Page 213

of interest to me, that is, the relevant ones as we've just characterized them.
Q. Okay. Now, some of the -- or many of the Simpson invoices that you've reviewed -- and let me be specific. I'm going to now talk about the invoices you actually cite in your report, okay?
A. Yes.
Q. And you cite a number of those invoices by listing the Bates number?
A. Yes.
Q. Okay. With respect to those invoices, some of those Simpson invoices refer to materials that Simpson hauled for Fall River Gas Company, correct?
A. Correct.
Q. Okay. Some of those invoices refer to hauling or moving ash or soot or oxide or coke or yard cleanings, correct?
A. Correct.
Q. Do any of the Simpson invoices indicate the location to which the material was hauled?
A. The -- the invoices have handwritten on them in a great many cases, "To dump."
Q. Right. The only location that's

indicated with respect to materials that were hauled off-site is -- is an indication that they were hauled to the dump?
MR. ORENT: Objection. Misstates.
A. The -- I don't know that -- again, to not cut it too fine, but there was an indication of some loading of some material onto a barge in one instance but --
Q. You're absolutely right.
A. -- but most -- but most of the invoices referred to hauling it to the dump.
Q. Okay. And that instance you referred to a second ago, there is an indication that you point out that some ash was hauled to a barge, correct?
A. As -- as I've stated, yes.
Q. Okay. Do you know what the -- what was being done with that material that was hauled to the barge?
A. No. Apart from the fact that it was -- well, let me refresh my memory here. I don't know if it specified anything further. It just said to barge. I can't find it too quickly here.
Q. Was that ash -- I'll give you a second to look first.



A. Okay. There it is. Bottom of Page 24. Invoice makes the first reference to use of a barge for hauling coke and cinders. Reference to boiler ashes. Okay. Yeah, so that -- that's all that I know about it.
Q. Yes. You actually go on to state that, "That entry makes explicit reference to boiler ashes, which makes sense, since these would be lower carbon contents and hence, have a higher sales value than high carbon clinker such as would come from the generator or producer." Did I read that right?
A. You did, yes.
Q. And why do the boiler ashes have a higher sales value than the higher carbon clinker?
A. Well, as we talked about this morning, to compound ashes with cement for concrete purposes, you can't put a lot of carbon into it, so --
Q. Okay.
A. -- on material that has the carbon burnt out, it would be inherently more valuable for them.
Q. So your expectation is these ashes are being hauled to a barge because they were being



sold for a commercial use?
A. That would be the logical explanation.
Q. Okay. So, again, going back to the invoices, the Simpson invoices, when they did indicate a location, the location they indicated was the dump?
MR. ORENT: Objection.
A. Yes. That -- that was explicitly stated throughout the invoices.
Q. Okay. By the way, John Simpson, Jr., is he deceased?
A. I believe he is, yes.
Q. You also talk about one or two invoices from the St. Pierres; is he deceased?
A. As far as I know. I mean I -- I haven't gone and tried to look him up but I would assume that if they were around, we would be hearing from them in the case.
Q. Okay. You also referred to Brito Construction and I think a person named Brito with that company. Is it your understanding that he's deceased also?
A. Well, the Brito Construction Company is very much alive. I don't know about any member of the Brito family personally.



Q. There's still a Brito Construction Company active in Bristol, Rhode Island, correct?
A. Correct.
Q. When you reviewed the Simpson invoices, did you have any other written materials that -- that told you more about the transactions described in those invoices such as dumping slip or related -- related business records?
A. No. No.
Q. Now, Dr. Suuberg, have you received any -- any special training in reading and understanding business invoices?
A. I suppose if -- if you count accounting courses that I had as part of my master's of business program.
Q. That makes you better able to read a business invoice?
A. You see them all the time.
Q. And you have several pages in your report where you -- where you set forth your opinion about the transactions being described in these invoices, is that correct?
A. Well, I describe what I see on those invoices, that's correct, yes.
Q. Okay. And sometimes you go beyond