UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

GAIL, JOHN D. and John F. CORVELLO, et al.,

                 Plaintiffs,

     v.                                C.A. No. 05-221T

NEW ENGLAND GAS COMPANY, INC.,

                 Defendant;

KEVIN BURNS, et al.,

                 Plaintiffs,

     v.                                C.A. No. 05-274T

SOUTHERN UNION COMPANY dba
FALL RIVER GAS AND NEW ENGLAND GAS,

                 Defendants;

COLLEEN BIGELOW, et al.,

                 Plaintiffs,

     v.                                C.A. No. 05-370T

NEW ENGLAND GAS COMPANY, formerly known as
FALL RIVER GAS COMPANY, an
unincorporated division of
SOUTHERN UNION COMPANY,

                 Defendants;

SHEILA REIS, et al.,

                 Plaintiffs,

     v.                                C.A. No. 05-522T

SOUTHERN UNION COMPANY dba
FALL RIVER GAS AND NEW ENGLAND GAS,

                 Defendants.

## MEMORANDUM & ORDER DENYING, IN PART, AND GRANTING, IN PART, MOTION TO RECUSE AND DENYING MOTION TO SEAL

New England Gas Company ("NEG"), an unincorporated division of Southern Union Company, has moved that this Court recuse itself from presiding over any further matters in these four consolidated cases because the Court, already, has indicated that it will recuse itself from presiding over any future trial.  In addition, the plaintiffs have moved to seal a motion and supporting memorandum that they have filed to enforce what they allege was a settlement agreement reached on April 22, 2008 between them and NEG (the "Motion to Enforce").

For the reasons hereinafter stated, the Motion to Recuse is denied, in part, and granted, in part, and the Motion to Seal is denied.

### Background

The plaintiffs are approximately 150 residents of Tiverton, Rhode Island, who allege that their properties have been contaminated by hazardous substances that NEG caused to be buried there.  In 2002, when the hazardous substances were discovered, the Town of Tiverton ("Town") imposed a moratorium on the issuance of building or excavation permits in what is referred to as the "moratorium area" until the area was remediated.

In May 2005, the plaintiffs brought these actions against NEG seeking damages and injunctive relief.  In November 2007, more than two years after these actions were brought and just before

2

discovery was scheduled to close, NEG filed third-party claims for indemnity and/or contribution against the Town and a number of business entities, claiming they were responsible for all or part of the contamination.   The Town counterclaimed against NEG, alleging that Town streets and rights-of-way in the moratorium area also had been contaminated.   Assertion of the third-party claims required postponement of the trial which had been scheduled to begin in January 2008.

Shortly thereafter, this Court bifurcated the trial into two phases. Phase I was to consist of the plaintiffs' claims against NEG and trial of that phase was scheduled to begin on April 24, 2008.  Phase II was to consist of the third-party claims by NEG and the Town's counterclaim against NEG and discovery with respect to the Phase II claims was stayed until after conclusion of the Phase I trial.

Several weeks before the Phase I trial was to begin, the plaintiffs and NEG made an effort to settle the case by participating in a mediation conducted by Professor Eric Green and, on April 3, 2008, the Court was informed that an agreement had been reached to settle the plaintiffs' claims against NEG.  One of the terms of that agreement was that NEG would underwrite the cost of remediating the plaintiffs' properties, provided that the parties could develop a remediation plan acceptable to the plaintiffs and DEM and that the cost of implementing the plan was acceptable to

NEG. Based on that "agreement," counsel for the plaintiffs and NEG requested that the Phase I trial be postponed for several months. The Court rejected that request on the ground that the purported "settlement" was nothing more than an "agreement to try to agree" that did not present a sufficient likelihood of finality to justify any further delay in resolving the plaintiffs' claims.

On April 22, 2008, counsel for the plaintiffs and NEG requested a conference with the Court at which they informed the Court that they had reached a more definitive "settlement." They described the agreement as calling for NEG to pay a specified sum of money in satisfaction of the plaintiffs' claims for damages and remediation of their properties, in exchange for which the plaintiffs would assume responsibility for the remediation work. The agreement also gave the plaintiffs the option to rescind it if the remediation costs exceeded $3 million. The Court required that the "agreement" be placed on the record and granted the parties' request to postpone the trial until late September in order to give the plaintiffs an opportunity to determine what the remediation costs would be. The Court, also, granted the parties' request that the transcript be sealed.

Although the parties apparently recognized that the Town's agreement to lift its moratorium would be necessary, there was no indication that the Town was a party to the negotiations leading to the April 22 "Settlement Agreement" and the Town did not

participate in the April 22 conference.[1]

In June, and again in September, NEG served extensive discovery requests on the third-party defendants, presumably, because it believed that the Phase I claims had been resolved and that, therefore, the order staying discovery with respect to the Phase II claims was no longer in effect.

In mid-October, the Court was informed that a dispute had arisen between the plaintiffs and NEG with respect to implementation of the April 22 "Settlement Agreement" and that no settlement had been reached with respect to the claims between NEG and the Town which, according to NEG, was a condition of the April 22 "Settlement Agreement." Consequently, the Court scheduled a conference with the counsel for the plaintiffs, NEG and the Town.

On October 22, 2008, the Court met with counsel for the plaintiffs, NEG and the Town in order to see whether there was some way to resolve their disputes. After briefly outlining the issues and referring to the possibility that a motion to enforce the April 22 "Settlement Agreement" might be made, plaintiffs' counsel expressed optimism that the issues could be resolved with the

---

[1]In summarizing the terms of the agreement as related by the parties, the Court noted that "the Town of Tiverton is not really a party at this point to the negotiations" and, again, that "but the Town is not a party yet, and we are just hopeful that you'll be able to negotiate an agreement with them, as well." April 22, 2008 Tr. at 5.

Court's help.[2]  The Court agreed that, because of its familiarity with the case, it might be able to help the parties reach agreement but that doing so "would require me to recuse myself from trying the case" but not "from hearing any motion. . . to enforce the settlement."  October 22, 2008 Tr. at 26-27.  The Court asked counsel whether, knowing that, they still wanted the Court to "try to broker some kind of an agreement."  Id. at 28.  When all counsel replied affirmatively, the Court conducted what amounted to a mediation that lasted the better part of two days.

The discussions that took place consisted of:

1.  Discussions in which the plaintiffs, NEG and the Town all participated and which dealt, primarily, with the manner in which the discussions would be conducted;

2.  Discussions in which only the plaintiffs and NEG participated which focused on what NEG maintained were the plaintiffs' obligations under the April 22 "Settlement Agreement" and discussions in which only NEG and the Town participated which focused on efforts to resolve the claims between them;

3.  Ex parte discussions between the Court and each party in which the Court explored ways in which the disputed matters might be resolved as well as the strengths and

---

[2]Plaintiffs' counsel stated "I'm optimistic that there's a way to resolve this.  But. . .  I think we need your help to do that, I really do."  October 22, 2008 Tr. at 5.

weaknesses of the positions taken by NEG and the Town with respect to their claims against one another. The Court assured the parties, in advance, that anything they might tell the Court in confidence would not be disclosed without their consent.

Although the discussions appeared to resolve the disputes between the plaintiffs and NEG, efforts to settle the claims by NEG and the Town against one another were unsuccessful. Since NEG maintained that settlement of those claims was a condition of the April 22 "Settlement Agreement," an impasse was reached which, eventually, led  the plaintiffs to file their Motion to Enforce.

### The Motion to Recuse

NEG makes two arguments in support of its Motion to Recuse. First, it argues that the Court recused itself and therefore should take no further action in the case. Second, NEG argues that, even if the Court did not formally recuse itself, it should take no further action in the case because it expressed an intent to recuse itself. Neither of those arguments is persuasive.

I.   Actual Recusal

On page two of its memorandum, NEG accurately quotes the Court as saying that it "would recuse itself from trying this case." However, in its argument, NEG cites authority for the proposition that the "trial judge who has recused himself" should not take any further action in the case.

7

That argument appears to be based on the erroneous premise that recusal already had taken place even though no recusal order had been filed.    Thus, in its memorandum, NEG asserts that, in a conference occurring on November 5, 2008, "the Court once again stated that it <u>had</u> recused itself from <u>trial</u> of the case."    NEG's Mem. at 3 (emphasis added).    Unfortunately, since the purpose of the conference was merely to ascertain whether continuing settlement negotiations between NEG and the Town had borne any fruit, it was not recorded.    However, the Court's recollection is that what it "once again stated" was that it <u>would</u> recuse itself from presiding over the <u>trial</u>.    In fact, at that conference, the Court established a briefing schedule for the Motion to Enforce.

NEG's argument also is based on the erroneous premise that the Court's statement that it <u>would</u> recuse itself from presiding over the <u>trial</u> meant that it, also, would recuse it from deciding any motion to enforce that might be filed.    That interpretation is directly contrary to the Court's statement during the October 22 discussions that, at that time, it saw no reason to recuse itself from hearing any motion that might be filed to enforce the April 22 "Settlement Agreement."

II.  <u>Intent to Recuse</u>

NEG's argument that the Court expressed an intent to recuse itself is no more convincing.    While it is true that the Court expressed an intent to recuse itself "from the <u>trial</u> of the case,"

NEG's Mem. at 2 (emphasis added), it never even suggested that it would recuse itself from any motions that might be filed.  On the contrary, the Court specifically stated that, at that time, it did not see any reason to recuse itself from deciding any motion to enforce that the plaintiffs might make.

In that respect, the decision in Moody v. Simmons, 850 F.2d 137 (3d Cir. 1988), relied upon by NEG, is readily distinguishable. In Moody, the judge did not in any way qualify his statement that he should or would recuse himself.  Here, this Court stated that it would recuse itself, only, from trying the case.

Furthermore, in Moody, the basis for recusal was the judge's belief that he and/or members of his family had dealings with one of the parties and one of the attorneys that could be viewed as affecting the judge's impartiality which, if correct, would have precluded the judge from participating in any aspect of the case. By contrast, in this case, the Court's expressed intention to recuse itself from presiding over the trial was limited to concern that any confidential information received during the October "mediation" might influence its assessment of evidence regarding disputed facts presented at trial.

III. Personal Knowledge of Disputed Facts

Although this Court finds that the arguments advanced by NEG lack merit, the Court has an obligation to independently consider whether it can properly decide the Motion to Enforce; and, if not,

whether the Court should recuse itself <u>sua</u> <u>sponte</u>.

28 U.S.C. § 455(b)(1) provides, in relevant part, that a judge must disqualify himself where the judge has "personal knowledge of disputed evidentiary facts concerning the proceeding." Recusal is not required where the knowledge was obtained through participation in the case as opposed to from an extrajudicial source. <u>Bilello v.</u> <u>Abbott Lab.</u>, 825 F.Supp. 475, 478-79 (E.D.N.Y. 1993)(collecting cases).

Knowledge obtained from statements made by a party during the course of settlement discussions in which all parties are involved, generally, is not a basis for recusal because it is viewed as knowledge obtained through the judge's participation in the case. <u>Omega Engineering Inc. v. Omega SA</u>, 432 F.3d 437, 447-48 (2d Cir. 2005). Otherwise, although Fed. R. Civ. P. 16 encourages judges to take an active role in the settlement of civil lawsuits, a judge who did so would be precluded from continuing to hear the case. See <u>Garrett v. Delta Queen Steamboats Co.</u>, 2007 WL 837177 at *3 (E.D. La. March 14, 2007). However, although the Court has been unable to find any authority directly on point, when the knowledge is obtained through a confidential <u>ex</u> <u>parte</u> communication made to the judge during the course of settlement discussions, it seems difficult to characterize the information as being obtained during the course of a judicial proceeding. Exposure to such information also creates a risk that the information might influence the

judge's determination with respect to some disputed fact in a way likely to be unfair to one of the parties.[3]

Consequently, the question, here, is whether, during _ex parte_ discussions with any of the parties, the Court obtained knowledge of any "disputed evidentiary facts" concerning the Motion to Enforce.  In attempting to answer that question, the Court is handicapped by: (1) not knowing what evidentiary facts may be presented or disputed during proceedings relating to the Motion to Enforce, and (2) not having a clear memory of everything that was presented during the _ex parte_ discussions.[4]

Although the Court cannot recall the presentation of any information regarding "evidentiary facts" that are unlikely to be both material to and disputed during proceedings on the Motion to Enforce, the Court has no way of definitively determining that. Therefore, in order to eliminate any possibility of unseemly disagreements between the Court and counsel regarding what was or was not said during the _ex parte_ discussions; and, in order to allay any concern by the parties that the Court might have received information that could influence its decision with respect to the

---

[3]If the information were unfavorable to the party making the disclosure, that party would be penalized for making what it believed to be a confidential disclosure to facilitate settlement.  On the other hand, if the information were unfavorable to the adverse party, the fact that it was made _ex parte_ would prevent that party from attempting to rebut it.

[4]In order to encourage the parties to speak frankly, no record was made of those discussions.

Motion to Enforce the April 22 "Settlement Agreement," the Court will recuse itself from hearing that motion.

The Court, also, will formally recuse itself from participating in any trial of this matter and from any further proceedings except for other motions that currently are pending, namely, the Motion to Seal and the third-party defendants' motion to sanction NEG for propounding discovery requests while Phase II discovery was stayed.

More specifically, the Court finds that recusal is neither required nor appropriate with respect to the Motion to Seal because, while it is conceivable that information presented during the ex parte "settlement discussions" in October may have some bearing on disputed evidentiary facts concerning the Motion to Enforce, such information clearly would have no bearing, whatever, on the Motion to Seal. Similarly, there is absolutely no connection between anything that may have been said during the ex parte discussions in October and any sanctions that should be imposed on NEG for violating the stay of Phase II discovery.

## The Motion to Seal

The Motion to Seal asserts that the Motion to Enforce deals with confidential information regarding the April 22 "Settlement Agreement." Although the Motion to Seal was filed by the plaintiffs, it is, now, apparent that they filed it only because the order sealing the April 22 transcript was still outstanding and

because NEG threatened to sue plaintiffs' counsel for disclosing "confidential" settlement information if they did not file their Motion to Enforce under seal.

NEG has filed a memorandum in support of the Motion to Seal in which it argues that "all papers and proceedings" relating to the Motion to Enforce the April 22 "Settlement Agreement" should be sealed in order to "avoid the disclosure of material non-public information of Southern Union Company (a public company), avoid tainting any potential jury pool with the revelation of settlement negotiation figures and terms, and avoid undermining the sanctity of settlement communications. . ." NEG's Mem. at 3. Alternatively, NEG argues that if the Motion to Seal is denied, the Court should "seal (or redact) that part of the filings reflecting the purported settlement amount, as well as any discussion in the parties' papers related thereto." Id. at 7.

In making its argument, NEG relies on what it describes as the parties' agreement not to disclose their settlement negotiations and the fact that the Court sealed the April 22 transcript and treated the October "settlement discussions" as confidential.

I.   The Presumption in Favor of Disclosure

It is well established that, as a general rule, documents filed with a court in connection with a pending case are public records; that proceedings conducted in a case are open to the public and that the evidence in such proceedings should be

presented in open court.  See Nixon v. Warner Commc'n Inc., 435
U.S. 589, 597, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978)
(recognizing common-law right of access to judicial records);
F.T.C. v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 412-13 (1st Cir.
1987)(referring to presumption of public's right to see "documents
which properly come before the court in the course of an
adjudicatory proceeding"); Citizens First Nat. Bank of Princetown
v. Cincinnati Ins. Co., 178 F.3d 943, 944 (7th Cir. 1999)(requiring
"good cause" for sealing documents because "[t]he parties to a
lawsuit are not the only people who have a legitimate interest in
the record compiled in a legal proceeding").

It is true that there are exceptions to the general rule that
permit documents to be sealed where there is a compelling reason
for doing so.  See, e.g., Gambale v. Deutsche Bank AG, 377 F.3d
133, 140 (2d Cir. 2004) (Documents related to court's adjudication
process may remain under seal if there are compelling reasons).
However, NEG has failed to present any such compelling reason.

NEG's assertion that sealing is necessary to "avoid disclosure
of material non-public information of Southern Union Company (a
public company)" begs the question as to whether, under these
circumstances, the April 22 "Settlement Agreement" is "nonpublic"
information.  Nor does NEG explain how Southern Union or
"prospective investors" would be harmed by the disclosure of
information regarding the measure of its potential liability in a

pending lawsuit.  Indeed, that is the kind of information that a public company must include in the periodic disclosure reports it is required to file with the Securities and Exchange Commission (SEC) and, it appears that, in a Form 10-Q that Southern Union recently filed with the SEC, the company stated its belief that "the final disposition of these proceedings will not have a material adverse effect" on the company's financial position.

It is true that if the Motion to Enforce is denied; the "Settlement Agreement" is widely publicized; and the case goes to trial it may be more difficult to empanel an impartial jury; but, at the present time, there is no way of knowing whether those possibilities will materialize.  This case involves a matter that is of considerable interest to residents of the Tiverton area but, unlike a high profile criminal case, it may not be closely followed by residents of other parts of the State.  In any event, while the potential difficulty of empaneling an impartial jury should not be minimized, it is not sufficient, by itself, to overcome the strong presumption that documents filed with the Court and proceedings conducted by the Court, generally, should be open to the public.

II.  <u>Confidentiality</u>

    A.    <u>The April 22 "Settlement Agreement"</u>

In this case, neither the previous issuance of a sealing order nor the confidentiality ordinarily accorded to settlement negotiations and agreements is sufficient to overcome the

15

presumption of openness because proceedings have been brought to enforce an alleged agreement.

Settlement agreements rarely are filed with a court; and, in most cases, their terms are not even disclosed to the court because they are negotiated by private parties who have agreed to keep them confidential and the case is terminated by filing a simple dismissal stipulation. In a case like this one, where the "settlement" is reached on the eve of trial and the "settled" claims cannot be terminated by a dismissal stipulation because the settlement is conditioned upon the occurrence of some future event, a court may require disclosure in order to determine whether there is sufficient justification for postponing the trial. Nevertheless, even where such disclosure is required, courts, ordinarily, are amenable to granting a request to seal the portion of the record reciting the terms of the settlement because they recognize that the prospect of forced disclosure may deter the parties from reaching an agreement. See, e.g., City of Hartford v. Chase, 942 F.2d 130, 135 (2d Cir. 1991)("[F]ederal judge has the power to prevent access to settlement negotiations when necessary to encourage the amicable resolution of disputes").

However, like any other order, an order sealing that portion of the record dealing with settlement negotiations or the terms of a settlement agreement may be reconsidered if changed circumstances or a public interest in disclosure are found to outweigh the

16

justification for confidentiality.  See, e.g., Poliquin v. Garden Way, Inc., 989 F.2d 527, 535 (1st Cir. 1993) (acknowledging that the court's power to terminate protective order "provides a safety valve for public interest concerns, changed circumstances or any other basis").[5]  Here, there has been a dramatic change in circumstance in that the terms of the "settlement" and its very existence have become the subject of an adversarial proceeding between the parties.  Thus, the Court no longer is dealing with an agreement reached between the parties that they wish to remain private; but, rather, it is dealing with a disputed matter that is being submitted to the Court for resolution and, therefore, should be treated like any other disputed matter.

It is well established that a settlement agreement is a type of contract and that a party alleging a breach of a settlement agreement may seek redress by bringing a civil action; or, where an action is pending, by moving to enforce the alleged agreement. See, e.g., Malave v. Carney Hosp., 170 F.3d 217, 220 (1st Cir. 1999)("A party to a settlement agreement may seek to enforce the agreement's terms when the other party reneges" or, if the "case

_____

[5]In civil cases where the parties request a protective order because they are concerned that, during discovery, proprietary information or trade secrets may be revealed, this Court includes in its standard protective order a provision that "[a]ny order authorizing the filing of documents or information under seal or prohibiting the disclosure of information, shall be subject to review at the request of any party, any member of the public, or the Court sua sponte."

already has been dismissed, the aggrieved party may bring an independent action for breach of contract"). There is no more reason for sealing the terms of the settlement agreement on which the action is based than there would be for sealing the terms of any other agreement that is the subject of a breach of contract action. Put another way, once the alleged settlement agreement becomes the subject of an adversary proceeding, it moves from the realm of a confidential understanding between the parties and into the public arena where all other litigation is conducted. Herrnreiter v. Chicago Hous. Auth., 281 F.3d 634, 636-37 (7th Cir. 2002) ("A settlement agreement is a contract, and when parties to a contract ask a court to interpret and enforce their agreement, the contract enters the record of the case and thus becomes available to the public, unless it contains information such as trade secrets that may legitimately be kept confidential.")

The fact that the parties may have agreed to keep their settlement negotiations confidential does not provide any additional support for NEG's argument that documents and proceedings relating to the April 22 "Settlement Agreement" should be sealed. NEG does not claim that the plaintiffs agreed to maintain confidentiality even if an agreement were reached and NEG breached it. Nor does it make any sense to suggest that such a promise should be implied. Thus, it is not surprising that NEG has failed to cite any case brought to enforce a settlement agreement

18

in which the court sealed the agreement or evidence relating to it. Furthermore, in those cases of which this Court is aware, the alleged agreement has been part of the public record. <u>See, e.g.</u>, <u>Herrnreiter</u>, 281 F.3d at 637.

Even if a case could be made for sealing the "papers" filed in connection with the Motion to Enforce, it is difficult to see any justification for sealing the "proceedings." Since NEG acknowledges that an evidentiary hearing will be required, sealing the proceedings, presumably, would require closing the courtroom during the hearing. Such an extreme measure would be justified only under "exceptional circumstances" that do not exist in this case. <u>See</u> <u>Wilson v. Am. Motors Corp.</u>, 759 F.2d 1568, 1570 (11th Cir. 1985) ("absent some exceptional circumstances," civil trials are public proceedings). The absence of any justification for closing the courtroom also makes it difficult to see what purpose would be served by sealing documents that refer to matters that, in any event, will be subject of evidence and/or argument presented during a public hearing.

B.   <u>The October Discussions</u>

NEG argues that sealing also is necessary to prevent disclosure of "confidential" information revealed during the October discussions but, it is difficult to see how that could occur. As already noted, the October discussions consisted of:

1.   Discussions in which the plaintiffs, NEG and the Town all

participated and which dealt, primarily, with the manner in which the discussions would be conducted;

2.   Discussions in which only the plaintiffs and NEG participated which focused on what NEG maintained were the plaintiffs' obligations under the April 22 "Settlement Agreement" and discussions in which only NEG and the Town participated which focused on efforts to resolve the claims between them;

3.   <u>Ex</u> <u>parte</u> discussions between the Court and each party in which the Court explored ways in which the disputed matters might be resolved as well as the strengths and weaknesses of the positions taken by NEG and the Town with respect to their claims against one another.  The Court assured the parties, in advance, that anything they might tell the Court, in confidence, would not be disclosed without their consent.

Since the discussions in which the plaintiffs and NEG participated dealt with interpretation of the April 22 "Settlement Agreement," those discussions would have little bearing on whether that "agreement" is enforceable.  The terms of that "agreement" were recounted to the Court in April and could not be altered by anything that the parties may have said six months later regarding their interpretation of those terms.  In any event, any information presented or any arguments made during those discussions as to why

20

the April 22 "Settlement Agreement" is or is not enforceable, undoubtedly, will be presented in connection with the Motion to Enforce even if the Motion to Seal is granted.

The discussions between NEG and the Town also would be irrelevant to the enforceability of the April 22 "Settlement Agreement" because those discussions dealt with the claims by NEG and the Town against one another. Furthermore, under the ground rules established for those discussions, the Town is bound not to disclose anything that NEG may have said.

Finally, there is no chance that any information communicated to the Court during the <u>ex parte</u> discussions will be disclosed because the Court assured each party that such information would not be revealed without that party's consent.

III. <u>Redaction</u>

NEG's fallback position is that the Court should seal or redact at least those portions of the documents and proceedings that refer to the amount that it agreed to pay as part of the alleged settlement and/or any settlement discussion in which that amount was mentioned, but there does not appear to be any practical way in which this could be accomplished. Since the amount of the purported settlement is an integral part of the alleged agreement, it would be virtually impossible to separate that evidence from other evidence bearing on whether an enforceable agreement was reached. Casting the Court in the role of censor would present

difficulties in drawing the fine lines required to separate evidence regarding the amount that NEG agreed to pay from evidence regarding the other terms of the agreement and it would result in the additional burden and distraction of resolving the disputes that inevitably would arise as to where those lines should be drawn.

In addition, the Court likely would find itself on the slippery slope of attempting to decide whether other terms of the alleged agreement, such as the "cap" on remediation costs, and/or the evidence relating to those terms should be excluded from the public record, as well.

Even if the Court were inclined to take detours to deal with such side issues, the result, undoubtedly, would be a truncated record presenting a distorted picture of the proceeding that could undermine public confidence in any decision that the Court might make with respect to the Motion to Enforce.

IV.  The Request for a Stay

NEG concludes its memorandum in support of the Motion to Seal with a request that, if the Court denies the motion, "disclosure of the confidential information" be stayed to permit NEG to appeal.

A party seeking a stay pending appeal must demonstrate "a strong likelihood of success on the merits of its appeal; that he will suffer irreparable harm if a stay is not granted; that the harm will outweigh the harm any opposing parties will suffer if a

stay is granted; and that the public interest would be furthered by the granting of a stay." <u>In re Power Recovery Sys. Inc.</u>, 950 F.2d 798, 804 n.31 (1st Cir. 1991).   Failure to satisfy even one of those requirements justifies denial of the stay.   <u>Id.</u>

In this case, NEG has failed to satisfy all four requirements. For reasons already explained, it has not established a strong likelihood of success on either the Motion to Seal or the Motion to Enforce.   Its opposition to the Motion to Enforce is based, primarily, on its assertion that the April 22 "Settlement Agreement" was contingent upon settlement of the claims between NEG and the Town but; as related to the Court, that "agreement" did not contain any such condition.   Moreover, NEG's actions in propounding discovery to the third-party defendants in June strongly suggests that NEG, itself, considered the plaintiffs' claims settled at that time.

Nor has NEG come close to showing that it will suffer irreparable harm if a stay is not granted.   There is nothing confidential about the fact that NEG has been sued or that the Phase I trial was postponed because a settlement had been or was being negotiated.   Until now, there were legitimate reasons for keeping the terms of the alleged settlement confidential but, because the alleged "agreement" has become the subject of litigation between the parties, those reasons have evaporated. Moreover, any harm that NEG might sustain if the stay is denied is

greatly outweighed by the harm that the plaintiffs will suffer if a stay is granted.   Hazardous substances were discovered on the plaintiffs' properties more than six years ago and no remediation of those properties has yet begun.   Plaintiffs' counsel has stated that it has commitments from contractors to perform the remediation work for a price that makes the "agreement" viable and further postponing resolution of the matter may cause those commitments to be withdrawn and/or escalate the remediation costs.   Granting a stay will delay resolution by putting the Motion to Enforce the April 22 "Settlement Agreement" on hold until the Court of Appeals has an opportunity to review the record and hear the arguments of counsel, and the fact that NEG's proposed appeal is unlikely to succeed coupled with NEG's failure to demonstrate that it will suffer irreparable harm if a stay is denied preponderate against granting a stay.

Finally, it is difficult to see how granting a stay will further the public interest.   On the contrary, the public, and especially the residents of Tiverton, have a strong interest in knowing the status of this case and seeing that its resolution is expedited.

## Conclusion

For all of the foregoing reasons, it is hereby ordered as follows:

1.   NEG's Motion to Recuse is denied with respect to:

A.   The plaintiffs' Motion to Seal;

B.   The third-party defendants' motions to sanction NEG for propounding discovery requests while third-party discovery was stayed, which this Court already has heard, in part.

2.   NEG's Motion to Recuse is granted with respect to any future proceedings in these cases and the Court will recuse itself from participating in any such proceedings and it directs that these cases be reassigned to another judge.

3.   The plaintiffs' Motion to Seal is denied and, since the April 22 transcript deals solely with the terms of the disputed "Settlement Agreement" that is the subject of the plaintiffs' Motion to Enforce, the order sealing that transcript is hereby vacated.

4.   Since the discussions on October 22 and 23 involved discussions of issues other than the stated terms of April 22 "Settlement Agreement" (e.g., settlement of the claims between NEG and the Town), the transcript of the portion of those discussions that was recorded will remain under seal until further order; provided, however, that neither the plaintiffs nor NEG shall be precluded from presenting any relevant evidence in connection with

proceedings on the Motion to Enforce simply because such evidence may deal with a subject that was discussed at that time.

By Order

Deputy Clerk

ENTER:

Ernest C. Torres
Senior U.S. District Judge

Date: December 16, 2008

26